CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                  :
WENDELL HARP and ARCHITECTS
ENVIRONMENTAL COLLABORATIVE       :
INTERNATIONAL, P.C.,
                                  :
            Plaintiffs,
                                  :  Civil Action No.:
       vs.                           303CV00977 CFD
                                  :
JOHN DeSTEFANO, CITY OF NEW
HAVEN and NEW HAVEN BOARD OF      :
EDUCATION,
            Defendants.           :

- - - - - - - - - - - - - - - - - x

       Deposition of WENDELL HARP, taken

pursuant to the Federal Rules of Civil

Procedure, at the law offices of Brenner,

Saltzman & Wallman, LLP, 271 Whitney Avenue,

New Haven, Connecticut, before Dawn DeNardis,

a Notary Public in and for the State of

Connecticut, on Friday, May 27, 2005, at

10:36 a.m.

SCRIBES, INC.

1  International, PC.
2       Was the certificate of incorporation for AECI
3  given to any of the defendants previously to today?
4       A.   I don't know.
5       Q.   Do you have any knowledge that it was given
6  to any of the defendants previously to today?
7       A.   I don't recall it being given. It might have
8  been. I just don't recall.
9       Q.   And if it had been given -- when you say it
10 might have been given, to which defendant would it have
11 been given to?
12      A.   Oh, I mean the New Haven Board of Education.
13 I don't know. I mean, you're saying at any time or --
14      Q.   At any time, yes.
15      A.   I don't know.
16      Q.   You don't know if this AECI certificate of
17 incorporation was given to the New Haven Board of
18 Education; is that correct?
19      A.   That's correct.
20      Q.   And the bylaws for AECI and any amendments or
21 modifications thereof, did you bring those here today?
22      A.   No, I didn't.
23      Q.   And those are the subject of your Motion for
24 Protective Order, as well; is that correct?
25      A.   I believe they're covered in it.

1   A.   I don't know for a fact, but I believe that
2   they were done, but I don't know for a fact.
3   Q.   And if AECI did have bylaws, would you have
4   possession of them?
5   A.   Yes, I would, if they did.
6   Q.   Does -- Item Number Three is the minute book
7   for AECI.  Did you bring that here today?
8   A.   No, I didn't.
9   Q.   And does AECI have a minute book?
10  A.   I -- I don't know.  I think that there might
11  be -- I think there might be annual, like, consent of
12  shareholders or something.  But I'm not sure if that's
13  the same as a minute book.
14  Q.   Do you know what the contents of the AECI
15  minute book would be, if it had a minute book?
16  A.   If so, it would be covered by a protective
17  order.
18  Q.   Well, there's been no protective order
19  entered at the moment.  I know this is the subject of
20  your protective order, but -- and the production is
21  what's the subject, but I'm just trying to figure out
22  what the contents of the AECI minute book is.
23       And let me ask my question a little bit
24  differently.  It is my understanding that you do not
25  know if AECI has a minute book; is that correct?

SCRIBES, INC.

1   A.   That's correct.
2   Q.   Okay. And so therefore, you do not know what
3   the contents of that minute book would be; is that
4   correct?
5   A.   That's also correct.
6   Q.   Number Four, "All minutes of AECI Board of
7   Directors Meetings at which the New Haven Prince-Welch
8   School was mentioned or discussed."
9        Did you bring any documents responsive to
10  that request today?
11  A.   None exist, to my knowledge. I don't believe
12  so.
13  Q.   Does AECI have directors?
14  A.   It has myself.
15  Q.   You're the sole director?
16  A.   Yes.
17  Q.   And does AECI director -- do you have
18  meetings, board of director meetings?
19  A.   Do I have meetings?
20  Q.   In the capacity as a director.
21  A.   If there are requirements for performing
22  certain annual corporate filings, then yes, that would
23  be the case. For instance, filing for an annual
24  report, or maybe biannual, would be done by me as a
25  director.

SCRIBES, INC.

```
 1                a.m.)
 2       Q.   This is going to be all documents that are
 3  responsive to Item Seven in the Notice of Deposition,
 4  Defendants' 2, together with Defendants' Exhibit 5,
 5  because you're saying both those categories of
 6  documents are responsive, correct, Mr. Harp?  The ones
 7  that we're now marking as Six, the ones that we marked
 8  as Five, they're all responsive to Item Seven in
 9  Defendants' 2?
10       A.   Yes.
11            (Documents Responsive to Item Seven in
12            Defendants' 2 marked Defendants' Exhibit 6
13            for identification)
14       Q.   If you can look on Item 8-A.  "All documents
15  concerning the New Prince-Welch School in Plaintiffs'
16  custody or control, including without limitation:  All
17  documents, including e-mails, notes of meetings or
18  telephone calls, minutes of meetings, letters
19  concerning any communication between, one, either or
20  both Plaintiffs, and two, any of the Defendants."
21       A.   That would be included in there also.
22       Q.   That's included in Defendants' Exhibit 6?
23       A.   Yes.
24       Q.   Okay.  And reading 8-B, "All documents,
25  including e-mails, notes of meetings or telephone
```

