**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                           :

WENDELL HARP and ARCHITECTS
ENVIRONMENTAL COLLABORATIVE    :
INTERNATIONAL, P.C.,

                           :

              Plaintiffs,

                        :  Civil Action No.:
      vs.                  303CV00977 CFD

                        :

JOHN DeSTEFANO, CITY OF NEW
HAVEN and NEW HAVEN BOARD OF   :
EDUCATION,
              Defendants.  :

- - - - - - - - - - - - - - - - x

           Deposition of WENDELL HARP, taken

      pursuant to the Federal Rules of Civil

      Procedure, at the law offices of Brenner,

      Saltzman & Wallman, LLP, 271 Whitney Avenue,

      New Haven, Connecticut, before Dawn DeNardis,

      a Notary Public in and for the State of

      Connecticut, on Friday, May 27, 2005, at

      10:36 a.m.

1          Q.    And the billing was to whom?

2          A.    Typically to Mr. Watt.

3          Q.    To the Board of Education?

4          A.    To the Board of Education, yes.  I think you

5     were asking me why I made note of Exhibits I --

6          Q.    Of 2003, yes.

7          A.    Because you had asked me to identify

8     documents that related to compensatory and punitive

9     damages, which were Item 14.

10         Q.    Okay.  Okay.  But I was -- and maybe perhaps

11    not clear -- I was moving on to the items that are on

12    the Amended Notice of Deposition, Items 19 through 29,

13    and asking you -- my understanding, and tell me if this

14    is incorrect, is that you had not seen that Amended

15    Notice of Deposition before today and therefore, you

16    had not assembled documents to bring today that would

17    be responsive to Items 19 through 29.

18         A.    That's correct.

19         Q.    Okay.  Let me go back to AECI.  You said that

20    you were the sole director; is that correct?

21         A.    Yes, I am.

22         Q.    And AECI, is it a Connecticut corporation?

23         A.    Yes, it is.

24         Q.    And when was it incorporated?

25         A.    I believe around 1997, but I'm not positive,

1    but it's something near that time frame.

2         Q.   The contract that you have -- the contract

3    that you had to design the Prince-Welch School to

4    provide architectural services, was that at all times

5    with AECI?

6         A.   Yes, it was.

7         Q.   And it wasn't with you personally?

8         A.   That's correct.

9         Q.   And who are the shareholders of AECI?

10        A.   I'm the one hundred percent shareholder.

11        Q.   And who are the corporate officers?

12        A.   I am.

13        Q.   You hold all positions?

14        A.   I'm not sure whether or not under that

15   formation it required a separate entity for secretary,

16   and if it did, then it might have been my attorney who

17   operated as secretary.  But I am the sole director and

18   hundred percent shareholder.

19        Q.   Okay.  And any -- if there's a corporate

20   officer that's other than you, it would have been your

21   attorney?

22        A.   Probably so.  But he would not have had

23   anything -- I mean if, in fact, that were the case, but

24   I'm not positive.

25        Q.   But he wouldn't have had anything to do with

1        Q.   Okay.  So let me -- does whether or not

2    you're an employee of AECI depend on the level of

3    architectural activity being conducted by AECI?  In a

4    year in which you had more work, you might be an

5    employee; is that correct?

6        A.   That's correct.

7        Q.   And are you married?

8        A.   Yes, I am.

9        Q.   And is your wife Toni Harp?

10       A.   Yes, she is.

11       Q.   And is she employed?

12       A.   Yes, she is.

13       Q.   What is her job?

14       A.   She's a state senator, and she's also the

15   director of a program at the Hill Health Center.

16       Q.   Does she perform any services for AECI?

17       A.   No.

18       Q.   Has she ever?

19       A.   No.

20       Q.   Does she have anything to do with the

21   management or running of AECI?

22       A.   Never.

23       Q.   Does -- let me go through and starting in

24   1997, can you tell me who were the employees of AECI?

25       A.   To the extent that I can recall?

1    knowledge, were done probably with the mayor's consent

2    and authority.  The mayor is the head of the school --

3    school -- Board of Education, and he exercises that

4    authority.

5        Q.    He's not the chairman of the Board of

6    Education; is that correct?

7        A.    He may not be the chairman by virtue of his

8    title, but I think he's a functioning director of the

9    Board of Education.

10       Q.    And what specific facts are you relying on?

11       A.    I can -- I can take one, which is my

12   termination.  That was not a decision, to my -- to my

13   way of thinking, that came as a consequence of the

14   Board making determinations and making evaluations.

15   That came to me at the behest and direction of the

16   mayor.

17       Q.    And what are you relying on for that

18   conclusion?

