**EXHIBIT B**

VOLUME II

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x
                                    :
WENDELL HARP AND ARCHITECTS         :
ENVIRONMENTAL COLLABORATIVE         :
INTERNATIONAL, P.C.,                :
                                    :
              Plaintiffs,           :
                                    : Case No.
          vs.                       : 3:03 CV-977 (CFD)
                                    :
JOHN DeSTEFANO, CITY OF NEW HAVEN   :
AND NEW HAVEN BOARD OF EDUCATION,   :
                                    :
              Defendants.           :
                                    :
- - - - - - - - - - - - - - - - - - x


          Continued deposition of WENDELL HARP,

     taken pursuant to the Federal Rules of Civil

     Procedure, at the law offices of Brenner,

     Saltzman & Wallman, LLP, 271 Whitney Avenue,

     New Haven, Connecticut, before Jenny L.

     Albert, License #00207, a Registered

     Professional Reporter and Notary Public in

     and for the State of Connecticut, on

     Thursday, July 14, 2005, at 10:19 a.m.

1    all right.

2              Now, just so the record is clear, you said

3    that in 1997, you started working on this project.  You

4    were hired as -- AECI was hired as the architect for

5    the Prince Welch School; is that correct?

6         A.    That's correct.

7         Q.    And you actually had a contract, a written

8    contract with the Board of Ed. in 1997 to design this

9    school?

10        A.    That's correct.

11        Q.    Okay.  And I'd just -- and that was

12   subsequently superseded by a written contract in 2000;

13   is that correct, a different written contract?

14        A.    That's correct.

15              MS. KONE:  Okay.  And could you mark

16              that as Defendants' 16.

17              (1997 contract marked Defendants'

18              Exhibit 16 for identification)

19        Q.    And I'm showing you what's been marked as

20   Defendants' 16.  Was that the contract between AECI and

21   the Board of Ed. to design Prince Welch School and

22   entered into in 1997?

23        A.    Yes.

24        Q.    And then we just said there was a contract

25   in -- that superseded Defendants' 16 and I'd like to

1    that correct?

2        A.    Yes, it is.

3        Q.    It's a fax transmission.   Is that what this

4    is?

5        A.    Yes, it is.

6        Q.    And it's to Mr. Watt; is that correct?

7        A.    Yes.

8        Q.    And it says, "On Tuesday, May 6, 2003, I

9    contacted you concerning the 5/5/03 notice for

10   mandatory training for our Prince Welch School

11   electrical engineer and the 5/9/03 deadline for our

12   rely for attendance," and attached pages two and three

13   are -- of Defendants' 18 are the notice of this

14   mandatory training; is that correct?

15       A.    Yes.

16       Q.    And it said, "You advised me that the

17   previous verbal approval to begin site studies was

18   rescinded and that you would advise me if approval for

19   the engineer's mandatory training is to be granted."

20   Can you tell me how Mr. Watt advised you that the

21   previous verbal approval to begin site studies was

22   rescinded?

23       A.    I don't know.   He was pretty good about

24   sending things in writing.

25       Q.    So you don't know if it was in writing or

verbally?

    A.   I don't know.

    Q.   And this would be site studies under a amendment or new contract to do the redesign that Defendants' 11 as part of -- do you understand that? Is that a confusing question?  Let me withdraw the question.

    Your testimony a little bit this morning and a great deal at your last deposition session was that you and Mr. Watt had negotiated a contract for you to do the redesign of the Prince Welch School in 2003?

    A.   Right.

    Q.   And is it my understanding that, reading Defendants' 18, that Mr. Watt had given you verbal approval to begin site studies under this -- the redesign work that we have previously been talking about?  That would be under this new contract or amendment to your old contract, the site studies?

    A.   What is your question again?

    Q.   Okay.  I can understand that.  At your last deposition session and at this morning, we talked about that the city -- you and Mr. Watt had negotiated an agreement where you were going to do redesign work for the Prince Welch School, correct?

    A.   Yes.

1      show you --

2                      MS. KONE:   I'll ask that this be marked

3              as Defendants' 17.

