**EXHIBIT C**

VOLUME III

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                   :
WENDELL HARP and ARCHITECTS
ENVIRONMENTAL COLLABORATIVE        :
INTERNATIONAL, P.C.,
                                   :
                Plaintiffs,
                                   : Civil Action
        vs.
                                   : No. 3:03CV977
JOHN DeSTEFANO, CITY OF NEW HAVEN      (CFD)
and NEW HAVEN BOARD OF EDUCATION,  :

                Defendants.        :

- - - - - - - - - - - - - - - - - x


            Deposition of WENDELL HARP, taken

        pursuant to the Federal Rules of Civil

        Procedure, at the law offices of Brenner,

        Saltzman & Wallman, LLP, 271 Whitney Avenue,

        New Haven, Connecticut, before Bonita Cohen,

        a Registered Merit Reporter and Notary Public

        in and for the State of Connecticut, License

        Number 00041, on Friday, September 2, 2005,

        at 10:18 a.m.

1          And that's how you get to this use component?

2      A.    Right.

3      Q.    Okay.  And then you decide -- you determine

4   your total costs are 729,185, and then you subtract

5   that from the income and you get your net profit/loss.

6          Now, tell me the number again on page 4 of 4

7   of Exhibit 90.  It says:

8              "W. Harp Loss of Income,

9              "Basic Design Wages" slash Income."

10         How did you come up with that figure?

11     A.    If we go back to -- go to page 2 of 4.  It

12  calls for "Basic Design Services."

13     Q.    Yes.

14     A.    If you'll look at item III, "AECI Principal,"

15  typically, during the design phase, that's primarily

16  what I do, and 50 percent of my time is devoted to

17  that.

18         That would have generated to me income -- it

19  would have been a cost to the project of $109,375, but

20  that also would have been income payable to me.

21         So it was deducted, on one hand, as a cost to

22  the project, but now it gets added back in, because

23  that's income that I individually would have received.

24     Q.    And let me ask you:

25         The $175,000, how did you arrive at that sum?

SCRIBES, INC.

**EXHIBIT D**

CERTIFIED COPY

VOLUME IV

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - x
                                         :
WENDELL HARP AND ARCHITECTS.
ENVIRONMENTAL COLLABORATIVE             :
INTERNATIONAL, P.C.,
                                         :
            Plaintiffs,
                                         :  Case No.
      vs.                                   3:03CV00977
                                         :  (CFD)
JOHN DeSTEFANO, CITY OF NEW HAVEN
AND NEW HAVEN BOARD OF EDUCATION,       :

            Defendants.                  :

- - - - - - - - - - - - - - - - - - - - x


            Continued deposition of WENDELL HARP,

      taken pursuant to the Federal Rules of Civil

      Procedure, at the law offices of Brenner,

      Saltzman & Wallman, 271 Whitney Avenue,

      New Haven, Connecticut, before Janet C.

      Phillips, License #00124, a Registered

      Professional Reporter and Notary Public in

      and for the State of Connecticut, on Monday,

      October 31, 2005, at 11:19 a.m.

624

1     Q.   And can you just tell me what that would be?

2     A.   In the second paragraph, "The city-wide

3  school building committee in April authorized a

4  redesign of the beleaguered project, citing a desire to

5  save needed housing stock from a wrecking ball.  School

6  construction officials last month said they were

7  negotiating with Harp's firm, Architects Environmental

8  Collaborative, PC to modify the plans.  Instead, the

9  school board voted Tuesday to give the redesign to

10  David Brody Bond of New York City, minority-owned firm

11  that is also redesigning the new Jackie Robinson

12  School."

13        That was dated May 28.  Our termination was a

14  little bit subsequent to that.  And in April, we were

15  being -- we were negotiating for a contract

16  modification.  The only thing that happened in between

17  that period of time was the announcement of my wife's

18  support for Sherry Killins.

19     Q.   Is there anything else in the article?

20     A.   "Harp is the husband of State Senator Toni

21  Harp, Democrat, of New Haven, who two weeks ago

22  endorsed DeStefano's opponent in the September primary

23  race for mayor, Sherry Killins.  Wendell Harp also is

24  supporting Killins, whose campaign headquarters is

25  housed in a building owned by Harp."  Quote by Mayor,

1    "If anything, this wasn't a political decision made

2    because of politics; this was a decision made despite

3    politics."

4        Q.    What do you think the significance of the

5    Mayor's statements are in terms of your claim in this

6    lawsuit?

7        A.    Well, I think it a duplicitous statement, a

8    lie.

9        Q.    It's not true?

10       A.    I think it's a lie, yes.

11       Q.    I just want to make sure I understand

12   something.  Is it your claim that AECI's contract was

13   terminated because of your wife's support of Sherry

14   Killins or because of your support of Sherry Killins or

15   because of both of your support of Sherry Killins?

