**EXHIBIT E**

CERTIFIED COPY

VOLUME V

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                   :
WENDELL HARP AND ARCHITECTS        :
ENVIRONMENTAL COLLABORATIVE        :
INTERNATIONAL, P.C.,               :
                                   :
                Plaintiffs,        :
                                   : Case No.
        vs.                        : 3:03 CV-977 (CFD)
                                   :
JOHN DeSTEFANO, CITY OF NEW HAVEN  :
AND NEW HAVEN BOARD OF EDUCATION,  :
                                   :
                Defendants.        :
                                   :
- - - - - - - - - - - - - - - - - x


            Continued deposition of WENDELL HARP,

        taken pursuant to the Federal Rules of Civil

        Procedure, at the law offices of Brenner,

        Saltzman & Wallman, LLP, 271 Whitney Avenue,

        New Haven, Connecticut, before Jenny L.

        Albert, License #00207, a Registered

        Professional Reporter and Notary Public in

        and for the State of Connecticut, on Tuesday,

        November 1, 2005, at 11:29 a.m.

1        Q.    And in the last five years, has there been

2    any time in which you have taken any medication for

3    emotional distress?

4        A.    No.

5        Q.    And yesterday, I asked you whether or not,

6    due to the termination of the contract for the

7    Prince-Welch, there was any family or personal issue

8    that had caused you emotional distress, but my question

9    today is:   Was there any AECI business, financial or

10   professional event starting in 2000 that caused you

11   emotional distress other than the termination of this

12   contract and the incident which happened that you

13   described yesterday?

14       A.    Can you define for me what you characterize

15   as emotional distress?

16       Q.    Well, my definition of emotional distress

17   would be only what you have set forth in plaintiffs'

18   supplementary damages analysis and I'm not sure what

19   exhibit number that is but as defined or as set forth

20   in the supplementary damages analysis.

21       A.    Well, with that definition then, it would

22   only be those issues then.

23       Q.    Okay.  Did you have any financial

24   difficulties beginning in the year 2000 that caused you

25   emotional distress?

1          A.    The loan payments had been -- the loan

2     payments had been averaging about almost $17,000 a

3     month, and the Connecticut Development Authority

4     advised me that they were willing to offer a reduction

5     in payment if I would agree to pay off the principal in

6     an earlier period of time, if I could arrange outside

7     financing.    They had given me -- well, they hadn't

8     given me.    They had, at that time, loans for developing

9     businesses, you know, for people who looked to create

10    new businesses, provide employment opportunity.    They

11    were offering loans at roughly 5 and a half percent

12    interest.    They advised me that they were looking to

13    remove some of these loans from their books at the

14    lower rate and that if I were able to, in a sense, pay

15    them off roughly 90 percent of the loan amount, that

16    they would waive the balance.    I agreed to that.

17         Q.    Okay.    Were there any other unusual

18    financial -- so were there any unusual financial

19    situations that caused you emotional distress in the

20    years 2000 to present in your business role?

21         A.    If you can define for me emotional distress.

22         Q.    Just the emotional distress that you set

23    forth in the exhibit -- the supplementary damages

24    analysis.

25         A.    Well, I would characterize that differently

1          Q.    And can you tell me what Dr. Mayo said during

2     any of those discussions?

3          A.    Well, we didn't have a great amount of

4     discussion.  I recall I represented to him once the

5     idea of perhaps transferring from under the auspices of

6     Mr. Watt being the contract administrator over my

7     particular school and the fact that I believed that

8     there wasn't a great sense of design appreciation or

9     perhaps even design talent within the administrative

10    structure that was over me, and he told me, in effect,

11    to kind of just ignore it.  Give him the list of

12    concerns that I had and just proceed on and,

13    ultimately, that I wouldn't have to be concerned, that

14    they would not be looking to try to make me design a

15    box, in effect, that he appreciated my architectural

16    talent, thought it was the best that he'd seen in the

17    city.  In fact, he said in the state, and that he would

18    do the things necessary to encourage it and support it

19    and just for me to work with Mr. Watt.

20         Q.    And when was that conversation?

21         A.    I'm not quite sure of the date, but there was

22    a letter that I had written to Mr. -- to Dr. Mayo, and

23    I believe it was in 2002 or maybe 2003, that he had

24    articulated part of my concern and the meeting was

25    following that.

```
 1        A.    Okay.

 2        Q.    And then we just won't be guessing.

 3                   (Pause in the proceedings)

 4        Q.    So I'm showing you Defendants' 22 and ask --

 5                   MS. KONE:   And then I will also mark --

 6              if we could mark this document as our next

 7              document.

 8                   (May 30, 2002 fax with attached letters

 9              marked Defendants' Exhibit 127 for

10              identification)

11        Q.    Now, first of all, can you identify what's

12   been marked Defendants' 127?

13        A.    It's a letter and a transmittal from me

14   dated -- the letter is dated May 29th, '02 and the fax

15   is dated May 30th, '02 forwarded to Mr. Watt.

16        Q.    And attached to the fax, there are three

17   letters; is that correct?

18        A.    That's accurate.

19        Q.    And the third letter -- there are actually a

20   number of letters, but the last letter -- the second to

21   last letter, which would be three pages from the end of

22   this exhibit, is a letter from you to Dr. Mayo

23   requesting a meeting?

24        A.    That's accurate.

25        Q.    Now, before, you had testified that you wrote
```

administrator who was not particularly concerned about

design or aesthetics per se, at least not to the extent

that I saw, or even the creative functionality of a

building, but then I think that was kind of common to

many school systems or at least to some that I've dealt

with before; and I'd simply asked that I thought it

would be more productive for me if I had a different

administrator.

