Exhibit K
2 of 2

during the course of the Project. In the event such total Construction Costs exceed such limit, Architect shall consult with Owner promptly following a determination of such projected excess, to recommend changes in the Project necessary to reduce the total Construction Costs to such fixed amount."

## ARTICLE 6

## USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS
## AND OTHER DOCUMENTS

53.   Article 6, Paragraph 6.1: The following language shall be added immediately after the deleted last sentence of said Subparagraph: "In the event Owner uses the Drawings and Specifications in connection with renovations or additions to the Project or for any other purposes other than as contemplated by this Agreement, Architect shall have no liability to the Owner for any such reuse of these documents without the Architect's written adaptation of these documents by Architect for such purposes, and Owner agrees to indemnify and hold Architect harmless from and against any and all damages caused by or arising out of such reuse by Owner."

## ARTICLE 7

## DISPUTE RESOLUTION

54.   The title "Arbitration," shall be deleted and replaced with "Dispute Resolution."

55.   Paragraphs 7.1, 7.2, 7.3 and 7.4 are hereby deleted in their entirety and replaced with the following:

"7.1  Should any claim, dispute or other matter arise between the Architect and the Owner arising out of or relating to this Agreement or the breach thereof, except as provided in paragraph 2.6.17 with respect to the Architect's decisions on matters relating to artistic effect or aesthetic effect, and except for claims which have been waived by the making or acceptance of final payment, such matters shall be decided as follows:

7.1.1  The matter, upon written request of either the Architect or the Owner, shall be referred immediately to the designated representatives of the Owner and the Architect for settlement. Each party will be represented by one individual who has no direct responsibility for the matters contemplated by this Agreement or the matters involved in

the dispute, but who is authorized to settle the matter involved in the dispute (collectively, the "Representatives"). The representatives shall meeting promptly in a good faith effort to resolve the dispute.

7.1.2  If the Representatives are unable to reach a resolution within fifteen (15) calendar days of referral of the matter to them (or such other time as may be agreed to between the Representatives based upon the issues involved and the complexity of the matters related thereto), the matter may be submitted by either party to voluntary non-binding mediation through the American Arbitration Association or such other third-party mediation service as may be jointly agreed upon between the parties. The submission by either party to mediation is neither mandatory nor is the result thereof binding on either party; however, should one party submit the matter to mediation, the other party shall be bound to proceed with the mediation process. Any such mediation shall be completed within thirty (30) days of submission and each of the parties shall cooperate in the process. Both parties may agree to extend the process depending upon the issues involved and the complexity of the matters therein. Matters relating to information to be provided in any mediation proceeding, the schedule for exchange of documentation, the location for proceedings and similar matters shall be as prescribed by the selected mediator. In the event that the parties are unable to agree upon a specific mediator or mediators, depending upon the rules of the mediation body selected by the party requesting mediation, the mediator(s) shall be selected by the body chosen, or if none has been chosen, by the Representative. Once the mediator has issued a finding with respect to the matters, the parties may agree to abide by the same, or either party may commence or continue litigation with respect to matters which are the subject of the mediation in the manner provide for herein.

7.1.3   Any claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof which are not resolved pursuant to he procedures called for in Subparagraphs 7.1.1 and 7.1.2 above shall be subject to arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association

currently in effect unless the parties mutually agree otherwise. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

7.1.4    Each of the parties shall bear its respective costs incurred in connection with the procedures called for in Subparagraphs 7.1.1 through 7.1.3 above, except that the parties shall share equally in any fees or expenses of the mediator(s) and/or arbitrator(s).

7.1.5    The parties agree that no arbitration proceeding may commence during the procedures called for in Subparagraphs 7.1.1 or 7.1.2 above until the earlier of the occurrence of one of the following:

(a)  The mediation procedures shall have been concluded or the time period called for shall have passed; or

(b)  Any date after which the commencement of litigation would be barred by any applicable Statute of Limitations shall be imminent.

Notwithstanding the foregoing, it is agreed that the parties will, despite the commencement of arbitration proceedings, continue to participate in good faith in the process described in Subparagraphs 7.1.1 and 7.1.2 above.