1  calls, minutes of meetings, letters concerning any
2  communication between, one, either or both Plaintiffs,
3  and two, any of the following:"
4         And then there's a list B-1 through B-37.
5  Can you tell me what documents are responsive to that?
6       A.  They're segregated by category, right?  So if
7  you choose a category, I'll tell you.
8       Q.  Can you explain that.  First of all, you're
9  referring to Defendants' Exhibit 6, right?
10      A.  Right.  What I'm saying is that there is a --
11      Q.  They're tabs?
12      A.  They're tabs.  And the tab will tell you, for
13 instance, whether or not it's a communication to the
14 Board of Education, or it's a communication to a
15 consultant, or it's a communication to their project
16 minute meetings, which would include, for instance,
17 SBB -- the small -- what do you call it?
18         MS. WEISSELBERG:  School Based Building
19      Advisory --
20         MS. KONE:  You're not allowed to do
21      that.
22         THE WITNESS:  Thank you.
23      A.  The School Based Building Advisory Committee,
24 which is a compilation of city officials, neighborhood
25 residents, and any other affected parties would be

1  included within here.
2  Q. Okay. So it's all with -- the documents
3  requested in Item 8-B are contained in Defendants'
4  Exhibit 6 that you have?
5  A. Yes.
6  Q. And I'm referring to 8-B of Defendants' 2.
7     Okay. Turning to 8-C of Defendants' 2, have
8  you brought those documents today?
9  A. Yes, I have.
10 Q. And where are those documents?
11 A. They'd be reflected right here, under the tab
12 that says "Minutes."
13 Q. And you're referring to the tab that says
14 "Minutes" as part of Defendants' Exhibit 6?
15 A. That's correct.
16 Q. And 8-D, did you bring any newspaper or
17 magazine articles and/or editorials concerning the New
18 Prince-Welch School?
19 A. Those that I have, which are identified as
20 8-D.
21 Q. And we will mark -- by that, you mean there's
22 an orange Post-It on one, two, three -- six pages with
23 an orange Post-It on it, is that 8-D?
24 A. Yes.
25    MS. KONE: And that will become

1    the running of the --
2         A.   No.
3         Q.   And who is your attorney?
4         A.   Roy Debarbieri.
5         Q.   And are you an employee of AECI?
6         A.   Am I an employee of AECI?
7         Q.   Are you paid a salary for which withholding
8    is made?
9         A.   Yes, yes.
10        Q.   Now -- yeah, go on.
11        A.   It depends upon the year, and certainly, my
12   accountant would typically handle that.  You know, we
13   would review it depending upon the circumstances of
14   activity of the business.
15             In some years, I am; and in some years, it's
16   been more consultant, so -- and I'm sorry, some years
17   it's been more just simply income.
18        Q.   Okay.  Did you -- let me just make sure I
19   understand.  During certain years, you're paid as an
20   employee of AECI --
21        A.   Well, a combination of both, because
22   actually -- I'm sorry for interrupting you.
23        Q.   No, no, you tell me.
24        A.   A combination of both.  Both as employee and
25   also taking income strictly as the sole shareholder.

1   Q.   Okay. So let me -- does whether or not
2   you're an employee of AECI depend on the level of
3   architectural activity being conducted by AECI? In a
4   year in which you had more work, you might be an
5   employee; is that correct?
6   A.   That's correct.
7   Q.   And are you married?
8   A.   Yes, I am.
9   Q.   And is your wife Toni Harp?
10  A.   Yes, she is.
11  Q.   And is she employed?
12  A.   Yes, she is.
13  Q.   What is her job?
14  A.   She's a state senator, and she's also the
15  director of a program at the Hill Health Center.
16  Q.   Does she perform any services for AECI?
17  A.   No.
18  Q.   Has she ever?
19  A.   No.
20  Q.   Does she have anything to do with the
21  management or running of AECI?
22  A.   Never.
23  Q.   Does -- let me go through and starting in
24  1997, can you tell me who were the employees of AECI?
25  A.   To the extent that I can recall?

```
 1       Q.   Yes, to the best of your recollection.
 2       A.   George Bumbray.
 3       Q.   And can you spell his last name?
 4       A.   B-u-m-b-r-a-y.
 5       Q.   And his -- what was his position?
 6       A.   He would have been a designer, architectural
 7  designer.
 8       Q.   Would he have been paid salary or would he
 9  have been paid on an hourly basis?
10       A.   Probably salary.
11       Q.   And was he full time?
12       A.   Yes.
13       Q.   And just approximately, how much would his
14  salary have been?
15       A.   I don't recall.
16       Q.   Okay.  And who were the other --
17       A.   Charles Ahlstrom.
18       Q.   And what would his position have been?
19       A.   He was in charge of contract documents.
20       Q.   What does that mean?
21       A.   It means that he's responsible for overseeing
22  the preparation of what we call working drawings and
23  specifications.
24       Q.   Okay.  Is he an architect by training?
25       A.   Yes, he is.
```