19       A.    I think it came as a consequence of the

20   mayor's being enraged and offended that myself and my

21   wife would be supporting someone for mayor other than

22   he.

23       Q.    Now, you say -- your testimony was, I think,

24   that the decision came as the result of the mayor being

25   enraged.  What facts are you relying on for that

1    conclusion?

2        A.    I'm relying upon the fact that from the

3    period of 1997, that we were engaged by the Board of

4    Education to undertake the redesign of a school; that

5    the Board of Education gave us a contract at roughly

6    $1,121,000 to perform that service; that service was

7    being performed through the period of 2000, when I

8    believe the mayor and the Board of Education decided

9    that they should reconsider -- I may be not totally

10   right on the dates, but they should reconsider the

11   design based upon different site uses, and based upon

12   different school building criteria.

13        They then gave a certain modification that we

14   proceeded on with.  And those modifications were then

15   coupled with a series of documents from the Board of

16   Education, requiring that we reassess the site for

17   purposes of meeting the mayor's determination that the

18   site would be reconfigured.

19        At no meetings or, to my recollection, no one

20   from the Board of Education had the authority or

21   executed their authority to reconfigure the site.

22        My experience was that the mayor completely

23   reconfigured the site, that the mayor gave the

24   directive that there would be a redesign, based upon

25   that site reconfiguration.  And from the period, again,

1    of 1997 up through the period of May -- May 28th, we

2    were involved, with contract authority, to perform the

3    design of that school.

4        And the only intervening issue that I know

5    that altered that was on May 14, when -- when the mayor

6    was made aware that we were supporting someone other

7    than he for mayor, that our contract status altered.

8        Q.   And other than what you've just testified,

9    are there any other facts that you're relying on that

10   the Board of Education terminated your contract at the

11   behest of the mayor's wishes, other than what you've

12   already said, which I understand.  Is there anything

13   else?

14       A.   Well, probably the idea that our earlier

15   communications -- in fact, I think maybe a week prior

16   to that had been that our contract was being reviewed

17   by corp. counsel, that we had been asked to submit back

18   to the Board of Education, which we did, revisions to

19   schedule the values for his comments about just the

20   time frame on which work would occur, and to prepare a

21   summary of issues for final contract execution.

22       And that was steps that we were operating on

23   until May 28th, when we read in the -- when I read in

24   the New Haven Register that my contract was being

25   terminated, with comments from the mayor and then

139

1    followed up by a hand-delivered letter to me at Two

2    p.m. that day.

3         Q.    Okay.   Other than what you just previously

4    testified and testified before, is there anything else

5    that you're relying on for your belief that the mayor

6    caused the Board of Ed. to terminate your contract on

7    May 28th?

8         A.    Those are the things that register in my mind

9    right now.

10        Q.    Can you -- is there any document you want to

11   look at or anything like that that would --

12        A.    Not at this time.

13        Q.    Okay.

14        A.    Other than those that I've presented to you,

15   which I think speak for themselves.

16        Q.    Well, let's maybe go through them.

17        A.    Okay.

18        Q.    You said that -- I think the way we got into

19   this was I asked you about the mayor's control of the

20   Board of Ed., being the de facto head, and I asked you

21   what examples.   And the example you said was the

22   termination of your contract.

23        A.    That was one example.   I cited other --

24        Q.    Then you gave the reconfiguration of the

25   site, that you believe he made that decision; is that

1    correct?

2        A.    Well, that's one.  He also made -- he made

3    the decision of what the site would be from the very

4    beginning.

5        Q.    Now, how do you know that fact?

6        A.    Because I was present.

7        Q.    Tell me about that.

8        A.    Well, there were a series of meetings, some

9    of which I attended and some of which were held with, I

10   guess, general community persons and staff.  But

11   then -- and part of it revolved around the initial

12   consideration of what site would be chosen for the

13   school.  And the school was going to replace, I

14   believe, Welch Annex and Prince, and it was a

15   consideration that -- recommendation from my part and I

16   think some other people involved that --

17       Q.    They're from who -- I'm sorry.

18       A.    A recommendation from me and from some other

19   person involved that the school should perhaps be

20   located on the site of those existing schools, since it

21   involved minimal disruption to the neighborhood.  They

22   were already existing school sites and it probably

23   could be phased a lot easier than the taking.

24            There were various meetings that occurred.

25   And then the mayor sent out a directive that I

1    received, saying what site would be taken.  And it was

2    not, to my way of thinking, a -- I mean, I think it

3    involved maybe input from other people but my sense of

4    it was that the mayor made the absolute decision as to

5    what site would be taken.

6         Q.   And was that directive in writing?

7         A.   The directive to me of what the site would

8    be?