4                      (2000 contract marked Defendants'

5              Exhibit 17 for identification)

6        Q.    And if you could look at -- if you could

7      actually look at the marked copy.  Can you just tell

8      me, is that the 2000 contract that superseded the 1997

9      contract between AECI and the New Haven School District

10     to design the Prince Welch School?

11       A.    Yes.

12       Q.    Okay.  Now, one of the documents that your

13     counsel provided me today -- yesterday was a five-page

14     document.

15                     MS. KONE:   Which I'd ask be marked as

16             Defendants' 18.

17                     (May 8, 2003 transmittal marked

18             Defendants' Exhibit 18 for identification)

19       Q.    If you could look at that document, it's a

20     transmittal.  Is that your handwriting?

21       A.    Yes, it is.

22       Q.    It's addressed to Mr. Watt and it's from you?

23       A.    Yes, it is.

24       Q.    And that's on the first page and then -- now,

25     it says, "On Tuesday, May 6" -- it's dated May 8th; is

Q.   And it was -- the amount that AECI was going to be paid was set out in Defendants' Exhibit 11 for the redesign work, and my question to you is, in Defendants' 18, it references a verbal approval to begin site studies.  Was that verbal approval to be done under the negotiated contract for the redesign work of which Defendants' 11 was part of or was that to be done under your old contract, the 2000 contract?

A.   I'm not --

Q.   You're not following?

A.   No, I'm not.

Q.   Okay.  I'm trying to figure out some sort way to say this.  You had the contract in 2000 and then you and Mr. Watt actually renegotiated a new contract to do redesign work, and that was -- I think you testified that you had understood that was sent to the corporation counsel and it was going to go to the A and F committee for approval; is that correct?

A.   That's correct.

Q.   Let's call that the redesign contract so we have a short way to talk about it.

A.   Okay.

Q.   So my question is, under the redesign contract, if you look at 18, it says, "You advised me that the previous verbal approval to begin site studies

1    first decide to run for mayor?  And just so that you

2    have a reference, the public announcement, you

3    testified to, was on May 14, 2003, and my question was,

4    how much earlier from May 14th, 2003 did she decide?

5        A.    I believe probably in March, March or early

6    April.

7        Q.    Okay.  And were you -- did you encourage her

8    to run for mayor?

9        A.    I think that's a fair statement.

10       Q.    Okay.  And is Sherri Killins still in the

11    Connecticut area today?

12       A.    I don't know.  I don't believe so.

13       Q.    Okay.  Were other people involved in that

14    initial -- withdrawn.

15            Were there people who were involved with her

16    campaign from March or April, before May 2003?

17       A.    Yes.

18       Q.    And who were those other people?

19       A.    My wife would have been one of them.

20    Alderman Brian Jenkins.  She had a lot of supporters.

21    I'm not sure what you're asking me.

22       Q.    I'm just asking about the period March and

23    early April 2003, who were the people initially

24    involved in her campaign?

25       A.    You would have to ask her.  I don't know

273

1    meetings or call people and try to garner support for

2    her before May 14th?

3        A.    Yes, I did.

4        Q.    And who did you call?

5        A.    Leslie White, Vivian Elder, Sondra McKinnon.

6        Q.    Sondra?

7        A.    Sondra McKinnon.   Those are names that I know

8    that I recall.

9        Q.    Of people you called?

10       A.    Right.

11       Q.    And you testified last time you spoke to

12   Dr. Mayo about your and your wife's support of Sherri

13   Killins before May 14th; is that correct?

14       A.    Yes.

15       Q.    And that conversation took place how long

16   before May 14th?

17       A.    Probably in April.

18       Q.    Okay.   And do you recall, was that

19   conversation in person or on the telephone?

20       A.    In person.

21       Q.    And was it only one conversation with

22   Dr. Mayo about your support for Sherri Killins or were

23   there several?

24       A.    I know that there were at least two.

25       Q.    The earliest one was in April, you think?

1      A.    Yes.

2      Q.    And what part of April do you believe that to

3  have been?

4      A.    I don't know.  I mean --

5      Q.    The beginning, middle, end?  That's all I'm

6  looking for.

7      A.    I would think probably early April.

8      Q.    And was this news to Dr. Mayo or had he heard

9  about your support of Sherri Killins the first time you

10  spoke to him?