16       A.    Both.

17       Q.    Okay.  Is there anything else that you didn't

18   tell me about in those articles that are reflective of

19   your claim, or I don't want to use the word support,

20   but I'll say, you know, they assist in your claims or

21   they lend credence to your claims or I would use the

22   words or they support your claims?

23       A.    I think the whole article dated May 14th

24   probably reflects that.  The topic is entitled, the

25   article is entitled: "Killins, Harp Take on Democratic

1    Status Quo."

2              In the third paragraph, it says, "Killins is

3    the candidate, but today the spotlight shines brightest

4    on State Senator Toni Harp, Democrat, New Haven, the

5    sleeping giant of Democratic party politics in

6    New Haven, and the first person to endorse officially

7    Killins' candidacy."

8         Q.    And can you tell me why you think that

9    paragraph is consistent or aids or supports your claim

10   in this lawsuit?

11        A.    Again, the contract was moving along well, it

12   had been endorsed by the Mayor, who previously then had

13   given a public affirmation in the newspaper as to why

14   he felt it should be done.  He and his Board of

15   Education members had recommended that it go -- first

16   of all, they recommended that it be undertaken.

17             Then they recommended that it go to the

18   finance and administration and finance committee.  They

19   had sent it to the corp. counsel for approval.  And

20   again, the only intervening difference was the

21   endorsement of my wife and my support for Ms. Killins

22   for mayor.

23        Q.    All right.

24        A.    There were no other conditions that existed

25   that gave rise to termination of the contract.

1    would have been probably easier had it simply -- well,

2    it does.  It's intended to reflect, this document, it

3    says Exhibit C, Exhibit C wasn't attached.  So I think

4    once it's attached, then it clearly then spells out the

5    characteristics of the loss.

6        Q.   So there's really no difference between the

7    two documents?

8        A.   That's accurate.

9        Q.   On page 2 of 118, there's a heading which is

10   called Plaintiff's Emotional Suffering of Plaintiff

11   HARP.  I'll read to you what's written on page 2.  "The

12   Plaintiff Harp was subject to public humiliation and

13   consequential pain, suffering and emotional distress by

14   the conduct of all defendants."

15            And then it says, "Only a jury can determine

16   the fair value of such injuries.  Plaintiff estimates

17   the fair value of these injuries to be $500,000."

18            Starting with the first sentence, can you

19   tell me what was the public humiliation that you were

20   subject to by the conduct of all defendants?

21       A.   May I see Exhibit 3?  Exhibit 3 is an article

22   disseminating -- prepared by the New Haven Register

23   dated May 28, 2003 which has a publication of tens of

24   thousands of people throughout the State of Connecticut

25   that says, "Architect fired from Prince-Welch School,"

1    which then highlights the firing and termination of me

2    from the school for what I believe are purely political

3    and personal and malicious reasons, and then followed

4    up with supportive editorials from the New Haven

5    Register and commentary from the Mayor.

6         Q.    Let me start with the commentary from the

7    Mayor.  Can you tell me, is that commentary found in

8    Exhibit 3?

9         A.    Yes, it is.

10        Q.    And can you read to me what the commentary is

11   that you claim caused you public humiliation?

12        A.    I think all of his statements in there do.

13   Everything that is attributed to him, as well as I

14   think the primary substance, which is the termination

15   of the contract, which is the most important.

16        Q.    Okay.  So let me just make sure the record is

17   clear.  You're talking about the article on page 1 of

18   Exhibit 3, is that correct, in terms of the comments by

19   the Mayor that are attributed to him?

20        A.    Yes.  And I'm also talking about the letter

21   of termination issued by the Board of Education.

22        Q.    And was that disseminated to the public in

23   any way?

24        A.    Sure.

25        Q.    And how do you know that?

1           A.    Because the headline says, "Architect fired

2     from school."  The only way that could happen is if

3     they disseminated that information.

4           Q.    That the letter was disseminated?

5           A.    Well, the information in the letter is the

6     same thing.

7           Q.    Okay.  So it's the fact of the termination

8     that caused you the public humiliation; is that what

9     you're saying?

10          A.    Yes.

11          Q.    Now, you said that editorials followed this

12    article on page 1 of Defendants' 3?

13          A.    Yes.  There was at least one subsequent and I

14    think several other New Haven Register editorials and I

15    believe some other articles relating to this firing.

16          Q.    And do you have those articles?

17          A.    No.

18          Q.    Do you know the dates of those articles?

19          A.    Sometime between that particular article and

20    I think several months or a month later.  And then

21    probably -- well, that's the time frame that I recall.

22          Q.    But you do not have any copies of those

23    articles?