Q.    And did that conversation -- when did that

conversation occur?

A.    I'm not sure of the exact date.  It probably

was in 2000 -- late 2002 or 2003.

Q.    Other than that conversation, did you have

any other conversations with Dr. Mayo about the

performance of AECI under the Prince-Welch contract?

A.    Well, yes, I think in a more --

Q.    Okay.  And can you describe those other

additional conversations?

A.    Well, we were having dinner one evening.  As

I said, we were friends.  We were having dinner one

evening and he'd indicated that there was some other

school projects coming up and, in effect, which ones

was I interested in doing and that those could, of

course, be orchestrated at the same time in doing the

Prince-Welch and how did I feel about that, in effect,

1      Q.   And do you know if there was more than one

2    request by Mr. Watt that the survey include above

3    ground surface development, if he had made more than

4    one request?

5      A.   I don't recall.

6      Q.   Okay.  Now, you testified that you thought

7    that Mr. Watt wrote a letter citing deficiencies after

8    you had written a letter requesting a program manager

9    transfer.  Did you write any response to anyone saying

10   that you thought that Mr. Watt's letter citing

11   deficiencies was retaliatory or not justified or had no

12   merit?

13     A.   I don't know if I wrote a letter, but I did

14   have discussion with Dr. Mayo subsequent to that.

15     Q.   And what did you tell Dr. Mayo?

16     A.   He, in effect, told me to get along with him.

17   Don't be overly concerned about the issues of having

18   to -- having issues like having to design to a box, to

19   be -- and to, in effect, work with him, which I didn't

20   have one particular concern.  I always thought he was

21   personally nice and engaging.  He was relatively easy

22   to, I think, like as a person.  I think the

23   difficulties that we had were purely professional.

24     Q.   And those difficulties had to do with, you

25   think, his lack of appreciation of your artistic or

1   your creative or your design needs?

2       A.   I'm not sure lack of appreciation is a good

3   phraseology, even if I may have used it.  I don't think

4   that's a good phraseology, but it's probably the best I

5   can think of at the time, yeah, so --

6       Q.   It's the best you can think of right now?

7       A.   Right.

8       Q.   Now, you testified at one of your depositions

9   that there were two SBBAC meetings, one of which Claude

10  Watt did not tell you about and you'd gotten a call

11  from the school principal, Ms. Wells?

12      A.   Yes.

13      Q.   Did you get a call for that meeting?  Did you

14  learn about that meeting before or after it took place?

15      A.   Afterwards.

16      Q.   And then you said there was another meeting

17  that had been rescheduled and you were not told of the

18  rescheduled date; is that correct?

19      A.   I believe so.

20      Q.   Okay.  Do you recall when these meetings

21  occurred, what the dates of those meetings were?

22      A.   No, I don't.

23      Q.   Generally, do you recall in terms of year and

24  season or --

25      A.   I would imagine that they would have been

1    completion of CD?

2        A.    I believe that we had.

3        Q.    And had you, by November 20th, 2001, provided

4    a listing of the anticipated content of the four DD

5    phase deliverables?

6        A.    I believe so but I'm not positive.

7        Q.    With respect to the bottom of page one of 156

8    where it says, "The SBBAC is to be convened on a

9    monthly basis minimum to review and comment on design.

10   The SBBAC only approved the schematic design principle

11   and, hence, reserving the right for future comment,"

12   and then it says, "To date, they have not been afforded

13   that opportunity."  Do you know why the SBBAC had not

14   been afforded the opportunity to comment on design?

15       A.    Probably because they had not been provided

16   or reviewed subsequent set of design development

17   documents.

18       Q.    Had Mr. Watt asked that, prior to November

19   20th, 2001, that you show the SBBAC the design

20   development documents that were in progress?

21       A.    I'm sure that he had or at least believe that

22   he had, and I think I indicated to Mr. Watt that -- I'm

23   quite sure that I did -- the manner in which I -- and I

24   think this was part of the issue.  The manner in which

25   I design buildings was, one, both reflecting their

1    requirements but also one of just inspiration of design

2    and that something such as design creativity without

3    purely mechanical functions and that I would often go

4    through a series of designs and a series of

5    presentations not satisfying myself and therefore be

6    unwilling -- not satisfy myself creatively and

7    therefore not be willing to present it to the board

8    simply to meet their design time frame, and that's what

9    I indicated to him; but I told him that we would meet

10   the criteria of meeting within that four-month time

11   frame but not necessarily on a weekly basis or several

12   weekly basis.

13        Q.   Do you know if between August 2001 and

14   November 20th, 2001, your firm had shown the SBBAC any

15   design development documents?

16        A.   I think what we had only been presented to

17   Mr. Watt as progress drawings but not that we had

18   presented to them, as I recall, as a submission ready

19   for design critique.

20        Q.   So I'm a little confused.  So had you shown

21   the design development documents to the SBBAC between

22   August 2001 and November 20th, 2001?

23        A.   I don't believe so.

24        Q.   And the next item --

25        A.   But I'm not positive.

1    development documents to what we deemed as 25 percent

2    construction documents.

3                    MS. KONE:  And if we could have this

4            marked as Exhibit 165.

5                    (Document marked Defendants' Exhibit 165

6            for identification)

7        Q.   If you could look at Exhibit 165 and tell

8    me -- I'm sorry.  I do have three more exhibits, so

9    let's stop for a moment.  How do you want me to do

10   this?  I have three more exhibits.  I don't think the

11   questioning will be long, but I do have three more

12   exhibits.