7.2  The parties recognize that all procedures provided for in Subparagraphs 7.1.1 and 7.1.2 are conducted for the purposes of settlement or compromise of a dispute, and the parties agree, with the execution of this Agreement, to keep confidential all aspects of any proceeding called for in Subparagraphs 7.1.1 or 7.1.2 above, including without limitation, all written, prepared or oral presentations, statements of any mediator or any other person hired as an expert with respect to such proceedings, and that the same shall remain confidential as to all other persons and shall be inadmissible as evidence in any pending or later filed civil action directly or indirectly involving the parties or subject matter, and inadmissible for any other purpose by virtue of the agreement of the parties and the principles expressed in Rule 408 of the Federal Rules of Evidence.

7.3  The parties agree that any proceeding commenced under
subparagraphs 7.1.1 and 7.1.2 and any arbitration
proceedings commenced with respect to this Agreement or
the Project may be expanded by any party by consolidation
or joinder or in any other appropriate manner to include
resolution of disputes with any other party involved in the
Project, which disputes arise out of a common question of
facts or law and if the presence of such party is desirable or
required to accord complete relief.  The intent of the
provision is to allow a single opportunity for resolution of
disputes relating to the same facts or events.  This
agreement to utilize consolidation or joinder shall be
specifically enforceable in any court having jurisdiction.

7.4  Unless otherwise agreed in writing, the Architect shall
carry on its services as provided in this Agreement and
maintain its progress during any proceedings undertaken
pursuant to this Article, and the Owner shall continue to
make payments to the Architect in accordance with this
Agreement, except for matters specifically relating to the
dispute."

7.5  The provisions of this Article 7 shall be incorporated
in any agreements or contracts entered into by
Architect with respect to the Project, including the
provisions of Paragraph 7.3 allowing consolidation or
joinder.

## ARTICLE 8

## TERMINATION, SUSPENSION OR ABANDONMENT

56.    Article 8. Paragraph 8.1:  The word "seven" is hereby deleted from the second line
of said Paragraph, and the word "ten" shall be added in lieu thereof.  The following
language shall be added at the end of Paragraph 8.1: "In the event this Agreement
is terminated due to the fault of the Architect or Architect's election to voluntarily
terminate this Agreement (without fault of Owner or the occurrence of a force
majeure event), the Architect shall not be entitled to receive any unpaid
compensation for Basic and Additional Services allegedly due or for any
Reimbursable Expenses allegedly incurred to date.  In the event this Agreement is
terminated due to the fault of the Owner or Owner's election to voluntarily
terminate this Agreement (without fault of Architect), the Architect shall be entitled

to receive compensation for the portion of its fee then earned and all substantiated Reimbursable Expenses incurred as of the date of termination.'"

57.    Article 8, Paragraph 8.2: Paragraph 8.2 is hereby deleted in its entirety from this Agreement and replace with the following:

> "8.2 In the event that the Owner has not acquired the site for the Project within twelve (12) months from the date of this Agreement, the Architect shall have the right to terminate this Agreement by providing the Owner with ten (10) days' written notice thereof."

58.    Article 8, Paragraph 8.3: The words "the Architect" in the fifth line of the Paragraph are deleted and replaced with "either party."

59.    Article 8, Paragraph 8.4: The following language shall be added directly at the end of said Paragraph: "Notwithstanding the foregoing, the Owner's failure to make payments in accordance with this Agreement shall not be considered substantial nonperformance and cause for termination unless and until the Owner fails to make payment in accordance with this Agreement on more than three (3) occasions or on one (1) occasion which continues for a continuous period of more than ninety (90) days."

60.    Article 8, Paragraph 8.5: The phrase "upon seven days written notice to the Owner" in the second and third lines is deleted and replaced with "seven (7) days after Owner's actual receipt of written notice,". After the eighth word in the fifth line (the word "of"), the words "the date of" are hereby deleted and replaced with the words "Owner's actual receipt of."

61.    Article 8, Paragraph 8.6: The balance of the sentence after the words "then due" are hereby deleted and a "." is hereby added.