1   name to save my life.
2   Q.  And Ron's position?
3   A.  He's an architect.
4   Q.  And he was paid by salary or independent
5   contract?
6   A.  He was paid by salary.
7   Q.  And how much was his salary?
8   A.  I think it's probably like 50 to $60,000, but
9   I'm not -- it would be in that ball park.
10  Q.  Okay.  Anybody else you can recall right now?
11  A.  (No response)
12  Q.  No; is that correct?
13  A.  There's someone that I'm missing but I
14  can't --
15  Q.  Well, if you remember, you'll tell me?
16  A.  Okay, yes.
17  Q.  Now, from '97 to 2000, when you were paid as
18  an employee, do you recall which years you were paid as
19  an employee?
20  A.  No, I don't.
21  Q.  And when you were paid as an employee, what
22  would your salary have been?
23  A.  I don't know.  That, I would have to ask my
24  accountant.  That's -- it was more a tax issue.
25  Q.  Okay.  You have no recollection, but your

1  accountant would know?
2      A.    Yes.
3      Q.    And who's your accountant?
4      A.    Gene Esares.
5      Q.    Can you spell that.
6      A.    E-s-a-r-e-s.
7      Q.    E-s-a-r-e-s.
8            And the first name?
9      A.    Eugene.
10     Q.    Eugene.
11           And would your pay be reflected on any
12 financial records?  Would it be in your tax returns?
13     A.    Tax return.
14     Q.    Okay.  And did AECI file a tax return itself?
15     A.    Yes, it did.
16     Q.    And the years you were paid profit, do you
17 recall which years, between '97 and 2000, you were paid
18 profit, or paid, you know, as an owner?  I don't
19 mean -- I used the wrong word.  I'm sorry.  Paid as an
20 owner or as a shareholder from AECI?
21     A.    I -- I don't recall which, you know.  But I'm
22 pretty sure the laws -- I'm not sure, but it would be
23 something that he would determine based upon making
24 sure that you comply with, like, Social Security
25 withholdings and other things.

```
 1      Q.   And would that also be on -- would that be on
 2   the AECI tax return?
 3      A.   Yes, it would be.
 4      Q.   On your own tax --
 5      A.   On my personal tax return.
 6      Q.   Okay.  Would Mr. Esares also have the records
 7   of, like, withholding taxes or Social Security paid for
 8   your employees?
 9      A.   I don't know about that.
10      Q.   Does he do that work for you, or does someone
11   else do that?
12      A.   Typically the bookkeeper would have done
13   that.
14      Q.   Do you have an independent bookkeeper or do
15   you have someone on staff that's a bookkeeper?
16      A.   Well, we have someone on staff.  That
17   particular person is no longer with us.
18      Q.   You used to have someone?
19      A.   Yes.
20      Q.   And the name of that person?
21      A.   Jackie Hanhurst.
22      Q.   And can you spell that?
23      A.   H-a-n-h-u-r-s-t.
24      Q.   And you currently do not have a bookkeeper;
25   is that correct?
```

1    staffing was?

2    A.  I can't tell you anything other than what I
3    just did.  I don't know how it differed, you know, if
4    it differed.

5    Q.  So, the testimony you gave me, you said these
6    were the people who worked for you between '97 and
7    2000, and I'm just trying to figure out who worked for
8    you between 2000 and 2003.

9    A.  Okay.  I would say basically George Bumbray
10   would not have been there.

11   Q.  Okay.

12   A.  Jorge Machado would not have -- well, he
13   might have been there part of the while.  All the other
14   people would have been there.  There's one other person
15   I mentioned that I could not think of her name.

16   Q.  And in terms of the staffing of this project,
17   Prince-Welch, the actual staffing that you did, the
18   first -- you started to tell me this before, the Site
19   Selection/Education Program you said was going on
20   pretty much simultaneously in terms of work.  Who from
21   your staff worked on that aspect?