9         Q.   Yes, written initially?

10        A.   Yes.

11        Q.   And is that in this -- in these pieces of

12   paper you've brought to me?

13        A.   It's somewhere in there.  It's a directive

14   from Mr. Watt, but it might have been from Dr. Mayo.

15   It's either one of them, advising me of what the site

16   would be.  Actually, it was simply a sketch that is

17   included in there, showing what the site would be.

18        And that was later amended by a more formal

19   document from Mr. Watt, giving us specific boundaries.

20        Q.   And why do you believe that that directive

21   was from the mayor?

22        A.   Because I was told it was from the mayor.

23        Q.   And who were you told by?

24        A.   I was told that by Dr. Mayo and by -- I don't

25   believe -- I don't believe Mr. Watt was -- was involved

1    in that at that time.  I'm not sure, but I'm pretty

2    sure that the drawing that I got was from Dr. Mayo,

3    simply stating that's the site that would be -- that's

4    what the mayor had chosen.

5           And later on, as I recall, Mr. Watt gave me

6    a -- an actual -- excuse me -- an actual formal

7    drawing.  The drawing that I got was an

8    eight-and-a-half by 11 kind of sketch.  Mr. Watt

9    subsequently gave me a little more detailed drawing,

10   with perhaps more accurate boundaries to it.

11       Q.   Did you ever have a conversation with

12   Dr. Mayo about the termination of your contract, AECI's

13   contract?

14       A.   No.  After we were terminated, no.

15       Q.   Did you ever have a conversation with

16   Dr. Mayo prior to May 28th, 2003 about the possible

17   termination of your contract?

18       A.   I had a conversation with him advising him

19   that I was going to support Sherri Killins.

20       Q.   So -- I'll go back to that, but did you ever

21   have a conversation with Dr. Mayo about -- prior to May

22   28th, 2003 about your contract being terminated?

23       A.   There was never a representation to me that

24   the contract would be terminated until I read it in the

25   newspaper.

1      Q.   Tell me about your conversation.  There was

2   never a representation to you by Dr. Mayo or anyone

3   that your contract would be terminated; is that what

4   you're saying?

5      A.   Not until it was received.

6      Q.   But you did have some conversation with

7   Dr. Mayo about the possible termination of your

8   contract?

9      A.   No.  The only thing I did prior to -- prior

10  to this day, prior, I think, to May 14th, which is

11  when -- which is when I think the article was released,

12  I think sometime prior to that, I advised him that my

13  wife would be supporting Sherri and that I would be

14  supporting Sherri.

15     Q.   And what did Dr. Mayo say to you?

16     A.   He indicated he didn't think the mayor would

17  be pleased with that.  I don't recall his exact

18  phraseology.

19     Q.   Did he indicate -- what else did he say

20  during that conversation?

21     A.   I think he asked me why would we support

22  Sherri.

23     Q.   And what was your response?

24     A.   I thought she'd be a better mayor.

25     Q.   Was there any discussion about the school, in

1    terms of your supporting Sherri Killins?

2         A.    I'm not exactly sure.  I'm not sure he -- I'm

3    not sure he -- I think he was trying to make an

4    evaluation of the extent to which we would be

5    supportive.  That was my assessment from the

6    conversation.

7         Q.    I'm not sure I understand.  Dr. Mayo -- can

8    you explain that.

9         A.    I said I think that he was trying to make an

10   assessment of the extent to which we would be

11   supportive of Sherri.  And I didn't choose to really

12   elaborate on that.

13        Q.    Did he indicate that your contract was at

14   risk as a result of your support of Sherri Killins?

15        A.    No, he didn't.

16        Q.    Do you know if he told the mayor about the

17   conversation he had with you?

18        A.    I don't know.

19        Q.    Other than through the newspaper article that

20   you've referenced that came out on the 14th, and you

21   provided as Exhibit 3 -- part of Exhibit 3, do you know

22   if the mayor knew of your support of Sherri Killins

23   prior to May 14th, 2003?

24        A.    Yes.

25        Q.    You believe he did know?

SCRIBES, INC.

1    A.    Yes.

2    Q.    And what was that belief based on?

3    A.    Based on the fact that there were signs put

4    up -- her campaign office was located in my office

5    building, and there were signs very prominently put up

6    on the lower level.  And it's typically indicative of

7    my being supportive of someone if they're leasing a

8    space for purposes of their campaign.  Or it's

9    sometimes indicative.

10    Q.    And sometimes it's not indicative?

11    A.    That's correct.

12    Q.    So there are some times candidates have

13    leased space in your buildings at 298 Whalley?

14    A.    Yes.

15    Q.    And they put up a sign and you don't

16    necessarily support them?