11     A.    I think it would be news to him.

12     Q.    And when was the second time that you spoke

13  to him about it?

14     A.    Well, he and I were friends, so I would see

15  him relatively frequent.  I just recall one time of

16  substance.  I mean, there probably were other times.

17     Q.    Now, the one time substance, was that the

18  conversation you testified to at your prior deposition?

19  You did testify about a conversation with him?

20     A.    Yes.

21     Q.    And during any of the conversations with

22  Dr. Mayo about -- and I know you were friends -- your

23  support for Sherri Killins, did you discuss whether or

24  not Dr. Mayo had told the mayor or any of the mayor's

25  staff about your support?

1      A.    No.

2      Q.    Okay.  But I think you testified that you

3   would not be surprised if Dr. Mayo had told the mayor

4   about your support; is that correct?

5      A.    That's accurate.

6      Q.    Okay.  And you probably wouldn't be surprised

7   if he had told him in early April when he first found

8   out; is that correct?

9      A.    No, I would not necessarily be surprised, no.

10     Q.    You didn't swear him to any kind of secrecy

11  or anything, did you?

12     A.    No.  But --

13     Q.    Yeah.

14     A.    -- I also didn't do it for the purpose of

15  divulgement either.  So I did not do either.

16     Q.    I'm not sure what that means.

17     A.    I didn't tell him for the purpose of

18  communicating it, and I didn't tell him for the purpose

19  of him not commune -- I simply told him because he was

20  a friend and we were --

21     Q.    Do you know if Dr. Mayo told anyone other

22  than the mayor about your support of Sherri Killins

23  prior to May 14th?

24     A.    I don't know that he told the mayor.

25     Q.    Right.  Okay.  Do you know if he told anyone,

1     Q.   Do you understand any of the -- from any of

2     the people who -- and I know you can't remember who

3     they are -- who made comments to you that you were --

4     your contract was terminated because of your or your

5     wife's support of Sherri Killins, that their comments

6     were based on what they read in the newspaper?

7     A.   Well, I think their comments were based upon

8     the mayor's statements, you know.

9     Q.   In the newspaper?

10    A.   In the newspaper, yes.

11    Q.   That's the question.

12    A.   That's accurate.

13              (Reporter asks to change paper whereupon

14              a lunch break was taken)

15              (Off the record from 12:18 p.m. to 1:27

16              p.m.)

17    Q.   At your last deposition session, Mr. Harp,

18    you stated that you are politically active?

19    A.   That I'm what?

20    Q.   That you're politically active in New Haven

21    in politics?

22    A.   That's accurate.

23    Q.   And can you just give me an overall

24    description of what that means in terms of activities

25    that you engage in or financial support that you

1    provide?

2        A.    That means that I will help candidates who

3    are running for office.  I will try to help persuade

4    others on occasions to help someone who's running for

5    office.  I will donate to campaigns when I deem it

6    appropriate, and I have a general sense of belief that

7    it's a responsibility of people to be involved in the

8    process that determines their life.

9        Q.    And by helping candidates running for office,

10   what activities other than making financial donations

11   or talking to others do you do?

12       A.    On occasions, if I decide to, I'll lease them

13   office space out of my building.  Sometimes I do it for

14   people I support.  Sometimes I do it for people

15   unconnected to my sense of support.  Sometimes I try to

16   persuade people not to support a particular candidate

17   as well as maybe support someone.

18       Q.    Do you show up at polls on voting days?

19       A.    Yes, I vote.

20       Q.    Other than voting, do you show up at polls?

21       A.    Yes, I do.  On occasions.

22       Q.    And that would -- would that involve giving

23   out campaign literature or not necessarily?

24       A.    Not necessarily.  But certainly to an

25   extent -- I mean, I have done it but it's not

1    necessarily typical, but I have done it.

2        Q.    But you might show up to a poll for a

3    candidate you support on election day?

4        A.    That's correct.

5        Q.    Do you make calls to get out the vote for a

6    candidate you support?

7        A.    That falls under the purview of trying to

8    help someone support -- the answer is yes.