24          A.    No.

25          Q.    Do you know if your counsel has any copies of

```
 1    those articles?

 2         A.   My counsel?

 3         Q.   Yes.

 4         A.   I would doubt it.

 5         Q.   And were those articles in the New Haven

 6    Register or were they also in other publications?

 7         A.   I don't know if they were in other

 8    publications.

 9         Q.   And what did those articles or editorials say

10    that you can recall?

11         A.   I think that they probably supported just the

12    idea of the termination.

13         Q.   Okay.  Anything else that you can recall?

14         A.   Not that I can recall.

15         Q.   And do you recall in what way they supported

16    the termination?

17         A.   I don't recall what way they supported it.

18         Q.   Now, had you ever -- had AECI or you

19    personally ever been fired from a project before?

20         A.   No.

21         Q.   And have you ever been fired from a project

22    since, AECI or yourself?

23         A.   No.

24         Q.   Were there any articles in any newspaper

25    prior to the termination of AECI's contract with
```

1    critical of AECI or your performance prior to the

2    termination of the contract?

3        A.    I think that the New Haven Register would

4    have had an editorial probably critical of us.  I don't

5    know if it would regard the Prince-Welch School.

6        Q.    I'm asking only regarding the Prince-Welch

7    School.

8        A.    I don't know specifically.

9        Q.    Prior to -- let me just ask you something:

10   Why do you find the article -- an article that says you

11   were fired from the Prince-Welch School or AECI was

12   fired from the Prince-Welch School humiliating?

13       A.    Because I don't believe it's standard within

14   the professional world or probably within anybody's

15   world even as a laborer, janitors, anyone else to

16   believe that being fired is not something that reflects

17   badly upon them.

18            I think that kind of is typically inherent

19   within the concept of someone being fired that they

20   did -- typically, it's presumed that it is done with

21   some degree of basis or, you know, with some degree of

22   substantiation for it, which I think tends to reflect

23   badly upon the person being fired.

24       Q.    There's some sense that the person did not

25   perform adequately, is that correct?

1          A.    That's accurate.

2          Q.    Now, prior to the termination of AECI's

3    contract for the Prince-Welch project, had there ever

4    been a malpractice suit filed against AECI?

5          A.    Never.

6          Q.    And can I bring your attention --

7          A.    Well, let me retrench from that.  I'm going

8    to put them in the same context.  The Board of

9    Education -- the Mayor or the City of New Haven pursued

10   a litigation against us simultaneous with this on the

11   Career High School.  Prior to that, we've never had any

12   malpractice claims in 30 years.

13         Q.    What was the date that the City of New Haven

14   commenced that or the Board of Ed commenced that

15   malpractice claim?

16         A.    As far as I know, it was last year, something

17   like that.

18         Q.    2004?

19         A.    2004 or late 2003.

20         Q.    After this termination?

21         A.    After the termination.  Now, we were

22   advised -- I was advised --

23                    MS. ENGSTROM:  Is this a privileged

24              matter?

25                    THE WITNESS:  No, no, it's not

                        SCRIBES, INC.

1      A.    Yes, it does.

2      Q.    Now, going back to 118, it said that you

3   suffered -- that you were subject to public humiliation

4   and consequential pain suffering and emotional

5   distress.  Can you describe for me the pain, suffering

6   and emotional distress that you had suffered?

7      A.    Sure.  First of all, the loss of roughly a

8   two million dollar contract, the impact upon

9   financially upon the business and myself and the staff.

10         And of course, just the humiliation of the

11   termination, and the sense of violation from someone

12   who's holding a public office to use it in a

13   retaliatory manner for someone exercising a right that

14   is due them.

15      Q.    Anything else?

16      A.    That's it.

17      Q.    And by emotional distress, can you tell me

18   what suffering -- can you explain to me what kind of

19   emotional distress and suffering you underwent?

20      A.    Sure.  I think it's like anyone else who

21   experiences the need to own a business, to provide for

22   their employees, to provide for their family, and to

23   have it be short-circuited, to be violated in a purely

24   retaliatory manner, that is, the termination in a

25   purely retaliatory manner because that person refuses

1    number?

2        A.    That's a number that I think is reasonable

3    for the degree of humiliation and unfairness as a

4    consequence of that action.

5        Q.    Turning to page 2 and the next heading,

6    Punitive damages against defendant DeStefano, and the

7    first sentence says, "Defendant DeStefano acted

8    maliciously, wantonly and the utmost of bad faith in

9    causing the plaintiff's injuries," could you give, tell

10   me what facts you're relying on for that statement?

11       A.    Can I what?

12       Q.    Tell me what facts that you're relying on for

13   that statement that "Defendant DeStefano acted

14   maliciously, wantonly and the utmost of bad faith in

15   causing the plaintiff's injuries."

16       A.    Sure.  We had a contract in effect.  We had

17   an amendment that was proposed for execution.  We had

18   negotiated the terms and conditions of a revision of

19   that contract.

20           We had proceeded toward having it adopted and

21   approved by the Board of Education.  He had sent it to

22   the corp. counsel.  And the only issue intervening

23   between that was the fact that myself, my wife chose

24   not to support him.

25       Q.    And he sent it, being -- who do you mean by

SCRIBES, INC.