13       A.   Make them real quick.

14       Q.   165, can you identify that document?

15       A.   It's a communication from Mr. Watt to myself

16   in which he's asserting that there is a requirement

17   under the basic services contract under the provisions

18   of site survey to include components of work which are

19   public street closings and utility connections.

20                   MS. KONE:  And this will be 166.

21                   (Document marked Defendants' Exhibit 166

22           for identification)

23       Q.   Now, did there come a time when it appeared

24   there might be some issue with respect to the church

25   that the board of ed. being able to acquire the land

1    upon which a church sat?

2         A.   Yes.

3         Q.   And you testified to that earlier.

4              And did Mr. Watt ask you to give him a

5    proposal to redesign the school to make it look more

6    urbanized?

7         A.   Yes, he did.

8         Q.   And to -- and is this request set forth in

9    Defendants' 166?

10        A.   Yes.

11        Q.   And he also requests other changes such as --

12   that the -- or at least states that the common

13   functions are decentralized, he discusses the wide

14   variety of materials and he talks about a concern about

15   the travel of distance between the bus drop off and the

16   facility?

17        A.   Yes.

18        Q.   Did you agree with any of those comments set

19   forth in 2 A, B, C or D?

20        A.   I don't know if agreement is the word, but I

21   understand that he is the party in charge and that we

22   needed to be responsive to those.  To some extent, I

23   think that we could attempt to exercise normal

24   architectural artistic prerogatives but that,

25   ultimately, they're the client and we do what the

1    A.   No.  I had provided them a response.

2    Q.   But you didn't know why they had asked you

3  for a more limited scope of services?

4    A.   Well, I took it as a proposal from Mr. Watt,

5  so --

6    Q.   Yeah.  But did you know what the motivation

7  for that proposal was?

8    A.   No.

9         MS. KONE:  And if we could mark this

10        document for identification.  This will be

11        for Kit.

12        (Document marked Defendants' Exhibit 167

13        for identification)

14    Q.   If you can look at Defendants' Exhibit 167

15  for identification, is this the letter that Mr. Watt

16  asked you, in part, for a proposal for AECI to provide,

17  quote, unquote, only consulting services for the

18  construction document, construction administration

19  phase and another architectural firm would be selected

20  to provide the professional services?

21    A.   Yes.

22    Q.   And you said that you did provide a response,

23  you provided a proposal and response to 167; is that

24  correct?

25    A.   We provided a response to it.  I'm not sure

**EXHIBIT F**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

DEFENDANT'S
EXHIBIT
90
9-2005

WENDELL HARP and
ARCHITECTS ENVIRONMENTAL
COLLABORATIVE INTERNATIONAL, P.C.

VS.

JOHN DeSTEFANO,
CITY OF NEW HAVEN and
NEW HAVEN BOARD OF EDUCATION

:
:
:
:
:
:
:
:
:
:
:

NO. 3:03CV977(CFD)

AUGUST 22, 2005

## PLAINTIFF'S DAMAGE ANALYSIS

Plaintiff sustained economic damages as a result of the termination of the Prince-Welch School contract in April, 2003.

As of April 8, 2003, the projected construction budget was $20,103,339. (Ex. A)

As of 2005, the projected cost for the project had risen to $38,400,000, which would arguably have required a higher architectural fee, although plaintiff is not claiming it. (Ex. B)

The plaintiff claims direct total compensation for the project as $923,450. He projects his total costs and expenses (ncluding his normal income and office overhead) would have amounted to $729,185.

He places his total lost profits and income at $485,200. (Ex. C)[1]

THE PLAINTIFFS

BY: _Katrena Engstrom_
KATRENA ENGSTROM (ct09444)
51 Elm Street
New Haven, CT 06510
203/562-9931
FAX: 203/776-9494
E-Mail: kengstrom@johnrwilliams.com
Their Attorney

CERTIFICATION OF SERVICE

On the date above stated, copies hereof were mailed or transmitted by e-mail to Attorney Rodger W. Lehr, Jr., Deputy Corporation Counsel, 165 Church Street, New Haven, CT 06510 [E-Mail: rlehr@newhavenct.net]; and Attorney Carolyn W. Kone at Brenner, Saltzman & Wallman LLP, 271 Whitney Avenue, New Haven, CT 06511 [E-Mail: ckone@bswlaw.com].

_Katrena Engstrom_
KATRENA ENGSTROM

---

[1]  An alternative method to determine the plaintiffs loss is as follows: In April, 2003, the plaintiff's fee was set by defendants at approximately 5% of the total construction cost. (Ex. A)  In January, 2004, the defendants' budget for the Prince Welch construction project had risen to $38,400,000.  (City of New Haven, Board of Education Web Site)  A 5% allocation would amount to $1.9 million.  Using the same pro-rata of defendant's loss of income/profits et al., 5% of $1.9 million = $969,000.

**A**

New Haven Public Schools
School Construction Program



54 Meadow Street
New Haven, Connecticut 06519

Sent Via Fax and First Class Mail

April 8, 2003

Mr. Wendell Harp, AIA
Architects Environmental Collaborative International, PC
300 Whalley Avenue
New Haven, CT 06511

Re.:     Prince Welch School Project
         (SDE#093-306, City No. 99-100-03)

Dear Mr. Harp:
The current construction budget is listed below. Included within this budget are costs for the demolition of the existing structures and site improvements _ see Items 'f and g'. Items 'a, b, c, d, e, i and j' reflect the anticipated cost for the construction of the new school building and site development (budget value @ $17,103,923). Item 'a' OCIP (Owner Controlled Insurance Program) is deducted at the time of the bid as a cost paid by the Owner. Item 'l' (Construction Contingency) should not be included as part of the estimated cost of construction. This cost is assigned to certain conditions of the project that may arise during the construction phase of the work.