62.    Article 8, Paragraph 8.7: Paragraph 8.7 is hereby deleted in its entirety from this Agreement, and the following language is substituted therefor: "Except as set forth in Subparagraph 8.1 hereof, in the event this Agreement is terminated by either the Owner or Architect, the Architect shall be compensated for all services satisfactorily performed in accordance with this Agreement and Reimbursable Expenses then due, prior to the date of termination."

# ARTICLE 9

## MISCELLANEOUS PROVISIONS

63. Article 9, Paragraph 9.1: The phrase "Unless otherwise provided," in the first line is hereby deleted, and the word "this" in the first line is hereby changed to "This". The words "the place where the Project is located" in the second line is deleted and replaced with "the State of Connecticut."

64. Article 9, Paragraph 9.4: The words "covered by property insurance . . . current as of the date of this Agreement" in this Paragraph are hereby deleted and replaced with "of actual recovery of any insurance proceeds."

65. Article 9, Paragraph 9.10: The following new Paragraph 9.10 shall be added directly after Paragraph 9.9:

> "When written notice, or other formal notice required pursuant to Articles 7, 8 or 9, shall be required by this Agreement or is otherwise appropriate, notice to the Architect shall be deemed to have been duly delivered if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice. If to the Owner, written notice shall be deemed to have been duly served if sent by registered or certified mail to the Coordinator of School Facilities Planning and Construction, New Haven School District, 54 Meadow Street, New Haven, Connecticut 06519."

66. Article 9, Paragraph 9.11: The following new Paragraph 9.11 shall be added directly after Paragraph 9.10:

> "The Architect shall provide the Owner with a certificate of insurance prior to the commencement of the services herein, evidencing insurance coverage for not less than the limits of liability as follows:

| Types of Insurance | Limits of Liability |
|---|---|
| Workers' Compensation | $ Statutory |
| Employer's Liability | $ 500,000 |
| Comprehensive General | $ 2,000,000 General Aggregate |

| (Bodily Injury and Property Damage) | $1,000,000 Each Occurrence |
| Comprehensive Automobile (Bodily Injury and Property Damage) | $1,000,000 Each Occurrence<br>$1,000,000 Each Person |
| Professional Liability (Errors and Omissions) | $1,000,000 |

Such policies shall provide that they may not be canceled, materially changed or allowed to expire until after thirty (30) days prior written notice to Owner. In addition, the Owner shall be named as an Additional Insured on such policies, except for the professional liability and workers' compensation policies. The professional liability coverage shall be carried by the Architect for the term of construction and for a period of five (5) years after the date of the Certificate of Substantial Completion. The Comprehensive General Liability policy limits shall be dedicated to the Project (i.e., apply on a per project basis).

## ARTICLE 10

## PAYMENTS TO THE ARCHITECT

67. **Article 10.2, Paragraph 10.2.1**: The following language shall be added after the end of the first full sentence: "Reimbursable Expenses payable to Architect hereunder may not exceed $45,000 without the prior written consent of Owner." The following sentence shall be added directly after the end of such sentence.

> "All requests for reimbursement of Reimbursable Expenses shall be accompanied by receipts for such expenses, or, in lieu of receipts, other evidence satisfactory to Owner."

68. **Article 10.2, Paragraph 10.2.1.1**: The words "Expense of transportation in connection with the Project" in the first and second lines of said Subparagraph are deleted.

69. Article 10.2, Paragraph 10.2.1.2: The words ",including expenses incurred in the preparation of bid packages" shall be added at the end of Paragraph 10.2.1.2 immediately before the "."

70. **Article 10.2, Paragraph 10.2.1.4.**: The following shall be added at the beginning of Paragraph 10.2.1.4: "Except as set forth in Paragraph 3.4.21,". The word "models" is deleted from such Subparagraph.

71. Article 10.2, Paragraph 10.2.1.5.: The balance of the sentence after the words "in excess of that" are hereby deleted and replaced with the following: "described in Subparagraph 9.11 hereof."