22   A.  On site selection?

23   Q.  Right, and education program.

24   A.  Well, I was a primary person, and there'd be
25   people who would do various activities in the office.

1  Q. So they wouldn't necessarily be working full
2  time until the latter phases of the period --
3  A. I think they would be working full time. I
4  think they may be working more kind of overtime, as we
5  approach a deadline date.
6  Q. The -- what other projects, during this 1997
7  through 2003 period, other than the Prince-Welch
8  School, was ACI working on?
9  A. I think that was it.
10 Q. But you told me they were working on a New
11 Britain school. Was that -- what period of time was
12 that?
13 A. I think, and I'm not positive --
14 Q. Sure.
15 A. -- but I believe we started -- I believe we
16 started in 2002.
17 Q. And when did the New Britain school --
18 A. It opened last year.
19 Q. So you worked from 2002 to 2004 on that
20 project?
21 A. Yes.
22 Q. And what was the size of your contract for
23 that project?
24 A. Ball park, I think like $800,000.
25 Q. Now, the contract document drafting stage,

SCRIBES, INC.

1  yet.

2     Q.   What positions would they have held; you

3  know --

4     A.   They would have both been architects.

5     Q.   And would they have also devoted 20 to 25

6  percent of their time?

7     A.   No.  Their time would be much more intense.

8  It would be -- one certainly would be full time.

9  Probably both would be full time, you know.

10    Q.   So the only period of time that I'm just not

11 sure was the working drawings, just trying to figure

12 out during that five-month period approximately how

13 much time you personally might have spent doing that.

14    A.   Well, I thought I told you about 25 percent.

15         MS. KONE:  Okay.  We should eat, right?

16         Take a break and eat.  Everyone's sort of

17         fading.

18         (Recess taken from 1:17 p.m. to 1:54

19         p.m.)

20    Q.   Mr. Harp, what kinds of financial reports

21 since 1997 has AEIC generated?

22    A.   What do you mean?

23    Q.   Do you -- do they do general ledger, do you

24 do cash flow statements?

25    A.   We just do our tax returns, no.

SCRIBES, INC.

1    Q.   And do you have any way of telling or
2    segregating by project, AECI, what the income and
3    expenses are for a particular project?
4    A.   I mean, we can do it by simply going through
5    and segregating out costs, to the extent that the
6    records exist for that period of time.
7    Q.   Have you ever done it for the Prince-Welch
8    School, segregated out the costs --
9    A.   No.
10   Q.   -- and compared it to the income?
11   A.   No.
12   Q.   And where are the records of the costs kept,
13   how do you keep those records?
14   A.   We really don't keep them like that.  I mean,
15   typically, we just do our tax statements, so we don't
16   segregate out the cost by project, per se.
17   Q.   So the tax statement would show the overall
18   costs for the AECI firm for a particular year?
19   A.   Right.  That's -- just shows income and
20   expenses.
21   Q.   Do you have any idea on the work that you did
22   do on the Prince-Welch School what your profit was on
23   that work?
24   A.   Not off the top of my head.
25   Q.   Could you figure that out?

1    A.    You're saying is it possible to figure that
2  out?
3    Q.    Could you figure it out, yeah.
4    A.    You're not asking at this moment, are you?
5    Q.    Correct, I'm not asking --
6    A.    Okay.  I imagine it could be done but --
7    Q.    And how would you go about doing that?
8    A.    I don't know.  I mean, you know, you -- I
9  don't know.  I'd have to sit down with the accountant
10  and see, to the extent that we have records there, how
11  we would come up with what would be profit, which --
12  and not only that, but what the classification of
13  profit is.  I'm the sole owner.  So I guess what I'm
14  saying is that even monies that would be paid to me
15  then, would that be profit or would that be a
16  service --
17    Q.    Assuming that it was considered profit, not
18  cost.  And so you took out your payments, whether as an
19  employee or as a shareholder?
20    A.    Right.
21    Q.    Could you figure out --
22    A.    That's a question to me?  I mean, the
23  accountant would have to -- I would have to ask the
24  accountant to do that.
25    Q.    And sitting here today, do you have any idea

SCRIBES, INC.

1   what the profit was?
2       A.   No.
3       Q.   How about on the New Britain school, do you
4   have any idea what profit you made on that school?
5       A.   No, I don't.
6       Q.   Do you think there's a difference in the
7   profits on the two schools?
8       A.   The New Britain school went much quicker.  It
9   was not a -- was not done for the Board of Education,
10  per se.  It was a private school facility, so it went
11  much quicker.  I don't know, I mean, it was a smaller
12  school by the same token.
13      Q.   And does the timing that -- the time that it
14  took to do the Prince-Welch School, would that have
15  resulted -- would that have affected the profit earned
16  by AECI on the school?
17      A.   Yes, it does.
18      Q.   And would it have made it less profitable?
19      A.   It depends.  In some cases, it may make it
20  more because on occasions, the delays are a consequence
21  of changes and additions and modifications that then
22  have a cost attended to them.
23      Q.   So you just don't know.  Okay.
24      A.   No.
25      Q.   Now, during the period 1997 through two