17    A.    That's correct.

18    Q.    So other than the sign, prior to the article

19    in the paper, was there -- do you believe that the

20    mayor had any other reason to believe that you were

21    supporting Sherri Killins?

22    A.    Yes.

23    Q.    And what other reason do you have?

24    A.    There was an event called the Freddie Fixer

25    Parade, which is an enormously big event within the,

1   predominantly the Black community, and which parades

2   from the Dixwell-Newhallville community through the

3   Yale community, downtown to roughly City Hall. And

4   there was a very significant motorcade of approximately

5   20 cars, 25 cars, with maybe a hundred or so supporters

6   there, my wife walking with Sherri.

7          And just a very significant parade and visual

8   event that was very, very clear to the mayor. And the

9   mayor was in front of City Hall, and the mayor walked

10  the parade route followed by this motorcade and street

11  patron support for Sherri. And then it -- the

12  motorcade ended up at City Hall and they performed

13  certain campaign events and rally events in front of

14  City Hall and in front of the mayor.

15      Q.   And were you part of this motorcade?

16      A.   I wasn't part of the motorcade, but I was

17  part of the walking procession.

18      Q.   So did you walk with Sherri Killins?

19      A.   I didn't walk with Sherri Killins, per se,

20  but I -- as I walked the parade route, I certainly

21  indicated to people that I was supportive of her.

22      Q.   Did you indicate to the mayor that you were

23  supportive of Sherri Killins during this Freddie Fixer

24  Parade route?

25      A.   I didn't talk to the mayor during the Freddie

1    Fixer Parade.  We didn't have verbal contact.  We were

2    at a distance.

3        Q.    So he couldn't have overheard you telling

4    someone else that you were supportive of Sherri

5    Killins?

6        A.    That's correct.

7        Q.    And the Freddie Fixer Parade was after Sherri

8    Killins had announced her candidacy?

9        A.    I believe it was a day or two after.

10       Q.    And before the May 14th, 2003 article in the

11   newspaper?

12       A.    I think it would have been after the May 14th

13   article.

14       Q.    It's usually at the end of the month, is it

15   not?

16       A.    No, I think she announced her -- no, the

17   parade would not have happened, I think, until after

18   she made her announcement.

19       Q.    So it would have happened after that?

20       A.    That's my recollection.  My recollection is

21   that she announced on Wednesday, and the parade was on

22   that following Sunday.

23       Q.    Okay.  Do you -- so I just want to make sure

24   that I've covered everything.  You've said that your

25   reasons to believe that the mayor knew prior to May

1    14th were the large banner and then the Freddie Fixer

2    Parade.  But now you think that was probably that

3    following Sunday.

4        A.    No, I -- your comment now, I think I said

5    from the beginning that the parade followed her

6    announcement.

7        Q.    Okay.  So the -- so you believe that the

8    mayor knew of your support of Sherri Killins on May

9    14th, as a result of that article; is that correct?

10       A.    Well, I also believe that Dr. Mayo may have

11   told him.  I'm not sure that he did.  I still don't

12   know.

13       Q.    So just -- let me just make sure I understand

14   this.  There was this article on May 14th, 2003, and I

15   haven't asked you this -- start the whole question:  Do

16   you believe that article -- and I believe that's what

17   your Complaint says -- gave the mayor notice that you

18   were supporting Sherri Killins?  Do you believe that

19   article provided such notice to him?

20       A.    Well, I said I think that's one indication.

21   I think the other indication as I mentioned was that

22   her banners and signs were in our office.  And I'm a

23   pretty direct person with things, so I think that if

24   it's pretty known that if I'm supporting someone, that

25   I'm supporting them, and that it's -- as I indicated to

1    compensation?

2        A.    I don't know exactly.  I'd have to look at

3    exactly what was being done at that time.  But I know

4    that we probably would not have been doing any

5    significant design work without having that notice to

6    proceed.

7        Q.    Or the written executed contract?

8        A.    That's correct.

9        Q.    Now I want to show you a part of Exhibit 5,

10   which is this transmittal letter, along with four

11   pages, because it says that there's five -- and I'll

12   put a paper clip on this -- it says that there are five

13   pages in the transmittal.

14       A.    And, you know, I'm going to need to make a

15   call in just a minute.

16       Q.    Sure.  You want to stop now?

17       A.    No, why don't you finish, and then I can make

18   the call.

19       Q.    That's okay.  Why don't you make your call

20   now.

21            (Recess taken, 4:10 p.m. to 4:18 p.m.)