9        Q.    Okay.

10       A.    I said that I try to help influence, if I'm

11   supporting someone, I try to help lend support for that

12   person by talking to other people, if I deem it

13   appropriate, or if I'm not in support or someone, the

14   same thing.

15       Q.    Okay.  And I was just trying to understand in

16   a little more detail some of the activities you engage

17   in in that support or lack of support, but have we

18   basically covered all of those activities that you

19   would be involved in in an election where you've

20   supported a candidate or didn't support a candidate?

21       A.    I answered your question.

22       Q.    You said you donate, you persuade others to

23   support or not support, you lease office space, on

24   occasion, you show up at the polls on election day and

25   that you might make calls to get out out the vote.  I

```
 1          A.    Yes.

 2          Q.    And what -- how is that person elected?

 3          A.    By a majority vote of the Democratic Town

 4    Committee members.

 5          Q.    And do you know how many members there are in

 6    the Democratic Town Committee?

 7          A.    There's 60.

 8          Q.    That's two from each ward?

 9          A.    That's correct.

10          Q.    There are 30 wards; the City of New Haven's

11    divided into 30 wards; is that correct?

12          A.    That's correct.

13          Q.    And each ward has an alderman; is that

14    correct, elects an alderman?

15          A.    That's correct.

16          Q.    And what functions does the chair of the

17    Democratic Town Committee perform?

18          A.    What functions am I aware of?  That they

19    serve and they preside as a chairperson of the

20    Democratic Town Committee.

21          Q.    And what does that mean in terms of political

22    power or ability to do things?

23          A.    I think it depends upon, to a significant

24    degree, the extent to which they're intertwined with

25    the mayor.  I think in other cases, it has a
```

1    functionary role of making appointments of -- to

2    various committees within the Democratic Town Committee

3    to, in a sense, controlling the nominating process for

4    the various Democratic positions; and there might be

5    other activities, but those are the ones that come to

6    my mind now.

7        Q.   Would you say that person, the Democratic

8    Town Committee chair, can be a powerful position within

9    the Democratic power for the City of New Haven?

10       A.   Yes.

11            MS. KONE:  Now, if we could have this

12            marked as 19, I believe.

13            (New Haven Register article marked

14            Defendants' Exhibit 19 for identification)

15       Q.   I'm showing you what's been marked as Exhibit

16   19, and that's an article that you've identified

17   previously at your prior deposition which appeared in

18   the New Haven Register on May 14th and announced your

19   wife's support for Sherri Killins candidacy for mayor,

20   and my question is, you'll see in the second column, it

21   says, and I'm going to read to you two paragraphs,

22   "Soon after that November's election," and that's

23   referring to 2001, "Democratic Town Committee Chairman

24   Nick Baletto stepped down and DeStefano ally Susan

25   Voigt as front runner to replace him.  This week, Harp

 1    said, that as the 2002 committee vote approached, she

 2    felt the chairmanship should go to someone that, quote,

 3    looks like New Haven.  Specifically, Harp said, someone

 4    black or Hispanic; and namely, Deputy City Clerk Sally

 5    Brown who managed Harp's 1998 campaign," and then it

 6    says, "Harp met with DeStefano to suggest Brown and the

 7    mayor politely declined, Harp said.  Quote, He said he

 8    had a hand-picked candidate and said thank you very

 9    much, and that's in quotes, Harp said," and then it

 10   said -- the article says, "It was at that point that I

 11   thought, He doesn't really understand how to engage

 12   people in our community at a grass-roots level, and I

 13   decided that I won't be supporting him again, Harp

 14   said.  I think he's limited," closed quotes.

 15        My question to you is, when you -- the

 16   paragraph that says, "This week, Harp said, as the 2002

 17   committee vote approached," is that the election of the

 18   co-chairs in each of the 30 wards that that's referring

 19   to?

 20        A.    I imagine so but I don't know.

 21        Q.    And you don't know because -- that's the only

 22   vote, right?  I mean, that could involve the town

 23   committee; is that correct?  I mean, there's no other

 24   vote that the public's involved in with respect to the

 25   town committee, is there?

1    A.   Well, I don't know because I just don't know.

2    I mean, I didn't think about it.  I don't know.  I

3    imagine that's what it is.