CONSTRUCTION BUDGET

| | | |
|---|---|---:|
| a. | OCIP Service Charges | 501,598 |
| b. | Bldg Permit App. Prep. & Fees | 0 |
| c. | Building Construction (Trade Contractor) | 14,502,325 |
| d. | Site & Earth Work | 1,700,000 |
| e. | Street Roadway & Utility Demolition | 300,000 |
| f. | Existing Building Demolition | 1,816,000 |
| g. | Soil Remediation | 250,000 |
| i. | Offsite/Ineligible Costs | 100,000 |
| j. | Escalation @ 3% | 0 |
| k. | Subtotal | 19,169,923 |
| l. | Construction Contingency @ 5% | 933,416 |
| | TOTAL CONSTRUCTION VALUE | 20,103,339 |

If you have any questions feel free to contact me.

Sincerely,

Claude E. Watt Jr.
Program Manager
New Haven School Construction Program

cc:     Thomas Rogér
        Susan Weisselberg

TOTAL P.05

| Delivery | at cost |
|---|---|
| Parking | at cost |
| Other copying and printing | at cost |
| In house plotting cost | $ 3.00 per sheet (for black & white) |
| | $ 6.00 per sheet (for color) |

79.  Article 10.5: The following shall be added to the end of Subparagraph 10.5:

"The Owner may institute a withholding from the Architect if the Owner or the Program Manager determines, at their sole discretion, that the Architect is not making satisfactory progress or there is other specific cause for such withholding which shall be stated in writing by the Owner or Program Manager ten (10) days prior to instituting a withholding."

## ARTICLE 11

## BASIS OF COMPENSATION

80.  Article 11, Subparagraph 11.1:  Subparagraph 11.1 is hereby deleted in its entirety.

81.  Article 11, Subparagraph 11.2.1: The following shall be added after the words "computed as follows:"

"Compensation shall be a stipulated lump sum of $1,121,000 payable in accordance with the provisions of Subparagraph 11.2.2 hereof and includes:

| Basic Services | $1,121,000 |
|---|---|

For changes in the project budget that necessitate a modification in the Architect's services and contract fees, Architect will provide a detailed cost proposal to Owner describing the services and costs associated with the proposed change."

82.  Article 11, Subparagraph 11.2.2:  The percentages listed in Subparagraph 12.2.2 are hereby deleted in their entirety, and the following percentages shall be inserted in lieu thereof:

| Schematic Design Phase: | 20 % |
|---|---|
| Design Development Phase: | 25 % |
| Construction Documents Phase: | 32 % |
| Bidding and Negotiation Phase: | 3 % |
| Construction Phase: | 20 % |

02/10/00

# EXHIBIT I – SCHEDULE OF VALUES FOR SERVICES

The Architect agrees to complete the different phases of Basic Services and Additional services within the following specified values and budget allowances:

| Item Description: | Article | Values: |
|---|---|---|
| **Basic Design Services** | 2.1.1 | |
| Schematic Design Phase | 2.2.1 | 224,200 |
| Design Development Phase | 2.3.1 | 280,250 |
| Construction Document Phase | 2.4.1 | 358,720 |
| Bidding Phase | 2.5.1 | 33,630 |
| Construction Administration Phase | 2.6.1 | 224,200 |
| | | |
| **Subtotal: Basic Design Services:** | | **1,121,000** |
| | | |
| **Additional Design Services** | | |
| Measured Drawings | 3.4.6 | NIC |
| Non-illuminated Scale Model | 3.4.21 | 14,700 |
| As–Built Record Reproducible Drawings | 3.4.22 | 32,000 |
| Building Program / Ed Specs | 3.4.23 | --- |
| Building Program / Ed Specs Addendum | 3.4.23.1 | --- |
| Site Selection | 3.4.25 | --- |
| Hourly Rate Additional Services | 3.4.26 | 20,000 |
| **Subtotal:  Additional Services** | | **66,700** |
| | | |
| **Consultants:** | | |
| Telecommunications Specialist | 3.4.24 | 35,000 |
| Security Consultant | 3.4.24 | 20,000 |
| Site Survey | 3.4.24 | 45,000 |
| Lighting Consultant | 3.4.24 | 10,000 |
| Acoustical Consultant | 3.4.24 | 10,000 |
| Audio Visual Consultant | 3.4.24 | 10,000 |
| Kitchen / Food Service Design Consultant | 3.4.24 | 15,000 |
| Code Consultant | 3.4.24 | 10,000 |
| FF&E Consultant | 3.4.24 | 90,000 |
| Geotechnical Consultant | 3.4.24 | 50,000 |
| Traffic Study | 3.4.24 | 10,000 |
| **Subtotal: Consultants** | | **305,000** |
| | | |
| **Total** | | **1,492,700** |
| | | |
| Reimbursable expenses  allowance | 10.2.1 | 45,000 |
| **Total of Table:** | | **1,537,700** |

All assignments and uses of the additional services and consultants require the written approval of the owner.  The values for additional services and consultants shall include the Architect's overhead and profit.

**B**



## New Prince / Welch K-8 School

Congress Avenue and Ward Street

Planned Opening 2006

Enrollment 650

Grades Pre-K – 8

Size 84,000 square feet

Cost $38,400,000

Architect: Davis Brody Bond

Construction Manager: Giordano Construction

Thirty years ago, the City of New Haven promised to build a new school for the Prince and Welch Annex School students, parents, and staff. Over the last six years, sites in the Upper Hill neighborhood have been identified, reviewed, revised and approved, and all property is now acquired. Relocations are ongoing and site cleaning is underway.