72. Article 10.2, Paragraph 10.2.1.6.: Subparagraph 10.2.1.6 is deleted in its entirety.

73. Article 10.2, Paragraph 10.2.2.: The following new Subparagraph 10.2.2 is hereby added immediately following Subparagraph 10.2.1.6:

"The following designated Reimbursable Expenses shall be paid at the rates set forth below:

| | |
|---|---|
| Phone | at cost |
| In-house copies | $ .05 per page |
| In-house prints | $3.00 per sheet |
| Postage | at cost |
| Delivery | at cost |
| Parking | at cost |
| Other copying and printing | at cost |

## ARTICLE 11

### BASIS OF COMPENSATION

74. Article 11, Subparagraph 11.1. Subparagraph 11.1 is hereby deleted in its entirety.

75. Article 11, Subparagraph 11.2.1. The following shall be added after the words "computed as follows:"

"Compensation shall be a stipulated lump sum of $1,121,000, payable in accordance with the provisions of Subparagraph 11.2.2 hereof In the event that the New Haven Board of Education, New Haven Board of Aldermen, Citywide School Building Committee and State of Connecticut Department of Education approve an increase in the fixed limit of total Construction Costs for the Project set forth on Exhibit D attached hereto and made a part hereof and such increase is not due in whole or in part to the fault, negligence or willful misconduct of the Architect, then the Architect's compensation shall be increased by an amount equal to eight percent (8%) of the increase in such fixed limit of total Construction Costs. "

76.    Article 11, Subparagraph 11.2.3: The following new Subparagraph 11.2.3 shall be added on page 9 of the Agreement directly after Subparagraph 11.2.2:

> "11.2.3  In the event of a material change in the scope of the Project or the Architect's services, the Architect shall continue to perform in accordance with the terms of this Agreement during the course of any renegotiation of the Architect's compensation hereunder."

## ARTICLE 12

### OTHER CONDITIONS OR SERVICES

The following new Paragraphs shall be added on page 11 of this Agreement:

77.    "12.1  Meetings. A representative of the Architect shall be present at all School Based Building Committee meetings as required (unless otherwise instructed by Owner) and shall be responsible for preparing the minutes of such meetings with Owner."

78.    "12.2  Events of Default. Either party may terminate this Agreement for default (an "Event of Default") by the other party  in the event of the occurrence of any event described below:

(1)    the dissolution or liquidation of a party, or cessation of doing business for thirty (30) days or more;

(2)    a party makes an assignment for the benefit of creditors;

(3)    a party either commences, or has commenced against it, bankruptcy proceedings under the Federal Bankruptcy Code or under any other insolvency law;

(4)    a trustee, receiver, custodian, or liquidator is named for the purpose of general administration of such party's property;

(5)    the failure by a party to observe or perform any covenant, condition, agreement or undertaking hereunder on its part to be observed or performed for a period of fifteen (15) days after notice specifying such failure and requesting that it be remedied is given to such party, unless the other party shall agree, in writing, to an extension of such time prior to its extension."

79. "12.3 ADA. Architect shall conform its Drawings and Specifications to the requirements of the Americans With Disabilities Act Accessibility Guidelines ("ADAAG")."

80. "12.4 No Presumption Against Drafter. Both parties acknowledge and agree that this Agreement has been freely negotiated by both parties, and that, in any dispute over the meaning, interpretation, validity or enforceability of this Agreement or any of its terms or conditions, there shall be no presumption whatsoever against either party by virtue of that party having drafted this Agreement or any portion thereof."

81. "12.5 Severability. If any provision or subparagraph of this Agreement shall to any extent be held void, unenforceable or invalid, then the remainder of this Agreement or the application of such provision to the persons or circumstances other than those as to which it is held void, unenforceable or invalid shall not be affected thereby, and each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law."

82. "12.6 CADD. All schematic, design and contract drawings and documents prepared by Architect shall be computer-aided design drawings."

83. "12.7 Compliance with City Of New Haven Requirements. The Architect shall in the performance of its work, in hiring, and in the employment, at all times comply with all applicable City of New Haven, State and Federal laws, statutes, ordinances, regulations and any special requirements of the Contract Documents in effect during the term of this Agreement, including without limitation, equal employment opportunity and affirmative action programs and execution of the City's equal opportunity clause attached hereto as Exhibit B and made a part hereof and provision of the Architect's affirmative action program and/or equal opportunity statement."