22       Q.    So, Mr. Harp, what I'm showing you is a

23   portion of Defendants' 5, and I put a paper clip around

24   it because it says it's a transmittal from Architects

25   Environmental Collaborative International, PC, and it

1     says it's five pages, and these were the pages that

2     were on top of it.  And it's to Dr. Mayo, and it says,

3     "From Wendell Harp," and it says, "Re:  Prince-Welch

4     School Redesign Criteria."

5            So, can you identify that document, and do

6     the four pages behind it go with it?

7            A.    Yes.

8            Q.    And if you look at Pages Two, Three and

9     Four -- or the second, third, and fourth page behind

10    the transmittal, at the top it says -- it says,

11    "Preliminary Internal Draft, Subject to Revision,

12    5/9/03."  How did you get that document?

13           A.    I believe it would have been given to me by

14    Mr. Watt, I believe, or Dr. Mayo.  One of them.

15           Q.    And you made some notes about -- on the front

16    page of the transmittal, did you not?  There's some

17    typewritten --

18           A.    Yes.

19           Q.    And what were your concerns about the

20    attachment?

21           A.    The time frame for it.  The criteria -- well,

22    it's stating here the time frame that they wanted us to

23    do the work would be okay.  We -- since they had not

24    issued -- since there was a delay in the start date,

25    that we amended the times in here to conform to the

```
 1        A.    Right.
 2        Q.    Did you -- was that actually faxed to
 3   Dr. Mayo?
 4        A.    Yes, it was.
 5        Q.    And --
 6        A.    It might have been hand delivered to him.
 7   I'm not sure which.  It might have been hand delivered.
 8        Q.    Did you ever talk to Dr. Mayo about this
 9   transmittal?
10        A.    Right, I did.  He --
11        Q.    What did he say?
12        A.    Well, he asked me to -- to look over the
13   conditions, to let him know what I thought, and that he
14   would -- because I had a previous discussion, saying --
15   I said I didn't understand what they were looking for.
16   He said, "Look over it, give me some comments, and we
17   will talk about it."
18              So I gave him my comments back, and said
19   "Okay, here's my comments."
20        Q.    Let me go back a bit.  With respect to
21   Dr. Mayo and your revised -- either a new contract or
22   an amendment to a contract to do these revisions to
23   this school, did you have any discussions directly with
24   Dr. Mayo about this?
25        A.    About what?
```

1          Q.    About your doing the work on the revised

2     plans for the school after the site had changed.

3          A.    Yes.

4          Q.    And how many discussions did you have with

5     Dr. Mayo about this?

6          A.    I don't really know.  I mean, we were

7     friends, so we would often talk sometimes about school,

8     most of the time just about things that friends talk

9     about.

10         Q.    Okay.  And in terms of -- would you talk on

11    the phone or in person or --

12         A.    Both.

13         Q.    And was it on a daily level or --

14         A.    I wouldn't say daily level, but weekly level.

15         Q.    And are you still friends with Dr. Mayo?

16         A.    I would say it's probably strained.

17         Q.    Now, with respect to the language of this

18    attachment to the transmittal, this -- we'll call it

19    supplemental conditions for the redesign, what

20    discussions did you have with Dr. Mayo about that?

21         A.    As I recall, after I -- I think I may have --

22    I don't know if I hand gave him this, which I think I

23    probably did --

24         Q.    Which has your -- the handwriting on it is

25    your handwriting; is that correct?

1      Q.   Okay.  And then you were telling me you may

2   have hand delivered the transmittal to him with your

3   comments?

4      A.   I think I probably did or -- yeah, it says

5   "hand delivered" on here, yeah.

6      Q.   So there it is.

7      A.   Yeah, I was looking for the fax number, so I

8   hand delivered it to him.

9      Q.   Where does it say "hand delivered"?

10     A.   Right there.

11     Q.   Correct.

12          And did you talk about your comments when you

13   hand delivered it to him?

14     A.   I'm sure I did.

15     Q.   And what was his reaction to your request

16   "Revise, please"?

17     A.   His general comment was that he knew that I

18   was very particular about design, and about a sense of

19   creativity that I had on projects, and that he would

20   kind of make sure that that was not obstructed by kind

21   of unnecessary bureaucracy, but that by the same token,

22   I had to be willing to sit down and work with other

23   people, and -- which I would, and just to kind of like

24   make sure it was balanced in all ways.

25     Q.   Was it your understanding after that

1      A.    I don't know if it was during that

2   conversation or during a conversation of that same

3   week, perhaps.  But, yes, he told me that there was an

4   urgency to get it to A&F Committee.  That, I recall.

5   And that I had to respond to that within a quick time

6   frame, which is why I hand delivered it.