4    Q.   And it says she felt the chair should go to

5    someone that looks like New Haven.  Specifically, Harp

6    said someone black or Hispanic.  Did you, as the 2002

7    elections of town committee approached, agree with

8    Mrs. Harp's suggestions that the chairmanship of the

9    Democratic party should go to someone that, quote,

10   looks like New Haven.  Specifically, someone black or

11   Hispanic?  Do you agree with that statement?

12   A.   Well, I don't know if I agree with that

13   phraseology, but I did agree that it should go to

14   someone other than the candidate that was nominated.

15   Q.   Did you agree that it should go to Sally

16   Brown?

17   A.   Yes, I did.

18   Q.   And other than the candidates nominated, that

19   refers to Susan Voigt; is that correct?

20   A.   That's correct.

21   Q.   And did you agree that it should go to

22   someone who was black or Hispanic?

23   A.   That wasn't the criteria.  I agreed that it

24   should go to Sally Brown.

25   Q.   But you didn't agree that it necessarily had

1    to go to a black or Hispanic individual?

2        A.    That's accurate.

3        Q.    And is one of the reasons that you supported

4    Sherri Killins because Mayor DeStefano had supported

5    Susan Voigt to become the chair of the New Haven

6    Democratic party in 2002?

7        A.    Not really, no.

8        Q.    So that reason that the mayor did not support

9    Sally Brown for town chair in 2002, that had nothing to

10   do with your support for Sherri Killins in 2003?

11       A.    That's accurate.

12       Q.    So you didn't take the same position as

13   Mrs. Harp on that?

14       A.    That's often the case.

15       Q.    Okay.  Now, did there come a time -- now, in

16   the 2002 town chair race where you were supporting

17   Sally Brown, did you support a slate of candidates for

18   Democratic -- for co-chairs of wards who supported

19   Sally Brown?

20       A.    That's accurate.

21       Q.    And by that support, that would mean the

22   kinds of activities that you've previously described

23   that you get involved in when you support a candidate?

24       A.    That's accurate.

25       Q.    And is it accurate also that the slate that

1    the mayor was supporting was a slate -- that the slate

2    of Democratic co-chairs that the mayor was supporting

3    was the slate that was supporting Susan Voigt in the

4    2002 Democratic town co-chair races?

5        A.    I believe so.

6        Q.    So you and the mayor were basically on

7    opposite sides in that 2002 race?

8        A.    Well, we had different positions.

9        Q.    He supported the slate of candidates that

10    were supporting Susan Voigt for Democratic town chair

11    and you supported the slate that was supporting Sally

12    Brown for co-chair?

13        A.    That's accurate.

14        Q.    For town chair.  And I'd like to talk to you

15    about some other races as well and to go back in time a

16    bit.  In 1997, there was an aldermanic race in Ward 29

17    between Carl Goldfield and Darnell Goldson.  Do you

18    recall that race for primary?  I guess a primary to

19    become the aldermanic candidate, the Democratic

20    aldermanic candidate?

21        A.    Not really but go ahead.

22        Q.    You don't recall the race?

23        A.    Not really.  But I mean, it's not something

24    that would have really been on my radar screen.

25        Q.    Well, would you have supported Darnell

1    When I think that his -- well, when I think he's being

2    a good alderman.

3        Q.    And do you recall in 1999 if you felt Ron

4    Gattison was a good alderman?

5        A.    I don't recall.

6        Q.    Okay.  In the 1999 mayoral race, you didn't

7    donate to the John DeStefano campaign either in the

8    primary or in the full race, did you?

9        A.    Who was he running against?

10       Q.    He was running against James Newton.

11       A.    I don't believe I did.

12       Q.    And in the 2001 mayoral race, you testified

13   that you did support Mayor DeStefano, that you actively

14   worked for him?

15       A.    Who did he run against?

16       Q.    He ran against Looney, Martin Looney.

17       A.    Yes, I did.

18       Q.    But you didn't donate to his campaign in

19   2001, did you, financially?

20       A.    I think I probably did.

21       Q.    Now, in 2001, there was a primary for a state

22   representative seat that had been vacated by the death,

23   I guess, of Howard Cippio.  Did you support any of the

24   candidates in that primary?