The new school building, which merges the two existing school populations, is being redesigned. The new school will continue to be two classes per grade, pre-K-8, with 650 pupils and the same key features (classrooms, library media center, science/art/music rooms, cafeteria, gymnasium, other specialized space). The redesign will adhere to the new design, energy and material standards and space program now in development by the School Construction Program.

There will be open space for outdoor classroom activities on the school site and adequate on site parking for staff and visitors.

The new schools facilities and outdoor spaces offer educational and recreational opportunities lacking in the existing schools. They were built in the 1930's, each on a site less than half an acre in size. Both schools are wedged in the area with medical offices and cannot be expanded.

The new building will have a smaller footprint than the original design, and may, in some portions, be three stories rather than two. It will complement its urban environment, with a red brick exterior and standard modular windows.

The school will continue to offer its "dual language" program, which is part of the comprehensive program consistent with the subjects offered in all our schools including music, art, and science as part of the regular curriculum. Welch Annex was the first school to pilot the dual language program beginning with kindergartners. Welch has two kindergartens and two first grade classes involved in a dual language program. Both classes have an average of 50% Spanish speakers and 50% English speakers. They are grouped for reading and writing in their native language in the morning and the rest of the day they are mixed, working in a target language. Dual Language instruction is a catching on nationally as an effective way to immerse kids in two languages and to help them master the basics of reading and writing while also broadening their cultural education.

26

## Worthington Hooker School Renovation

Whitney Avenue

Planned Opening 2006

Enrollment 354

Grades 3 – 8

Size 60,000 square feet

Cost $20,400,000

Architect: Roth & Moore

Construction Manager: Bridgeport Restoration

The new building will have an auditorium/stage, a gymnasium, science labs, a computer lab and a cafeteria, a library/media center, a music room, an art studio, and special education resource rooms. Also to be provided are support service rooms, including but not limited to: a teacher's room, a parents' area, administrative offices, a health suite, and office/conference areas for such functions as guidance counselor, social worker, speech pathologist, language assessment and school psychologist.

The school will offer a comprehensive program consistent with the subjects offered in all our schools including music, art, and science as part of the regular curriculum.

The site of the new building will have adequate on-site parking for staff and visitors and open space for outdoor classroom activities.

180 Canner Street

Planned Opening 2006

Enrollment 173

Grades K – 2

Size 24,000 square feet

Cost $7,980,000

Architect: Milton Lewis Howard Architects
Ancora Emma Architects

Construction Manager: Tri-Con

This renovate-as-new project will update the existing school to current building code and accessibility guidelines.

The School will include a relating kitchen, a cafeteria, a library/media center, a music room, an art studio, and special education resource rooms. Also to be provided are support service rooms, including but not limited to: a teacher's room, a parents' area, administrative offices, a health suite, and office/conference areas for such functions as guidance counselor, social worker, speech pathologist, language assessment and school psychologist.

The school will offer a comprehensive program consistent with the subjects offered in all our schools including music, art, and science as part of the regular curriculum.

27





New Haven Public Schools
Citywide School Construction

Project Summary

John DeStefano, Jr., Mayor
Dr. Reginald Mayo, Superintendent of Schools

# New Haven Public Schools
# Citywide School Construction



## Project Summary

John DeStefano, Jr., Mayor
Dr. Reginald Mayo, Superintendent of Schools

January 2004  Second Edition

# Contents

2  Overview
3  Message from Mayor John DeStefano, Jr.
4  Message from Superintendent of Schools Dr. Reginald Mayo

**COMPLETED SCHOOLS**
5  Hill Regional Career High School
6  Edgewood School
7  Lincoln-Bassett Elementary School
8  Clarence Rogers School
9  Swing Space
10  Harry A. Conte West Hills Magnet School
11  Katherine Brennan School
12  Wexler/Grant Community School
13  James Hillhouse High School
14  New Haven Athletic Center
15  Wilbur Cross High School
16  Betsy Ross Arts Magnet School
17  Aquaculture/Sound School
18  Nathan Hale School
19  Central Kitchen/Satellite Kitchens

**UNDER CONSTRUCTION**
20  Fair Haven Middle School
21  New Fair Haven Pre-K – 8
22  Jackie Robinson Replacement School
23  Truman School
24  Old Betsy Ross School
25  Celentano School
26  Prince/Welch

**IN DESIGN**
27  Benjamin Jepson School
27  Worthington Hooker School Renovation
28  New Worthington Hooker School
28  Barnard Magnet School
29  Beecher School
29  Clinton Avenue School
30  Troup School
30  New Cooperative Arts & Humanities High School
31  Christopher Columbus School
31  Sheridan Communications & Technology

**APPENDIX**
32  Summary Project Schedule
33  Citywide School Construction benefits New Haven workers and professional artists
34  District Accomplishments
36  Oversight Boards and Committees

C



# architects environmental collaborative international

300 Whalley Ave.
New Haven, CT 06511
(203) 624-0815

Page 1 of 4
8-19-05

ANALYSIS OF AECI
LOSS OF INCOME AND PROFIT
DUE TO TERMINATION OF PRINCE-WELCH
SCHOOL ARCHITECTURAL CONTRACT

Total Gross A/E and Consultant Contract                    $1,537,00

Analysis of Gross Architectural Income
        Less Consultant and Basic Engineering Services