84. "12.8 Indemnity. The Architect hereby agrees to indemnify and hold the Owner, and any subsidiary, parent or affiliate corporations of the Owner , and their trustees, directors, officers, agents and employees (collectively, the "Indemnitees") harmless from all losses, claims, liabilities, injuries, damages and expenses, including attorneys' fees, that the Indemnitees may incur (i) to the extent arising out of or resulting from the Architect's performance of the Basic Services which results in bodily injury or physical or actual damage to the property of the Architect or its agents, subcontractors, employees or licensees; (ii) to the extent arising out of or resulting from any violation by the Architect of state, federal, or local law, rule or regulation which results in bodily injury or physical or actual damage or the imposition of a fine, penalty or other charge; or (iii) arising out of or resulting from the negligence or willful misconduct of the Architect or the Architect's agents, subcontractors, employees or licensees; provided, however, that nothing contained herein shall be construed as requiring the Architect to indemnify the Indemnitees or any of them

for any claim for damage or loss of any kind when said damage or loss was caused in whole or in part by the negligence or willful misconduct of the Indemnitees or any of them. The Architect shall include in each agreement with a subcontractor for the Project, a provision similar to this Subparagraph 12.8 which provides that such subcontractor shall indemnify the Architect and the Indemnitees for all losses, claims, liabilities, injuries, damages and expenses, including attorneys' fees, that the Architect or the Indemnitees may incur arising out of or resulting from such subcontractor's performance of services, violation of state, federal, or local law, rule or regulation or negligence or willful misconduct."

85.    "12.9 Presentations. Architect shall make presentations to the School Based Building Advisory Committee, Citywide School Building Committee, the New Haven Board of Education, the New Haven City Plan Commission, New Haven Change Order Committee, New Haven Capital Projects Committee, New Haven Board of Aldermen or other Commissions and Boards of the City of New Haven necessary to securing funding or other approvals in connection with the Project. At least once per year during the Project on a date and at a time designated by the Owner, the Architect shall prepare and arrange a visual display at the school involved in the Project, which describes, without limitation, the status of the Work and the Project and the various components of the Project and which includes, without limitation, sample floor plans, materials and finishes; and photographs of the progress of the Work. "

86.    "12.10 Internships. Architect shall make maximum practicable efforts, except as prohibited by state or federal law, to hire high school students chosen from a pool of high school students (sixteen and older) designated by Owner, who will act as part-time administrative assistants to the Architect during the school year and the summer."

87.    "12.11 Representations. Architect hereby represents and warrants to the Owner the following:

> (a)    that Architect is able to furnish any of the plant, tools, materials, supplies, equipment, key personnel and labor required to complete the services required hereunder and perform all of its obligations hereunder and has sufficient experience and competence to do so;

> (b)    that Architect is authorized to do business in Connecticut and properly licensed by all necessary governmental and public and quasi-public authorities having jurisdiction over it and the services required hereunder and the Project itself;

    (c)    that Architect's execution of this Agreement and its performance thereof is within its duly authorized powers; and

    (d)    that Architect's duly authorized representative has visited or will visit the Project site and generally familiarized himself with the local conditions under which the services required hereunder are to be performed and correlated his observations with the Contract Documents."

Architect agrees said representations and warranties in this Subparagraph 12.11 shall survive the execution and delivery of this Agreement."

IN WITNESS WHEREOF, the parties have caused these Supplemental Conditions to be executed as of the 10th day of ___February___, 1997.

OWNER:
CITY OF NEW HAVEN

ARCHITECT:
ARCHITECTS ENVIRONMENTAL COLLABORATIVE INTERNATIONAL, P.C.