7      Q.    And so when you left -- what was your

8   impression from the conversation with Dr. Mayo about

9   what the next step was going to be after you had given

10  him the comments?

11     A.    That it was going to A&F Committee and

12  that -- and I knew it was at corp. counsel, and that

13  was it.

14     Q.    So your understanding is that it would go to

15  A&F Committee as drafted?

16     A.    Essentially.  I knew that he would consider

17  the time frames because it was just something that

18  they -- they could not technically make work.  But

19  maybe they would have -- might have sent it the same

20  way they had it.  I don't know.

21     Q.    I just want to ask you a little bit about

22  your political activities in New Haven.  You had said

23  before there are some candidates that you have

24  supported.  You, yourself, have never run for office in

25  New Haven, have you?

1        A.    No, I haven't.

2        Q.    But you are active in politics in New Haven;

3    is that correct?

4        A.    That's correct.

5        Q.    And when we've been speaking of the mayor

6    during this deposition, we haven't identified him, but

7    we've been speaking of Mayor John DeStefano; is that

8    correct?

9        A.    That's correct.

10        Q.    And do you know how long -- when he was first

11    elected mayor, his first election was for mayor?  Let's

12    start with that question.

13        A.    I think he's in his 10th year, so working

14    back from that, it would be 1995 or --

15        Q.    Ninety-three, does that sound --

16        A.    Might be.

17        Q.    And the mayoral terms are two years, are they

18    not?

19        A.    That's correct.

20        Q.    He has to run for mayor every two years?

21        A.    Yes.

22        Q.    Have you ever supported him in a reelection

23    on an election primary contest?

24        A.    Yes.

25        Q.    And when did you do that?

187

1    A.    I think he ran in 2001.  I know when he ran

2    against Marty Looney, I supported him there.

3    Q.    Do you recall any other time that you have

4    supported Mayor DeStefano in his running for

5    reelection?

6    A.    Well, there have been other times when I've

7    donated to his campaign.  That was a time when I

8    actively assisted his campaign.

9    Q.    And when you've donated to his campaign, have

10   you also donated to his opponent's campaign?

11   A.    I don't do that.  I either donate to one

12   or --

13   Q.    Or to the other?

14   A.    Yes.

15   Q.    And what years did you donate to his

16   campaign?

17   A.    I don't know exactly.

18   Q.    Did you -- did you donate the year you

19   actively supported him, which was 2001?

20   A.    Yes.

21   Q.    Okay.  Do you believe you donated on any

22   occasion other than 2001?

23   A.    I believe so, but I'm not positive.  But I

24   believe so.

25   Q.    And have you ever supported, since he has run

1    for election in '93, anybody who's run in a Democratic

2    primary against -- have you ever supported any opponent

3    other than Sherri Killins, who's run against Mayor

4    DeStefano?

5         A.   Yes.

6         Q.   And who was that?

7         A.   Artis Yopp.

8                   THE WITNESS:  Artis Yopp, Y-o-p-p.

9         Q.   And was that in -- what year was that?

10        A.   I think it would have been the year -- the

11   term after he was first elected.

12        Q.   That would be the '95 election?

13        A.   It might have been the first time he was

14   running.  I'm not sure.

15        Q.   One or the other?

16        A.   Yeah.

17        Q.   And at that time that you supported Artis

18   Yopp, did you have a contract to design any New Haven

19   school?

20        A.   I don't know.

21        Q.   When did you first have a contract to design

22   Hill Career -- oh, I'm sorry, let's do -- you had --

23   you were the architect for Hill Career; is that

24   correct?

25        A.   That's correct.

189

1    Q.    And when did you first start working on that

2    contract?

3    A.    I think 1990 --

4    Q.    Okay.

5    A.    -- but I'm not positive.  But I think 1990.

6    Q.    And when was that school finished?

7    A.    Let's see, 1996/97, I believe.  Well,

8    actually, no, because I think the school took 10 years

9    all total so I'm not sure.  Maybe we started prior to

10   1990, because there were a series of delays on the

11   school and there was a change in the administration.

12   The school sat dormant for several years, so I know

13   that the total time frame was almost 10 years, so I

14   don't recall the exact --

15   Q.    But you do know it opened in '97, fall of

16   '97; is that correct?

17   A.    It opened -- all right, then in that case, we

18   probably started in 1986, then.

19   Q.    Okay.  And your contract with Hill Career, it

20   was amended, was it not?

21   A.    Yes, it was.

22   Q.    And it was amended -- it was amended more

23   than once; is that correct?