25       A.    Yes, I did.

1    Q.   And who did you support?

2    A.   I think initially John Daniels ran for that

3    seat and I supported him.

4    Q.   And did the mayor support his opponent?

5    A.   The mayor supported a different person.  I

6    think there were multiple candidates as I recall.  I'm

7    not positive.  I know the mayor supported a different

8    person.

9    Q.   From John Daniels?

10    A.   That's correct.

11    Q.   Now, are you familiar with the entity or

12    association or an organization called Democrats for the

13    Future?

14    A.   Yes, I am.

15    Q.   What is Democrats for the Future?

16    A.   It's an association of people who just come

17    together who -- of which I'm involved in that looks to

18    support candidates that we feel are in the best

19    interest of the city.

20    Q.   And what candidates have Democrats for the

21    Future supported?

22    A.   Certainly, my wife.  I believe, when John

23    DeStefano ran for mayor against Martin Looney, John

24    DeStefano.  Sherri Killins.  Maybe others.  But those

25    come to my mind.

1       Q.    You can't recall any others at this moment?

2       A.    Raoul Avilla when he ran for state

3    representative.

4       Q.    Anybody else?

5       A.    Against charter revision, when -- there was a

6    charter revision question and I'm not sure of the year,

7    but it's sometime after 2000 and it worked against the

8    charter revision proposal.

9       Q.    Okay.

10      A.    Those are things that come to mind.

11      Q.    Anything else?

12      A.    No.

13      Q.    Now, let's talk about the Raoul Avilla race.

14   That was in 2002, was it not?

15      A.    I'm not sure of the time.

16      Q.    Let me show you an article.

17            MS. KONE:   We'll mark this as 20.

18      Q.    And see if this refreshes your recollection.

19            (Newspaper article marked Defendants'

20            Exhibit 20 for identification)

21      A.    Okay.

22      Q.    Does Defendants' 20 refresh your recollection

23   as to what year Raoul Avilla ran for state rep?

24      A.    Well, this says 2002.

25      Q.    So does that refresh your recollection?

1          A.    Well, if it's accurate, yes.

2          Q.    Do you have any reason to believe it's not

3     accurate?

4          A.    No, I don't.  I said --

5          Q.    This is an Advocate article.  That's from the

6     internet.  Can I just have that back, Defendants' 20?

7                And did Raoul Avilla run against -- do you

8     recall who he ran against?

9          A.    John Martinez.

10         Q.    And Mayor DeStefano was a supporter of John

11    Martinez, was he not?

12         A.    On that occasion, yes.

13         Q.    And Raoul Avilla was defeated in that

14    election, was he not?

15         A.    That's correct.

16         Q.    And was this seen or perceived in any way as

17    a challenge by you to Mayor DeStefano's -- well, let me

18    just read this to you.  "Allied with Avilla are New

19    Haven politicians whom the DeStefano team tried to

20    unseat over the past year and ward level committee

21    races.  Also backing Avilla is black power broker slash

22    architect Wendell Harp.  They portrayed backers of

23    Mayor John DeStefano not as reformers cleansing the

24    party in local government but as bullies themselves."

25                Was the race between Avilla and Martinez seen

```
 1       as a race basically challenging Mayor DeStefano's -- as

 2       a challenge to Mayor DeStefano in any way?

 3            A.   Seen as by whom?

 4            Q.   By anyone.  By you, for instance.

 5            A.   No.

 6            Q.   Was it perceived by anybody that you're aware

 7       of as a challenge to Mayor DeStefano?

 8            A.   No.

 9            Q.   And Defendants' 20 reads, "Meanwhile,

10       Avilla's two to one loss was a huge blow to power

11       broker slash architect Wendell Harp"; is that correct?

12            A.   Is what accurate?  That statement?

13            Q.   That sentence, was Avilla's two to one loss a

14       huge blow to you?

15            A.   I think that's a ridiculous comment.

16            Q.   And the next paragraph of Defendants' 20

17       reads, "For decades Harp has won government contracts

18       even amid embarrassing controversies by threatening or

19       staging primaries against city politicos who don't

20       support him.  He's steamed that the major's new allies

21       called his bluff."

22                 Is that an accurate statement, that you were

23       steamed that the mayor's new allies called your bluff?

24            A.   That's a ridiculous comment.

25            Q.   So you think that's not accurate?
```

1        A.    That's correct.

2        Q.    Okay.  And then the next sentence says, "Harp

3    backed Avilla visibly to show city hall its mistake."