Total Architectural fee exclusive of
        Engineering and consultant services

|  | Gross Contract | AECI Net Basic Fee |
|---|---|---|
| AECI Basic Design Services Fee<br>Less Basic Engineer Services | $1,121,000 | $ 811,000 |
| Mech/Elec: Eng. Des. Group | $ 200,000 | |
| Landscape Des: | 8,000 | |
| Structural Eng: M. Horton Assoc. | 102,000 | |
| Sub-total Basic Eng. Fee | $ 310,000 | |
| AECI Arch. Fee @ Basic Services<br>(less Basic Eng. Fees) | $ 811,000 | |
| AECI Additional Services Fee | $ 66,700 | $ 66,700 |
| AECI Consultant Services Fee<br>(AECI overhead, coordination, & profit @ 15%) | $ 305,000 | $ 45,750 |
| AECI Direct Total Compensation | | $ 923,450 |

# ANALYSIS OF AECI COSTS FOR BASIC DESIGN SERVICES

## I.    AECI In-House Personnel

| Position | Personnel | Approx. Annual Wages + OV HB | x | Length of Design Svc. @ 16 Mths. | x | % Allocated Time | = | Est. Pro-Rata Cost |
|----------|-----------|------|---|------|---|------|---|------|
| Architect | Charles Ahlstrom | $90,000 | x | 1.25 | x | 50% | | $56,250 |
| Dftsmn | Neftali Arroyo | 35,000 | x | 1.25 | x | 50% | | 21,875 |
| Dftsmn | Kim Graham | 25,000 | x | 1.25 | x | 50% | | 15,625 |
| Admin. | Joy Dunston | 30,000 | x | 1.25 | x | 50% | | 18,750 |

## II.    AECI Architectural Consultants

| Position | Personnel | | x | | x | | | |
|----------|-----------|------|---|------|---|------|---|------|
| Architect | Hunter Smith | $100,000 | x | .5 | x | 100% | | 50,000 |
| Architect | Scott Small | 100,000 | x | .2 | x | 0 | | 20,000 |

## III.    AECI Principal

| Position | Personnel | | x | | x | | | |
|----------|-----------|------|---|------|---|------|---|------|
| Architect | Wendell Harp | $175,000 | x | 1.25 | x | 50% | | 109,375 |

Total Est. Direct AECI Costs @ Basic Design Services      $ 291,875

# ANALYSIS OF AECI DIRECT COSTS FOR CONSTRUCTION ADMINISTRATION

AECI In-House Personnel

| Position | Personnel | Approx. Annual Wages + OV HB | x | Length of Design Svc. @ 16 Mths. | x | % Allocated Time | = | Est. Pro-Rata Cost |
|---|---|---|---|---|---|---|---|---|
| Architect | Charles Ahlstrom | $90,000 | x | 1.75 | x | 50% | | $78,750 |
| Dftsmn | Neftali Arroyo | 35,000 | x | 1.75 | x | 50% | | 30,625 |
| Dftsmn | Kim Graham | 25,000 | x | 1.75 | x | 50% | | 43,750 |
| Admin. | Joy Dunston | 30,000 | x | 1.75 | x | 50% | | 13,125 |

IV.    AECI Architectural Consultants

| Position | Personnel | | | | | % Allocated Time | | Est. Pro-Rata Cost |
|---|---|---|---|---|---|---|---|---|
| Architect | Hunter Smith | $100,000 | x | 1.75 | x | 50% | | 87,500 |
| Architect | Scott Small | 100,000 | x | 1.75 | x | 20% | | 35,000 |

V.    AECI Principal

| Position | Personnel | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Architect | Wendell Harp | $175,000 | x | 1.75 | x | 25% | | 76,560 |

Total Est. Direct AECI Costs @ Construction Administration    $365,310

SUMMARY OF W. HARP AND
AECI INCOME LOSS AND PROFIT

VI.  Summary of AECI Direct Costs
A.  Wage, Salary, and Consultant Costs
    1.  AECI Basic Services @ Design          $ 291,875
    2.  AECI Const. Admin.                       365,310
    Sub-total                                  $ 657,185

B.  Insurance, Overhead, Facilities, Et. Al.

    Professional Liab Insurance               $  33,000
        ($22,000 ann. prem.x 3yrs x .50%=$33,000)
    Facilities Use/Rent/Utilities et. al.         72,000
        ($48,000 x 3yr. x 50%=$72,00)
    Sub-total                                 $ 105,000

C.  Total all AECI Operations Cost.           $ 729,185

VII.  Computation of Loss of Income and Profit

    1.  Profit Loss
        Proj. Total AECI Income =             $ 923,450
        Less Total AECI Costs                 - 729,185
        Net Profit Loss                       $ 194,265

    2.  W. Harp Loss of Income
        Basic Design Wages/Income               109,375
        Const. Admin. Wages/Income               76,560
        Sub-total                             $ 185,935

    3.  Total W. Harp/AECI Loss
            Of Income and Profits
        Profit Loss                           $ 194,265
        W. Harp Income Loss                     185,935
        Loss Income @ Overhead
        Facilities Exp. & P.L. Ins.             105,000
        Total Loss of Income                  $ 485,200
            Overhead, Profit

**EXHIBIT G**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

WENDELL HARP and                    :
ARCHITECTS ENVIRONMENTAL           :
COLLABORATIVE INTERNATIONAL, P.C.  :
                                    :
VS.                                 :        NO. 3:03CV977(CFD)
                                    :
JOHN DeSTEFANO,                     :
CITY OF NEW HAVEN and              :
NEW HAVEN BOARD OF EDUCATION        :        SEPTEMBER 26,  2005

## PLAINTIFF'S SUPPLEMENTARY DAMAGES ANALYSIS

Pursuant to the order of this court (Smith, J.) issued one month after the

plaintiff's original Damages Analysis was submitted to defense counsel, the

plaintiffs supplement their damages analysis as follows:

*I     ECONOMIC DAMAGES AGAINST ALL DEFENDANTS:*

Plaintiff sustained economic damages as a result of the termination of the

Prince-Welch School contract in April, 2003.