By: _Patricia McCann Vissepó_
    Name: _Patricia McCann Vissepó_
    Title: _Chair_

By: _Wendell C. Harp_
    Name: _Wendell C. Harp_
    Title: _President_

H958551.DOC 01/31/97

EXHIBIT A

# EXHIBIT - EDUCATIONAL SPECIFICATIONS STUDY

## A.   DESCRIPTION

The work of this proposal shall include a comprehensive study to determine the needs of the students and staff and develop formal space, functional and cost requirements which will encourage the achievement of the educational goals of the Board of Education and the City of New Haven.

## B.   SCOPE OF SERVICES

### 1.   Initial Meeting

To meet with the SBBAC and the designated public schools representatives prior to the start of the workshop process to introduce the team and familiarize the participants with the programming procedure and methodology.

### 2.   Workshop One - Goals and Objectives

a. Define process and identify key participants
b. Define goals and objectives
c. Identify project constraints; including site, budget, schedule and program
d. Discuss issues
e. Collect existing data; i.e., prior reports, studies, drawings and similar documentation

### 3.   Owner/User Interviews

Work with project management to identify key personnel (see attached) who should be interviewed in order to gather specific programming data. Senior personnel within the various subject and operations areas will be interviewed. The data gathered from all interviews will be summarized and submitted for review at workshop two.

### 4.   Workshop Two - Standards and Criteria

a. Data analysis - presentation of the data collected and analyzed from the owner/user interviews, surveys and discussions to this point
b. Space standards development; generally based on SFU guidelines
c. Criteria for planning
d. Staffing accommodation
e. Technical criteria
f. Special conditions and requirements

-2-

5.  **Workshop Three - Concepts and Options**

   a.  Presentation of a series of plan alternatives and concepts developed from the discussions and workshops to this point
   b.  If renovation, issues and alternatives
   c.  If new construction, explore preliminary costs

6.  **Development of Educational Specifications Preliminary Draft**

   This task involves the preparation of the preliminary document incorporating all the information developed previously and will include the following project requirements:

   a.  Project goals and objectives
   b.  Existing space utilization analysis
   c.  Current and projected staffing analysis
   d.  Functional relationship requirements
   e.  Space standards
   f.  Program of space requirements
   g.  Existing condition report

7.  **Workshop Four - Presentation of Recommendations**

   a.  Comparative analysis of options and alternatives
   b.  Net space requirements
   c.  Gross area projections
   d.  Cost implications
   e.  Recommendations

8.  **Develop Final Report**

   Data and conclusions from the workshops and interviews will be documented and presented to owner for review and comment. The report will include all narrative and graphics which reflect the selected direction and concepts.

   A draft report will be submitted to the Superintendent for review and approval. Upon approval, a final Educational Specifications document will be submitted by the architect.

   The Final Report shall:

   1.  Outline the general nature of the educational program to be housed within the specific proposed project including instructional group sizes, number

-3-

of teaching stations, number of individual learning stations, specialized
instruction or subject need, and extracurricular activities where required.

2. Outline the required support facilities within the specific proposed project
   including areas for administration, health, guidance staff, food service,
   custodial services and storage.

3. Outline the non-pupil activities that may take place during and after school
   hours within the proposed project, such as group meetings, library use,
   counseling services, vocational counseling, adult education and leisure
   activities.

4. Outline the specialized systems requirements, such as security, clocks,
   and program intercommunication, cable and/or closed circuit television,
   electronic and long-distance learning.

5. Outline the requirements for environmental controls such as acoustics,
   lighting, heating, ventilation and air-conditioning.

6. Outline the specialized equipment and furniture required to carry out the
   function of each area. Include telephones, television communication and
   interconnection of data equipment throughout the school and to outside
   resources.

7. Outline the site development requirements, including instructional,
   recreational, community and/or service facilities, landscaping,
   ecological requirements, parking, bus access and athletics.