24   A.    That's correct.

25   Q.    And, in fact, it was a situation where you

```
 1    actually redesigned the school; is that correct?

 2         A.    That's correct.

 3         Q.    What year did you redesign the school?  When

 4    was it amended to allow you to redesign the school?

 5         A.    I'm going to guess in 1990, but I'm not

 6    positive.

 7         Q.    So it was seven years between design and the

 8    opening of the school?

 9         A.    It was more.  It was 10 years between the

10    time we started and the time it opened.

11         Q.    Right, I realize that.  But I'm talking about

12    the redesign of the school.

13         A.    It probably was -- I mean, you know, but I

14    should say that there were several redesigns.  There

15    was one when they -- I think the initial redesign was

16    when they decided to go from a -- I think from a K-5

17    to -- I'm sorry, from a -- from a -- I think at one

18    point, it was a -- I think at one point, it might have

19    been a middle school.

20              And I'm not positive but -- because there

21    were -- again, there were so many program changes to

22    it.  And I think the biggest change probably was that

23    it went from being a 600-capacity school to being a

24    regional magnet high school.

25              And then there was a change in the
```

1    administration from whoever the previous mayor was

2    to -- to DeStefano.  And then the Board of Education

3    changed.  There was a -- anyway, the school sat dormant

4    for several years, I think maybe three or four years,

5    while they redecided on their educational program,

6    on -- there were some site issues, not that many.  And

7    then, again, its regional magnet high school status,

8    and how it would be funded, issues like that.

9        Q.   But your contract continued after the --

10   well, let me withdraw the question.

11             The Democratic primary for mayor, is that

12   usually held in September every year?

13       A.   Yes.

14       Q.   So the primary between Artis Yopp and John

15   DeStefano would have been September '93, the one in

16   which you supported Artis Yopp?

17       A.   It's possible.

18       Q.   Do you recall it being in any other month

19   or -- what is your hesitation with respect to this?  Is

20   it you're not sure if you supported Artis Yopp in '93

21   or '95?

22       A.   I'm not sure if it was in '93 or '91 or '95,

23   or if it was September or August for the primary.  So I

24   don't know.

25       Q.   Okay.  So assuming Artis Yopp did not run in

```
 1    '91, which is when John Daniels was elected, and that

 2    he ran either in '93 or '95, you, at that point in

 3    time, had a contract to design the Hill Career School;

 4    is that correct?  An architecture contract in place?

 5        A.   That's correct.

 6        Q.   And that continued until the school opened;

 7    is that correct?

 8        A.   That's correct.

 9        Q.   And do you recall supporting any other

10    opponents of John DeStefano in terms of mayoral

11    elections?

12        A.   I think he ran against John Daniels once.

13    And I'm not positive.  If he ran against John Daniels I

14    certainly supported John Daniels, if he ran against him

15    at that time.

16        Q.   And that would have been in 1989; is that

17    correct?

18        A.   If he ran against him.  I'm not positive that

19    he ran against him, but --

20        Q.   But if he did, you would have supported John

21    Daniels?

22        A.   That's correct.

23        Q.   Any other opponents of John DeStefano that

24    you've ever supported?

25        A.   Not to my recollection.
```

```
1          Q.   How about in the campaign of 1999 when Jim
2     Newton ran against --
3          A.   I didn't support either one.  I'm sorry, I
4     did not support Jim Newton, and I did not actively
5     campaign for the mayor.  I might have donated to his
6     campaign, but I was not -- I was not supporting Jim
7     Newton, and I don't believe that I actively got
8     involved in the mayor's campaign, other than maybe to
9     donate to his campaign.
10         Q.   Now, in your -- in your political activities,
11    you also have been involved in campaigns for Town
12    Committee members; is that correct?
13         A.   That's correct.
14         Q.   And have you been involved in any campaigns
15    for Town Committee members in which you've supported
16    candidates and the mayor has supported the people
17    running against the candidates you were supporting?
18         A.   Probably so.
19         Q.   And can you recall any specific instances of
20    that?
21         A.   Not really, but I'm -- I'm certainly probably
22    sure that's happened.
23         Q.   Do you recall supporting some
24    African-American challenge candidates in March of '98?
25    Hattie Turner, does that sound --
```

1          A.    Yes, I do.

2          Q.    And they were challengers to the incumbents,

3    members of the Town Committee; is that correct?  Can

4    you tell me about that, what you did and who you were

5    supporting?

6          A.    I'm not sure that this is exact -- I'm not

7    really sure, but I've supported a lot of different

8    candidates.  I think that maybe the race where the

9    mayor, to my knowledge, had worked against my wife to

10   attempt to deny her the nomination to even run on the

11   ballot as a state senator.  And then we, in turn --

12   "we," meaning my wife and other people who supported

13   her -- challenged the entire Democratic slate for that,

14   and won.