4    Is that an accurate statement?

5        A.    Well, when I do things, I always do them

6    openly and with a sense of responsibility and vigor

7    because it's what I believe.  That's what I think is a

8    responsibility of people and whether you win or lose is

9    never the issue.  To me, it's whether or not you do

10   what you think is correct.

11       Q.    But did you -- is this sentence that you

12   backed Avilla visibly to show city hall its mistake, is

13   that accurate?  Did you back him to show city hall that

14   they'd made a mistake in any way?

15       A.    I backed him because he was the candidate

16   that I wanted to have win and supported, and he wasn't

17   running against the city.  He was running against John

18   Martinez for that seat.

19       Q.    So is it accurate that you did not back

20   Avilla to show city hall it had made a mistake?

21       A.    That's a ridiculous comment.

22       Q.    So it's not accurate?

23       A.    It's -- that's correct.

24       Q.    Now, you spoke about a charter revision --

25       A.    Uh huh.

1    Q.    -- that the Democrats for the Future opposed;

2    is that correct?

3    A.    Yes.

4    Q.    And you stated that you did not know what

5    year that occurred; is that correct?

6    A.    I think it was after 2000, I believe.

7    Q.    Was it November 2002?

8    A.    It could have been.

9    Q.    Well, why don't we mark this as 21, Exhibit

10   21, and see if that refreshes your recollection.

11                   (Dear Neighbor letter marked Defendants'

12            Exhibit 21 for identification)

13   Q.    If you could read Defendants' 21.

14                   (Pause in the proceedings)

15   A.    Okay.

16   Q.    And does Defendants' 21 refresh your

17   recollection as to when the charter revision was on the

18   ballot?

19   A.    If it's accurate, yes, 2002.

20   Q.    When you say, "if it's accurate," Defendants'

21   21 is a letter from your wife to neighbors, is it not?

22   A.    That's correct.

23   Q.    And is it signed by your wife?

24   A.    Yes, it is.

25   Q.    And you recognize her signature?

1    A.    Yes, I do.

2    Q.    And do you have any reason to doubt that she

3  would write an incorrect or an inaccurate date in a

4  letter a neighbor?

5    A.    I have no reason to doubt that she would, but

6  she's not the question.  The question is whether or not

7  someone else would alter it.

8    Q.    She wrote this letter, didn't she?

9    A.    Right.

10    Q.    And she signed this letter?

11    A.    I'm responding to the idea that you gave it

12  to me, and I don't doubt that that's the date; but the

13  reference to whether or not I question something is

14  only a general response that I give that what you give

15  me has to be unaltered.  So if this is unaltered, then

16  I think that it's accurate.

17    Q.    Well, I'll represent to you that it's

18  unaltered.

19    A.    Okay.  Then to that extent, I think it's

20  accurate.

21    Q.    At least, it's unaltered by me.

22        Now -- and that's not far from your

23  recollection that it was sometime after 2000 --

24    A.    Right.

25    Q.    -- that there was this issue on the charter?

1   And we're talking about 2002?

2          A.    Right.

3          Q.    Now, the charter revision was to change the

4   City of New Haven's charter to have four-year terms for

5   the mayor and for the aldermen, was it not?

6          A.    Yes.

7          Q.    And you opposed that charter revision, did

8   you not?

9          A.    Yes, I did.

10          Q.    And Mrs. Harp opposed it as well?

11          A.    Yes.

12          Q.    And the mayor strongly supported this charter

13   revision, did he not?

14          A.    Yes.

15          Q.    Now, it's accurate, isn't it, that after

16   March of 2002, you and the mayor were not politically

17   aligned, at least with respect to the slate for the

18   Democratic Town Committee and this charter revision

19   issue; that's correct, right?

20          A.    Repeat that, please.

21                MS. KONE:    Why don't we just read that

22          back.