As of April 8, 2003, the projected construction budget was $20,103,339.

(Ex. A)

As of 2005, the projected cost for the project had risen to $38,400,000,

which would arguably have required a higher architectural fee, although plaintiff

1



is not claiming it. (Ex. B)

The plaintiff claims direct total compensation for the project as $923,450. He projects his total costs and expenses (ncluding his normal income and office overhead) would have amounted to $729,185.

The plaintiffs' total lost profits and income is $485,200. (Ex. C)

## II    EMOTIONAL DISTRESS, PAIN AND SUFFERING OF PLAINTIFF HARP

The plaintiff Harp was subjected to public humiliation and consequential pain, suffering and emotional distress by the conduct of all defendants. Only a jury can determine the fair value of such injuries. Plaintiff estimates the fair value of these injuries to be $500,000.

## III    PUNITIVE DAMAGES AGAINST DEFENDANT DeSTEFANO

Defendant DeStefano acted maliciously, wantonly and the utmost of bad faith in causing the plaintiffs' injuries. Punitive damages should be assessed against him in an amount to be decided by the jury in the exercise of its sound judgment. However, because of the egregiousness of defendant DeStefano's misconduct and his obvious lack of remorse, a sum sufficient to dissuade him from similar misconduct in the future would be $1,500,000.

2

*IV*    *ATTORNEY FEES AGAINST ALL DEFENDANTS*

Attorney fees in an amount to be determined by the court after entry of

judgment in accordance with standard rules pursuant to 42 U.S.C. § 1988.


THE PLAINTIFFS


BY:_____

JOHN R. WILLIAMS (ct00215)
51 Elm Street
New Haven, CT 06510
203/562-9931
FAX: 203/776-9494
E-Mail: jrw@johnrwilliams.com
Their Attorney


CERTIFICATION OF SERVICE

On the date above stated, copies hereof were mailed or transmitted by e-mail to
Attorney Rodger W. Lehr, Jr., Deputy Corporation Counsel, 165 Church Street,
New Haven, CT 06510 [E-Mail: rlehr@newhavenct.net]; and Attorney Carolyn W.
Kone at Brenner, Saltzman & Wallman LLP, 271 Whitney Avenue, New Haven,
CT 06511 [E-Mail: ckone@bswlaw.com].


_____

JOHN R. WILLIAMS

3

**EXHIBIT H**

300 Whalley Avenue, 3rd Floor, New Haven, CT 06511
Tel. (203) 777-1875        Fax (203) 777-9891

**Architects
Environmental
Collaborative
International, P.C.**



DEFENDANT'S
EXHIBIT
22
7/14/05

# Transmittal

| To: Dr. Mayo | From: Wendell C. Harp |
|---|---|
| Fax: Hand Delivered | Pages: 5 |
| Phone: | Date: 5/13/03 |
| Re: Prince-Welch School redesign criteria | CC: |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

---

Re: Review of 5-9-03 proposed redesign Criteria @ Prince-Welch School

Mayo,

My concerns are two-fold:

1. TIMELINES: The actual time allowed to do the work would be o.k. as per the schedule – but since we have not received the approval to start as called for in the letter; I changed the timeline to go by the number of days from the time we get a notice to proceed.

2. DESIGN: The requirements spelled out in the letter almost dictate a box with "punched window openings"



What is the purpose of such a meaningless and terrible looking criteria? Revise please.

Thank You    Wendell C. Harp

*Preliminary Internal Draft Subject to Revision – 5/9/03*

EXHIBIT ___ to Architect Agreement

## Supplemental Conditions for the Redesign

The Architect agrees to redesign the new Prince Welch School in accordance with the criteria established by the Owner. This Agreement with these supplemental conditions as issued supersedes the Agreement dated March 27, 2000. This revised Agreement is issued with the understanding the Architect shall revise the design of the school facility within the terms, conditions and parameters prescribed by the Owner. These are as follows:

### Changes in Site: Land Use Studies

1. The Architect 's basic design services will include a series of conceptual land use studies. These concept studies will reflect the following considerations and changes:
   a. The City will not acquire the parcel at 34 - 36 Asylum Street.
   b. The City owns 33 Asylum Street, but is considering not developing this parcel as part of the school site.
   c. The City has given the property owner at 46 Ward Street the option to keep their parcel. This parcel would be excluded from the school site. The property owner has expressed an interest in following through with the sale of this parcel to the City. Final resolution is pending, based upon the owner meeting the City's time frame for relocating off the site.
   d. The City owns the parcels at 611 and 619 - 635 Congress Avenue, but has opted not to develop these parcels as part of the school site.
   e. The City owns 6 and 8 - 10 Baldwin Street, but is considering not developing these parcels as part of the school site. Whether these parcels are to be a part of the final school site configuration is unknown at this time.
   f. The City owns the parcels at 12, 14, 18, 20, 22, 24, 26, 28, 30, 32, 34, and 38 Baldwin Street. Each of these parcels is included as part of the school project site.
   g. The development of the new school building is limited to the land area between Baldwin and Ward Streets.

### Baldwin and Asylum Streets

1. The section of Asylum Street between Davenport and Congress Avenue south of 34 – 36 Asylum Street will be closed and demolished as part of AECI's scope of work. This includes the disconnection, relocation and/or removal of all above and below ground utilities within the existing public right of way.