## EXHIBIT B

### EQUAL EMPLOYMENT OPPORTUNITY

During the performance of this Contract the Contractor agrees as follows:

   a. To comply with all provisions of Executive Orders 11246 and 11375, Connecticut Fair Employment Practice Act, and Chapter 12½ of the Code of Ordinances of the City of New Haven, including all standards and regulations which are promulgated by the government authorities who administer such acts and requirements, and all standards and regulations are incorporated herein by reference;

   b. Not to discriminate against any employee or applicant for employment because of race, color, religion, age, sex, physical disability or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to race, color, religion, sex, age or national origin and physical handicap. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship;

   c. To post in conspicuous places available to employees and applicants for employment notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause;

   d. To state, in all solicitations or advertisements for employees placed by or on behalf of the contract, that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, age, physical disability, or national origin;

   e. To send to each labor union or representative of workers with whom he has a collective bargaining agreement, or other contract or understanding, a notice advising the labor union or worker's representative of the contractor's commitments under the equal opportunity clause of the City of New Haven, and shall post copies of the notice in conspicuous places available to employees and applicants for employment. The contractor shall register all workers in the skilled trades who are below the journeyman level with the Apprentice Training Division of the Connecticut State Labor Department.

   f. To utilize labor department and city sponsored manpower programs as a course of recruitment and to notify the contract compliance unit and such programs of all job vacancies;

   g. To take affirmative action to negotiate with qualified minority contractors for any work which may be proposed for subletting or for any additional services, supplies, or work which may be required as a result of this contract.

   h. To cooperate with city departments in implementing required contract obligations for increasing the utilization of minority business enterprises;

   i. To furnish all information and reports required by the Contract Compliance Director pursuant to section 12½-1.1, 12½-19 through 12½-33 and 12½-48 through 12½-52 and to permit access to its books, records and accounts by the contracting agency, the contract compliance officer, and the Secretary of Labor for purposes of investigation to ascertain compliance with the program;

   j. If such contractor employs three or more employees to refrain from paying such employees' membership dues and related expenses for clubs that restrict membership or use of their facilities on the basis of race, color, sex, religion, national origin or ancestry;

   k. To take such action, with respect to any subcontractor, as the city may direct as a means of enforcing the provisions of sub-paragraphs (a) through (n) herein, including penalties and sanctions for noncompliance, provided however that, in the event the contractor becomes involved in or is threatened with litigation as a result of such direction by the city, the city will intervene in such litigation to effectuate the city's equal employment opportunity program. In the case of contracts funded directly or indirectly, in whole or in part, under one or more federal assistance programs, the contractor or the city may ask the United States to enter into such litigation to protect the interest of the United States.

   l. To file, along with its subcontractors, if any, compliance reports with the city in form and to the extent prescribed in the contract by the contract compliance director of the City of New Haven. Compliance reports filed at such times as directed shall contain information as to the employment practices, policies, programs and statistics of the contractor and his subcontractors or vendor.

   m. To include the provisions of sub-paragraphs (a) through (n) of this equal opportunity clause in every subcontract or purchase order so that said provisions will be binding upon each such subcontractor or vendor.

   n. That a finding, as hereinafter provide, of a refusal by the contractor, or subcontractor, to comply with any portion of this program as herein stated and described, may subject the offending party to any or all of the following penalties:

   (1) Withholding of all future payment under the involved public contract to the contractor in violation until it is determined that the contractor, or subcontractor, is in compliance with the provisions of the contract;

   (2) Refusal of all future bids for any public contract with the City of New Haven, or any of its departments or divisions, until such time as the contractor, or subcontractor, is in compliance with the provisions of the contract;

   (3) Cancellation of the public contract;

   (4) Recovery of specified monetary penalties;

   (5) In case of substantial or material violation, or the threat of substantial or material violation of the compliance procedure or as may be provided for by contract, appropriate equitable or legal proceedings may be brought to enforce these provisions against contractors, subcontractors or other organizations, individuals or groups who directly or indirectly are not in compliance with the policy as here r outlined (Ord. 12-5-77).

IN WITNESS HEREOF on the ___**10th**___ _____ day of ____**February**____ _____ 199___ the contractor has caused four (4) counterparts of this Agreement to be executed and delivered.

Architects Environ-Collab. Int'l, P.C.