15         Q.    That was the race for your wife for the

16   nomination --

17         A.    Right.

18         Q.    -- for her nomination?

19         A.    Right.

20         Q.    And you were on opposite sides from the mayor

21   in that race?

22         A.    That's correct.

23         Q.    And that would have been in 2002.  Does that

24   sound correct to you?

25         A.    I thought it was much longer ago than that,

1    but I don't know.

2        Q.    It was at a time when you still had the

3    contract to do the Prince-Welch School?

4        A.    You're making a statement.  I don't know.  I

5    just said I don't know.

6        Q.    Well, let's talk about the time frame when

7    you think it was.  When did you think it was?  Did you

8    think it was before 1997?

9        A.    No, but I just don't know -- there was -- I

10   don't know exactly when it was.

11       Q.    But it wasn't before 1997; is that correct?

12       A.    No, I don't think it would be before.

13       Q.    And it wasn't after May 28th, 2003?

14       A.    No.

15       Q.    Now, between -- do you recall any other --

16   any other sort of Town Committee races, because that's

17   where we started, rather than the slate for your wife

18   to become elected, but a Town Committee race?

19            And I think your testimony was that you

20   thought that could have happened, where you supported

21   African-American challengers, and the mayor would have

22   supported the incumbents.  Do you recall that

23   happening?

24       A.    No, that was your comment.

25       Q.    I'm sorry.  Okay.

1       Let me ask a question:  Did you at any point
2   in time, between February '97 and May 2003, support
3   African-Americans who had -- were bringing a challenge
4   to Town Committee seats, and the mayor was supporting
5   the incumbents that those challengers were running
6   against?
7       A.   I've supported Whites, Hispanics and
8   African-Americans that were challengers to Whites,
9   Hispanics and Blacks that the mayor might have been
10  supporting.  But then in some instances, we might have
11  been supporting the same candidates.
12      Q.   Okay.  But I'm just -- I'm just wanting to
13  know if you did support -- and would that -- did that
14  occur at any point in time between 1997 -- February
15  1997 and May 2003?
16      A.   Well, I've supported people at different
17  periods of time, so the answer would be yes.  If I were
18  involved in a race, I don't know whether or not the
19  may -- I don't recall whether or not the mayor was on a
20  particular side where I was on.  Town Committee races,
21  I don't quite hold it up to a very significant standard
22  of political involvement or interest.
23      Q.   But is it your testimony, just so we have a
24  clear record, that between February '97 and May 2003,
25  you supported candidates in Town Committee races and

```
 1    the mayor supported the opponents of the people you
 2    were supporting?
 3         A.   I don't know if -- I don't know if there's
 4    this kind of blanket assessment that there was
 5    opposition to the mayor's candidates and his opposition
 6    to ours.  I think I might have supported candidates
 7    that he was supporting different candidates, and we
 8    might have had occasions where we were supporting
 9    similar candidates or challengers.  I don't recall
10    specifically.
11         Q.   Do you recall if at any time between February
12    '97 and May 2003 you supported a candidate for a Town
13    Committee race and the mayor supported the candidate
14    that your candidate was running against?
15         A.   Absolutely.
16         Q.   And do you remember any specific names?
17         A.   Wait, wait, wait.  Candidates that we were
18    against?  I'm sorry, I thought you were going to say
19    that we were for.
20              Well, Hattie Turner would have been one.  I
21    don't know if Al Paolillo was running then.  If so, we
22    might have been supporting him.
23         Q.   And the mayor may have been supporting the
24    other side?
25         A.   Right.  Again, Town Committee races don't
```

1    particularly strike my level of recollection that

2    great.

3        Q.    So those -- Hattie Turner and Al Paolillo are

4    the only two that you can remember, sitting here today,

5    during that time frame?

6        A.    They're the two that come to my mind.

7    There's --

8        Q.    Those are the two that come to your mind at

9    this moment?

10        A.    Yeah.

11            MS. KONE:    Okay.  All right.  So we're

12            going to suspend the deposition.  And I'll

13            e-mail John Williams and we'll figure out how

14            much more time we have left, and we'll pick a

15            date between now and July 1st.

16            THE WITNESS:    Okay.

17            (Time noted:  4:51 p.m.)

18            (Jurat follows on page 199, no omission)

19

20

21

22

23

24

25

C E R T I F I C A T E

       I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

       I further certify that the deponent named in the forgoing deposition was by me duly sworn, and thereupon testified as appears in the forgoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the forgoing is true and accurate transcript of the testimony.

       I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

       Witness my hand and seal as Notary Public this _____ day of _____, 2005.

Dawn DeNardis
Notary Public

My Commission expires:
July 31, 2006
License #00075