23                (Last question read back)

24          A.    That's accurate.

25          Q.    Now, after March of 2002, did you and Mayor

SCRIBES, INC.

1   even years; is that correct?

2       A.   I believe so.

3       Q.   And the state senator races are in even

4   years; is that correct?

5       A.   They run contemporaneous.

6       Q.   Now, at your last deposition, you testified

7   about a meeting that you had with Dr. Mayo on May 13th,

8   2003, and do you recall that testimony?

9       A.   Yes.

10      Q.   And it was during that testimony that --

11  well, let me just show you.

12               (Five-page transmittal marked

13               Defendants' Exhibit 22 for identification)

14      Q.   Mr. Harp, it was during that meeting with

15  Dr. Mayo on May 13th, 2003 that you discussed

16  Defendants' 22; is that correct?

17      A.   I think so.

18      Q.   That was your testimony --

19      A.   Yes.

20      Q.   -- at your last deposition.

21           And during that meeting, did you -- were you

22  upset?  Do you recall if you were upset or agitated in

23  any way?

24      A.   No.

25      Q.   And did you -- did Dr. Mayo, during that

1    a bill without having the -- your bill for this work

2    without having had some input from the various

3    committees who would review your work?

4         A.    What I'm saying is that it was kind of multi

5    phase, that our performing the schematic design

6    represented our evaluation of an architectural

7    solution, but that architectural solution also then had

8    a secondary phase of SBBAC committee then critiquing it

9    and making its input and then our doing any kind of

10   changes or revisions to it.  So on one hand, we would

11   have finished the first part, which is our

12   architectural design, but until we've gone through the

13   various committee meetings, he would not have

14   authorized a payment.

15        Q.    And therefore, you didn't submit a payment?

16        A.    That's correct.  We didn't submit a

17   requisition, yes.

18        Q.    Did you request that Mr. Watt be removed as

19   the program manager at any time during 1998, '99 or

20   2000?

21        A.    I think I requested he not be mine, yeah.

22        Q.    Your program manager --

23        A.    Right.

24        Q.    -- for Prince Welch?

25        A.    Yes.

1          Q.    And can you tell me, who did you make that

2     request to?

3          A.    To Dr. Mayo.

4          Q.    And why did you tell Dr. Mayo that you wished

5     that Mr. Watt not be the program manager for this

6     project?

7          A.    Because I felt that I could do a more

8     effective job without Mr. Watt being my program

9     manager.

10          Q.    And what reason did you believe that you

11     could do a more effective job if Mr. Watt was not your

12     program manager, what reasons?

13          A.    Because I felt that my sense of design

14     creativity was different from the sense of

15     regimentation that he is.  I think -- I think his focus

16     was much more narrow focused as a technocrat.  Even

17     though I respect that and appreciate that, but I think

18     it missed, to me, the essence of good design.

19          Q.    And what -- did you make this request in

20     writing or in person to Dr. Mayo?

21          A.    I probably made it in writing.

22          Q.    And what was Dr. Mayo's response to this

23     request?

24          A.    Work with Claude Watt.  He's a good program

25     manager and you two can work it out, and I never had

1    difficulty getting along with him as a person.  I

2    thought he was a fine person.  This was simply a

3    question of architectural style and architectural

4    approach.

5        Q.   And after this request was made, were you

6    able to work better with Mr. Watt or did the problems

7    continue from your point of view?

8        A.   Well, I don't know -- when you say problems,

9    I mean, I think that I always had the same opinion.  I

10   think he's a great technocrat and I think he does -- I

11   think he does the Board of Education great service.  I

12   think for me as an architect, that my design creativity

13   would have been best served if I wasn't under that same

14   constraint, but that was a request and it wasn't

15   accepted.  So that was it.

16       Q.   And did you ever, after that first request

17   was made, did you ever make a second request that

18   Mr. Watt be removed as your program manager?

19       A.   No.

20       Q.   Now, did there come a time where --

21           MS. KONE:  I'm sorry.  If we can mark

22           this, this will be 41.

23           (Memo marked Defendants' Exhibit 41 for

24           identification)

25       Q.   Did you receive Defendants' 41 from Mr. Watt?