2. Asylum Street is to be closed per the original scope. The Architect's design shall include within the design the redesign of the street section of Asylum, which

*Preliminary Internal Draft Subject to Revision – 5/9/03*

intersects with Davenport. This section shall be developed to allow a turn around and access the abutting properties.

3. Baldwin Street will remain open as a public right of way, subject to confirmation from the Owner after review with the SBBAC and others. The Owner reserves the right to opt to close Baldwin Street prior to completion of schematic design. If the Owner chooses this option, the Architect will include the demolition of Baldwin Street as part of its scope of work.

## Educational Program

1. The school's educational program will continue to support a Pre-K-8 school for 600 pupils. The Architect's design shall reflect the model space program provided by the School Construction Program.

## Building Design and Revised Site Plan

1. The Architect will adhere to the new design, material and energy standards, which standards will be incorporated by attachment to this Agreement. The Owner and the Citywide School Building Committee allow no deviations from the new standards without prior approval. The Architect and its consultants shall participate in the energy savings program as established by United Illuminating. The Mechanical, Electrical and Plumbing Engineers will provide a life cycle cost analysis, which examines various MEP / HVAC systems for the facility. The Architect and its consultants will make a presentation of these systems to the Owner. The Owner-approved system will be incorporated into the design.

2. The size of the new facility is limited to the net 84,000sf allowed by the State Department of Education (SDE) space standards.

3. The change in site size and configuration requires that the physical design of the facility adapt to the more limited land area. The Architect will provide land use schemes and site plans, to be reviewed and approved by the Owner. The site is to support four primary components: minimal building footprint, off-street parking, play / recreation area and service support for school maintenance and operations. Provide bus drop off along Baldwin Street. The direction of traffic flow along Baldwin and Ward will remain.

4. The Architect's design will incorporate the use of three floors above grade. The Architect will provide variations on preliminary conceptual design ideas that show the space program's layout, groupings and adjacencies, as well as major entrances and a clear "front door." The Owner's acceptance of a particular scheme or combination of schemes will constitute the basis for the schematic design.

*[handwritten: These design limitations mean create a box "why!"]*

*Preliminary Internal Draft Subject to Revision – 5/9/03*

5. The Architect's design will reflect the rich urban texture that typifies the City of New Haven. The Architect shall incorporate the use of red brick and individual modular windows (discreet punched window openings for repetitive glass sizes of neutrally tinted glass) at the exterior walls. The Architect is to solicit and incorporate input from both the City Plan Department and the Historic District Commission, as directed by the Owner. The Architect is to provide further context of the building to its neighbors on the adjacent blocks, with elevations drawn to a certain scale and in the context of the neighborhood. The building vocabulary will not consist of undifferentiated long ribbon windows and spandrels. The building setback will be compatible with the predominant pattern of adjacent blocks. The new school building will be developed on the land area between Baldwin and Ward Streets, with the mass of the building along Congress Avenue. The service components will be located and screened appropriately, as directed and approved by the Owner. The schematic design, in incorporating these components, shall rely heavily on rectilinear forms and shall incorporate the Owner's comments, including comments concerning cost.

*[handwritten: why the requirement to make a box-like school?]*

6. The revised land use scheme and site plan and conceptual design ideas will include the incorporation of comments from the School-Based Building Advisory Committee (SBBAC), the City Plan Department staff, the Historic District Commission, and others, as directed by the Owner.

**Time Frames**

The School-Based Building Advisory Committee (SBBAC) will be reconstituted and reconvene.

The educational program review will be completed and provided to the Program Manager by June 30, 2003.

The conceptual revised land use schemes and site plans will be:
- provided to the Program Manager by May 30, 2003; *[handwritten: within 20 days of notice to proceed]*
- provided to the SBBAC for review and comment by June 5, 2003; *[handwritten: 15 days of PM comments]*
- provided to the Program Manager by June 20, 2003, including the incorporation

of comments from the SBBAC, City Plan Department and others as directed by the Owner. *[handwritten: 15 days of SBBAC comments]*

The conceptual design ideas will be:
- provided to the Program Manager by July 3, 2003; *[handwritten: 30 days NTP]*
- provided to the SBBAC for review and comment by July 10, 2003; *[handwritten: 15 days comments from PM]*
- provided to the Program Manager by July 24, 2003, including the incorporation

of comments from the SBBAC, City Plan Department and others as directed by the Owner. *[handwritten: 15 days comments]*

3

The schematic design, including the outline of materials and building components, will be:
- provided to the Program Manager by Sept. 1, 2003; *— 75 days of NTP*
- provided to the SBBAC for review and comment by Sept. 8, 2003; *— 15 days of PM Comments*
- provided to the Program Manager by Sept. 22, 2003 incorporating SBBAC comments and utilized for other reviews and suggestions as directed by the Owner;
- revised, completed, and presented to the Citywide School Building Committee by Oct. 9, 2003. *— 15 days of PM/SBBAC Comments*

The design development will be completed and: *— 130 days of NTP*
- provided to the Program Manager by Jan. 8, 2004;
- provided to the SBBAC, City Plan Department, the Historic District Commission and others as directed by the Owner, for review and comment by Jan. 15, 2004; *15 days of comments*
- revised, completed, and provided to the Program Manager, including the incorporation of comments, by Jan. 29, 2004. *— 15 days of PM comments*

The energy savings program and various MEP / HVAC systems for the facility will be:
- completed and provided to the Program Manager by Oct. 1, 2003; *— 30 days NTP*
- if the Program Manager so directs, provided to others for review and comment by Oct. 8, 2003; *— 10 days of comments*
- revised, completed, and provided to the Program Manager, including the incorporation of comments, by Oct. 22, 2003. *— 10 days of comments*