WITNESS:

_Arlene J Klauss_

_____

_Wendell C. Harp_ — Contractor Signature

_President_ — Title

## EXHIBIT C

## DESCRIPTION OF SITE SELECTION SERVICES:

**A.     SCOPE OF WORK**

The NHBE shall identify a proposed site for the design and construction of the new Prince/Welch K-5 school.  AECI shall conduct an evaluation and analysis of the suitability of the proposed site.  This assessment shall entail:

**ZONING CONFORMITY:**
A review and analysis of the site with respect to minimum site area; allowable site coverage; front, rear, and side yard setbacks; building height limitations; parking, and related zoning issues.

**SITE OPEN SPACE DEVELOPMENT ANALYSIS:**
Recognizing that open space for recreational purposes is at a premium in New Haven urban areas, this analysis will address the primary considerations and/or alternatives for recreational activities.  An assessment will be made for determination of probable exterior active/ passive play areas, and complementary indoor active/passive recreational areas.

**TRAFFIC AND PARKING:**
A general analysis of the site area for the purposes of providing on site parking for staff, visitors, and commercial activities will be performed. Additionally, a general assessment of the site for traffic flow patterns will be undertaken.  (The traffic assessment will be limited to evaluating the building placement for optimum vehicular access, safety considerations for eggress and ingress, and handicapped and visitor access needs).  It will not include traffic count analyses and revised signalization.

## GENERAL SITE SUTABILITY EVALUATION:

An overall evaluation of the site suitability will be performed with regards to pedestrian and vehicular accessibility to the subject site; characteristics and compatibility of surrounding facilities, institutional structures, and residential fabric; and general site conditions.

## UTILITIES AND APPARENT TOPOGRAPHY CONSIDERATIONS:

Contacts will be made with utility companies to determine the availability of water, gas, electricity, sewer, as it relates to the probable demands needs of the K-5 school.  And, an analysis will be performed of any available site survey and topographic data for understanding school placement impacts.

## EXHIBIT D. - Fixed Limit of Construction

1. Project:     Prince/Welch  K-5 School
                New Haven, Connecticut

2. Location:    Site to be identified in the Hill Neighborhood

3. Type:        new construction of a K-5 neighborhood elementary school in the
                Hill neighborhood

4. ED049 Proj.          600
   Enrollment:

5. SFU Space Standard - 351 to 750 total enrollment

| Grade | SFU Allwd. | Stud./Grade | Calculation |
|-------|-----------|-------------|-------------|
| k | 120 | 100 | 12000 |
| 1 | 120 | 100 | 12000 |
| 2 | 120 | 100 | 12000 |
| 3 | 120 | 100 | 12000 |
| 4 | 120 | 100 | 12000 |
| 5 | 152 | 100 | 15200 |
| 6 | 152 | | |
| 7 | 176 | | |
| 8 | 176 | | |
| TOTAL | | 600 | 75,200  max.floor area |

6. Fixed Limit of Construction Calculation

   $ per s.f. constr. cost          $129
   (siteconstr. & bldg. constr.)
   Max. Floor area:                 75,200

   Fixed Limit of Constr.:          $9,700,800

# EXHIBIT E - AS BUILT DRAWINGS

As-built drawings to be provided in accordance with section 3.4.22 of this Agreement shall be:

Construction drawings revised to show significant changes made during the construction process, based on marked-up prints, drawings and other data furnished to the construction manager by the construction contractors.  The construction manager shall collect such prints, drawings and other data from the construction contractors and deliver same to the architect for his/her use in preparing a complete set of reproducible Record Documents and required numbers of copies.

**EXHIBIT F**

**\*HOURLY RATE SCHEDULE FOR ADDITIONAL SERVICES:**

Personnel                                    Hourly Wage Rate
                                             (Including all considerations
                                             for overhead, fringe, profit, et.al.)

| Personnel | Hourly Wage Rate |
|---|---|
| Principal | $150 |
| Project Manager | 125 |
| Senior Architect | 100 |
| Staff Architect | 90 |
| Senior Draftsperson | 80 |
| Draftsperson | 70 |
| Specification Writer | 110 |
| Office Assistant | 55 |

\*   The subject hourly rates are effective for the period January 1, 1997 to Dec. 31, 1997.  Periodic annual adjustments may be made for inflation considerations or variations.