**EXHIBIT M**

300 Whalley Avenue, 3rd Floor, New Haven, CT 06511
Tel. (203) 624-0815          Fax (203) 777-9891

**ARCHITECTS
ENVIRONMENTAL
COLLABORATIVE
INTERNATIONAL,
p.c.**

# Transmittal

MR. CLAUDE WATT, JR.                    FAX + U.S. MAIL
SCHOOL CONST. UNIT
NHBE

**To:**                              **From:** WENDELL HARP

**Fax:** 946-8920                     **Pages:** (Incl. Cover Sheet)

**Phone:** 946-6808                   **Date:** 5-30-2002

**Re:** P/W ISSUES                    **CC:**

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

•

DOCUMENTS: (WITH ATTACHMENTS AS NOTED)

1. AECI 5-29-02 LETTER REGARDING HISTORIC
   DISTRICT SCOPE OF WORK/FEE

2. AECI 5-29-02 LETTER REGARDING 125%
   CONTRACT DOCUMENT COMPLETION

3. AECI 5-29-02 LETTER (COPY) TO DR. MAYO
   REGARDING DIFFICULTIES/REQUEST FOR
   CHANGE IN PROJECT MGMT.



DEFENDANT'S
EXHIBIT
127
11/1/05   JCA
PENGAD 800-631-6989

# architects environmental collaborative international, p.c.

## Wendell C. Harp, AIA Architect

300 Whalley Avenue
New Haven, CT 06511
Tel. (203) 624-0815
Fax (203) 777-9891

May 29, 2002

Mr. Claude Watt, Jr. Program Mgr.
New Haven Board of Education
54 Meadow Street
New Haven, Conn.
06519

Re:    Status of Design Completion for Prince-Welch School

Dear Mr. Watt, Jr.

   In reply to your letter of 5-23-2002, this letter is to restate that the latest submission of Prince-Welch architect/engineers drawings is at least 125% Contract Document completion. This level of completion is obviously beyond the 100% Design Development submission required – and was preformed because of the details necessary to yield a comprehensive budget assessment by the NHBE construction manager.

   Attached are letters from our structural engineer Michael Horton Assoc., and mechanical/electrical engineer, Engineering Design Group – each with nearly 25+ years of design experience. All of our firms – as knowledgeable working professionals – state that the drawings are at least 125% Contract Document complete.

   Since the project inception we have had a continuing problem and/or variance with you with respect to understanding the nature of design processes; assessments of work completion; and basic communication. It is clear to me that these issues are managerially driven and that the project would be better served under our performing in a different structure. Under a separate letter I have requested a meeting with Dr. Mayo to seek an alternative work procedure. Hopefully this meeting will be granted and a new relationship/process implemented to solve our project issues.

                                                    Sincerely,

                                                    Wendell C. Harp
                                                    Wendell C. Harp

Encl: 5-28-02 M. Horton Letter, struc. eng.
      5-28-02 Eng. Des. Group letter
             mech./elec. eng.

cc:    Dr. Reginald Mayo
       Mr. Thomas Roger
       Mr. Paul Guidone

# Michael Horton and Associates

1978 Whitney Avenue
Hamden, Connecticut 06517
(203) 288-7783
Fax (203 288-9006

May 28, 2002

Mr. Wendell C. Harp, AIA
Architects Environmental Collaborative International
300 Whalley Avenue
Hartford, Connecticut 06511

RE:    **Prince Welch School**
       **New Haven, Connecticut**
       **MHA Proj. No. 01-159**

Dear Wendell,

The firm of Michael Horton and Associates was established in 1994. The predecessor firm of Martin-Horton and Associates was established in 1982. Prior to his position as a principal of these firms, Mr. Horton was positioned as Chief Engineer at Cahn Engineers.

During the past 20 years, under the direction of C. Michael Horton, these firms have provided structural engineering services on approximately (30) public and private, high school and elementary school projects.

As requested, we have reviewed the current structural documents, dated 5/20/02, and the Design Development Documentation outline provided. Based on our review of this outline and our previous experience, it is our opinion, that the current Structural Documents, represent 100% completion of the Design Development Phase. We would also estimate these documents to represent 25% completion of the Construction Document Phase.

I trust this letter provides you with the information you desired. Should you have any questions please contact our office.

Sincerely,

Al Lombardi
Michael Horton and Associates

cc: C. Michael Horton (MHA)
c:\myfiles\01159-052802.ltr



## ENGINEERING DESIGN GROUP, INC. / CONSULTING ENGINEERS

60 HINMAN STREET • CHESHIRE, CT 06410 • TELEPHONE (203) 272-1860 • FAX (203) 271-1538

May 28, 2002

AECI
300 Whalley Avenue
New Haven, CT 06511

Attn:  Wendall Harp

Re:  Prince Welch School
New Haven, CT

With our thirty years of experience as Consulting Engineers, we feel based on the Design Development Phase Format given us, we are 100% complete.

We also feel that we are the following completion percentages toward Construction Documents.

HVAC - 50%, Plumbing - 80%, Fire Protection - 40%, Electrical - 60%

Very truly yours,

Joseph S. Zielski
ENGINEERING DESIGN GROUP, INC.

New Haven Public Schools
School Construction Program

54 Meadow Street
New Haven, Connecticut 06519



REBUILDING OUR SCHOOLS

May 23, 2002                              Sent Via Fax and First Class Mail

Mr. Wendell Harp, AIA
Architects Environmental Collaborative International, PC
300 Whalley Avenue
New Haven, CT 06511

Re.:    Prince Welch School Project
        (SDE#093-306, City No. 99-100-03)

Subj.:  Point of Clarification on Document Submissions

Dear Wendell:

AECI presented design phase documents in late January 2002 that it alleged represented 100% Design Development Phase Documents. Close examination by my staff and the Construction Manager revealed that these documents fell far short of this percentage. AECI was made aware of this condition and given an opportunity to remedy. Also several request for information, RFI, were submitted to AECI. These RFI targeted the deficiencies in the documents. It was hoped that by responding AECI would clarify its design intent, coordinate design information and provide critical pieces of missing information. You have opted to respond on May 14, 2002 with what you classify as 100% DD documents / 25% Construction Documents.

Please be advised that these documents are being received only as a DD documents. No consideration will be given for any representation made by AECI concerning CD Phase documents.

AECI has been cautioned on previous occasions about classifying submittals at higher levels of completion than is supported by the information contained within the documents being submitted. You are directed to cease this practice. Please refer to your Agreement for the minimum requirements for design phase submission.

Sincerely,

Claude E. Watt Jr.
Program Manager

Cc:     Dr. Reginald Mayo, Supt.
        Paul Guidone
        Thomas Roger

File: 2445PrinceLtr 60

## architects environmental collaborative international, p.c.

### Wendell C. Harp, AIA Architect

300 Whalley Avenue
New Haven, CT 06511
Tel. (203) 624-0815
Fax (203) 777-9891

May 29, 2002

Mr. Claude Watt, Jr. Program Manager
New Haven Board of Education
54 Meadow Street
New Haven, Conn. 06519

Re:    Reply to C.W. letter dated 5-23-2002 regarding fee and scope of work for out-of-contract historic district elevations and surrounding streets/PW school.

Dear Mr. Watt, Jr.

In reply to your letter of 5-23-2002, and your earlier communication of 5-17-2002 where you outlined a proposed scope of work for additional drawings to be utilized for historic district commission review purposes, the following is submitted for your consideration:

I.    REPLY  TO  C.  WATT LETTER

1.    Your statement in your 5-23-02 letter that "All you have been requested to do is present work that you have already produced in a format it should have (been) presented in originally as part of your basic design services". This is an absolute misstatement of fact.

Our office has never prepared elevations of drawings of the 20 or so buildings surrounding the school on the Davenport, Ward, and Congress Avenue facades. Nor would there have been any reason to do this since the whole issue of historic district requirements was not even known for nearly a year after project start.

Our "basic services contract" never required the preparation of any "historic district documents. The Architect/Owner agreement signed by AECI/NHBE does not even acknowledge that our site is indeed an historic district site. And, as noted above, it is my understanding that even NHBE officials were not privy to this until many months/+ year into the planning process. (ref. AECI 1-9-2001 letter on revise of 619-635 Congress Ave. submitted per C. Watt request).

2.    Our cost for the preparation of the specified work is appropriate and reasonable. There is no restatement of cost unless there is a change in the project scope.

**architects environmental collaborative international, p.c.**

**Wendell C. Harp, AIA Architect**

300 Whalley Avenue
New Haven, CT 06511
Tel. (203) 624-0815
Fax (203) 777-9891

II.     OTHER OPTIONS:

1.      Since your scope of work requires field intensive measurement and
drawing of all affected site building; and since the drawing of the
elevations of the surrounding building can be done by any architectural
firm – I suggest you consider a separate architectural firm to prepare these
elevations for you. You may therefore achieve any cost you can negotiate.

We would then take these elevations, and prepare our elevations in the
format you requested. Additionally, we would prepare the site plan. We
would do these at no cost. Obviously, we feel that you do not appreciate
the magnitude of work in field observing and drawing numerous building
elevations.

2.      You may restate your scope of work for the elevations to be drawn.
If they are only outline forms, depicting height, mass, and limited outlines
of doors and windows then the cost will be $2,800.

3.      If you would restate your project scope to have us prepare streetscapes
**using photographs only** and our drawn elevation then the cost would be
$1,200. Dr. Mayo has advised me that this has been done in other historic
presentations. Under separate cover (with a copy attached to you) we have
explained our request for a program manager change. We look forward to
resolving these concerns.

Sincerely,

Wendell C. Harp

cc:     Dr. Reginald Mayo
Mr. Paul Guidone
Mr. Thomas Roger

# architects environmental collaborative international, p.c.

## Wendell C. Harp, AIA Architect

300 Whalley Avenue
New Haven, CT 06511
Tel. (203) 624-0815
Fax (203) 777-9891

Dr. Reginald Mayo, Supt.
New Haven Board of Education
54 Meadow Street
New Haven, Conn.                                May 29, 2002
06519

Re:    Request for meeting and resolution of concerns regarding construction program
       management for proposed Prince-Welch school

Dear Dr. Mayo:

       This letter is to officially bring to your attention – and seek your assistance, in
resolving continuous difficulty our design team has had with Mr. Claude Watt, Jr.,
program manager for the planned Prince-Welch school. Enclosed for your review are
several letters of correspondence between Mr. Watt and I, as design team leader,
regarding various assessments of work completion, C.W. requests for additional studies,
and general project issues. Additionally, I have enclosed letters from our design team
engineers – all of whom have 20 to 30 yrs. of real project experience, which are also at
variance to Mr. Watt's assessments. While the issues at hand are seemingly resolvable,
there is a broader concern that I have regarding the continued progress of this project and
the avoidance of problems at later stages. My basic concern is my belief that the
individual in charge of our project lacks effective practical experience and there is a
continuing problem of miscommunication.

       As you may recall, I did raise these two issues (i.e. practical knowledge and
miscommunication) early on in the 1st stages of our project – and requested that we have
a different program manager assigned to us at that time.

**architects environmental collaborative international, p.c.**

**Wendell C. Harp, AIA Architect**

300 Whalley Avenue
New Haven, CT 06511
Tel. (203) 624-0815
Fax (203) 777-9891


Since we are now approaching the most critical stages of our project – and there has been no improvements in regard to these concerns – your assistance and help would be appreciated. Certainly for us, a transfer of our project to a manager of broader experience would be helpful – obviously this is the purview of the NHBE. Myself, AECI senior project staff, and our consultant engineers are available to meet with you, and/or any personnel you feel appropriate to resolve this issue. I look forward to your reply.

Sincerely,

Wendell C. Harp

Wendell C. Harp


Encl: 5-23-2002 C. Watt Jr. Letter
        5-28-2002 Letter, AECI
        5-28-2002 Letter, Horton Assoc. Struc. Eng.
        5-28-2002 Letter, Eng. Des. Group


cc: Mr. Claude Watt, Jr.

# Michael Horton and Associates

1978 Whitney Avenue
Hamden, Connecticut 06517
(203) 288-7783
Fax: (203 288-9006

May 28, 2002

Mr. Wendell C. Harp, AIA
Architects Environmental Collaborative International
300 Whalley Avenue
Hartford, Connecticut 06511

RE:    **Prince Welch School**
       **New Haven, Connecticut**
       **MHA Proj. No. 01-159**

Dear Wendell,

    The firm of Michael Horton and Associates was established in 1994. The predecessor firm of Martin-Horton and Associates was established in 1982. Prior to his position as a principal of these firms, Mr. Horton was positioned as Chief Engineer at Cahn Engineers.

    During the past 20 years, under the direction of C. Michael Horton, these firms have provided structural engineering services on approximately (30) public and private, high school and elementary school projects.

    As requested, we have reviewed the current structural documents, dated 5/20/02, and the Design Development Documentation outline provided. Based on our review of this outline and our previous experience, it is our opinion, that the current Structural Documents, represent 100% completion of the Design Development Phase. We would also estimate these documents to represent 25% completion of the Construction Document Phase.

    I trust this letter provides you with the information you desired. Should you have any questions please contact our office.

Sincerely,

Al Lombardi
Michael Horton and Associates

cc: C. Michael Horton (MHA)
c:\myfiles\01159-052802.ltr

**EXHIBIT N**

HARP v. DeSTEFANO                                November 7, 2005

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - x
WENDELL HARP and ARCHITECTS:
ENVIRONMENTAL COLLABORATIVE
INTERNATIONAL, P.C.,            :

        Plaintiffs,          :
                               CIVIL ACTION
        -versus-             :CASE NO. 3:03-CV-977
                                   (CFD)
JOHN DeSTEFANO, CITY OF      :
NEW HAVEN and NEW HAVEN
BOARD OF EDUCATION,          :

        Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

Deposition of DR. REGINALD MAYO,

taken pursuant to the Federal Rules of Civil

Procedure, at the LAW OFFICES of JOHN R.

WILLIAMS and ASSOCIATES, LLC, 51 Elm Street,

New Haven, Connecticut, before Donna Tucker

Kelsey, LSR, and Notary Public in and for the

State of Connecticut, on November 7, 2005, at

10:05 a.m.

HARP v. DeSTEFANO                                      November 7, 2005

```
                                              Page 11

 1        A.   I think that process was something that

 2   took place over a period of time.  I don't think

 3   it was something that just happened just

 4   overnight.  I think there was always some conflict

 5   between the Gilbane and Mr. Harp, construction

 6   project managers for the New Haven Board of Ed, I

 7   don't think it was something that just happened

 8   overnight, I think it was a series of things that

 9   led up to that termination.

10        Q.   How did you become aware that there were

11   issues between Mr. Harp and Gilbane Construction?

12        A.   Through meetings with the project

13   managers, through meetings and communications,

14   well, meetings and communications.

15        Q.   Now, when you say "meetings" are you

16   referring to meetings with a particular person or

17   persons?

18        A.   Basically, Claude Watt, who would keep me

19   informed about the project, you know, that he was

20   working with Wendell, that there were

21   communications between Wendell and Mr. Watt.

22        Q.   And what was Mr. Watt telling you about

23   that?

24        A.   Boy, I think certain requests for

25   documents and so forth, he would complain were not
```

HARP v. DeSTEFANO                                    November 7, 2005

Page 12

1    responded to in a timely fashion, with a lot of

2    those things, that Wendell was stubborn about the

3    input that he may have given him or certain pieces

4    of design, whatever, mostly due to details in the

5    design that he was concerned about that he was not

6    getting from Wendell, those are the kinds of

7    issues that he would complain about.

8         Q.  Did you receive any memos from Mr. Watt

9    on any of those circumstances or any of those

10   issues?

11        A.  I think from time to time he would send a

12   memo, just as Wendell from time to time would send

13   a memo.

14        Q.  Are you telling us that there are memos

15   to you from Mr. Watt that complain about one or

16   another aspect of Mr. Harp's performance or

17   communications?

18        A.  I can't remember specific memos, but I

19   would think so, yeah, I mean there certainly were

20   verbal conversations.

21        Q.  There were?

22        A.  Yeah.

23        Q.  All right.  Did you have any such

24   conversations during the month of April 2003?

25        A.  Relative to Wendell's performance?

Page 13

1      Q.   Yes.

2      A.   I wouldn't be able to pinpoint whether

3    Claude spoke about his performance in any

4    particular month, that particular month, I

5    wouldn't be able to pin it down to that, yeah.

6      Q.   Would that be your answer also with

7    regard to the month of May 2003?

8      A.   Is that around the time that that --

9      Q.   The contract was terminated in May of

10   '03?

11            MS. KONE:   Objection.

12      A.   The contract was terminated, okay.

13   During that particular time there was discussion

14   about whether to continue Wendell's contract or

15   not, and that was prior to the contract being

16   terminated.  Several months prior to that there

17   was discussion about whether he should continue

18   with the contract or not.  Certainly Claude was a

19   part of those conversations and certainly Claude

20   did not want his contract to be continued.  There

21   had been some discussions prior to that about

22   whether he should just participate in a portion of

23   that, meaning the design and not being a part of

24   the construction phase of it and to do the

25   construction designing piece of, but just the

HARP v. DeSTEFANO                                        November 7, 2005

                                                              Page 14

1    general overall design, there was discussions
2    around that.  Somewhere close to like a month or
3    so prior to, maybe a couple of months prior to the
4    termination of his contract kind of was decided to
5    keep Wendell on, you know, at the urging of me to
6    keep him on.  And I said, you know, and I promised
7    that I would have Wendell to Claude to adhere to
8    certain criteria, certain guidelines if that were
9    the case, if we were, if we kept him on.  That's
10   pretty much, you know, Claude, again, did not
11   really have, he didn't advocate the case for him
12   to stay on.
13        Q.  Are you saying that Mr. Watt was opposed
14   to Mr. Harp staying on or that he simply wasn't
15   supporting his staying on?
16        A.  He was opposed, yes, he was.
17        Q.  And but Mr. Watt reported to you; isn't
18   that right?
19        A.  Yeah.
20        Q.  Through the chain but?
21        A.  Through the chain, right, he worked for
22   the board of ed.
23        Q.  You had the power to overrule any
24   recommendation that Mr. Watt might make; is that
25   right?

HARP v. DeSTEFANO                                    November 7, 2005

Page 16

1    March, April I guess, April.

2         Q.   Of '03?

3         A.   Yeah.

4         Q.   Okay.   And I presume that that was

5    communicated to Mr. Harp?

6         A.   Yes, that he had to abide by some things,

7    yeah.

8         Q.   Now, when you say that we had that

9    agreement, that is you and who else?

10        A.   That what now?

11        Q.   You say that we decided to continue him

12   on?

13        A.   Yes.

14        Q.   When you say "we" who are you including

15   within the word "we"?

16        A.   Basically Gilbane, Mayor DeStefano, I

17   think several members of the administration and

18   finance, we talked about it.   I think the -- well,

19   that's pretty much it.

20        Q.   Okay.   So that was at some point in April

21   of '03 that --

22        A.   Around April, I don't want to be --

23   March, April, somewhere in there.

24        Q.   Are there any daybooks, logs, any kind of

25   written records that would show when that decision

HARP v. DeSTEFANO                                    November 7, 2005

Page 17

1    was actually made and/or communicated to Mr. Harp?

2              MS. KONE:   Objection as to form.

3         A.   That I can't say that that decision

4    pretty much was like in writing, no.

5         Q.   But just in terms of, for instance, do

6    you yourself keep some kind of notes, whether

7    diary or something less formal, that would record

8    the making of decisions of that kind for your own

9    purposes?

10        A.   Absolutely not, no.

11        Q.   Now, that decision as you've told us was

12   made in April or possibly March of '03?

13        A.   Yes.

14        Q.   And we've agreed that it was sometime in

15   May of '03 that Mr. Harp's contract was

16   terminated?

17        A.   Yes.

18        Q.   What happened to bring that about?

19        A.   Well, what I suggested was that we put

20   down that there were concerns about the design of

21   the school in terms of whether it was white brick

22   or your traditional brick, because there were

23   questions from the community and the historic

24   society relative to the kind of design in the

25   neighborhood and they wanted something a bit more

HARP v. DeSTEFANO                                    November 7, 2005

Page 18

1    traditional that the original design that Mr. Harp

2    had done.  So my thing to Mr. Watt was put down

3    everything relative to expectations, relative to

4    time lines, relative to the kind of design that

5    you want from Mr. Harp, I don't want Mr. Harp

6    started, I want all of that agreed upon in writing

7    so that everyone is on the same page.

8          Q.  Was that done?

9          A.  Claude did put something in writing to

10   Wendell.

11         Q.  And that concerned what topics?

12         A.  Okay.  After that I gave the expectations

13   to Mr. Harp.

14         Q.  In writing?

15         A.  In writing, Claude had put those in

16   writing, these are what the expectations will be.

17         Q.  So Mr. Watt gave them to you and you gave

18   them to Mr. Harp, is that it?

19         A.  Yes.  Look at these, Wendell, this is

20   what the expectations are going to be.

21         Q.  When was it that you gave those to Mr.

22   Harp?

23         A.  Again, in that time period of April, May

24   '03, in that time frame.

25         Q.  And so what happened then?

HARP v. DeSTEFANO                                   November 7, 2005

Page 19

```
 1        A.  So Wendell wanted to see me relative to
 2   the criteria, called, was upset about several
 3   different things.
 4        Q.  Okay, so he called you?
 5        A.  Yes, he did.
 6        Q.  All right, when was that?
 7        A.  Again, probably end of April, first of
 8   May, somewhere in there.
 9        Q.  Did you in fact meet?
10        A.  Did I what now?
11        Q.  Did you meet then with Mr. Harp?
12        A.  Yes, I did, Wendell came by.
13        Q.  That took place at your office?
14        A.  Yes.
15        Q.  When?
16        A.  Again, probably May, probably early May.
17        Q.  Now that was by appointment, correct?
18        A.  I'm not sure whether it was by
19   appointment or if Wendell kind of dropped by late
20   afternoon and he wanted to see me, I can't recall
21   whether that was an appointment, but he did come
22   by.
23        Q.  There should be a notation in your office
24   calendar reflecting that meeting, should there
25   not?
```

HARP v. DeSTEFANO                                    November 7, 2005

Page 20

1            MS. KONE:  Objection as to form.

2        A.  Not necessarily, that's what I'm saying.

3        Q.  Now, what type of calendaring system do

4   you maintain or did you maintain in your office in

5   2003 with respect to meetings that were held in

6   your office?

7        A.  Usually if it was something that was done

8   in advance it would be on my calendar.  If it was

9   impromptu meeting it would not be in my calendar,

10  meaning someone would call and say I'd like to

11  stop by this afternoon if you have the time and

12  fine, I have time, that would not be in my

13  calendar, so I don't know.

14       Q.  Do you maintain your calendar personally

15  or is it maintained by a staff member?

16       A.  Both.

17       Q.  So there would be two calendars?

18       A.  Two calendars.

19       Q.  Who was the staff member who was

20  maintaining a calendar for you in '03?

21       A.  Valerie Hudson Brown.

22       Q.  Is she still employed in your office?

23       A.  Yes, she is.

24       Q.  I presume you save your calendars; is

25  that right?

HARP v. DeSTEFANO

November 7, 2005

Page 21

1        A.   Not necessarily, no.

2        Q.   What decides whether or not they get

3    saved?

4        A.   Sometimes I throw them on the shelf,

5    sometimes I don't.

6        Q.   All right.  But she would maintain her

7    calendars?

8        A.   Not necessarily, I don't know whether,

9    what she does.

10       Q.   You don't know?

11       A.   No, I don't.

12       Q.   Now, Mr. Harp in any event came by and

13   you had a meeting, what took place at that

14   meeting?

15       A.   He expressed his objections to a number

16   of things in the criteria that was sent to him.

17       Q.   What did he object to?

18       A.   Can't recall all the specifics that were

19   in, some time lines, as I recall it, just some,

20   not all.  And the major ones, you know, appeared

21   to have been what was expected in terms of the

22   design of the building.  His complaint was that it

23   was going to be a box, they were trying to force

24   him to draw a box instead of being more creative,

25   and so I guess that was a major concern that he

HARP v. DeSTEFANO

November 7, 2005

Page 22

1   had.

2         Q.   Okay.   What was the outcome of that

3   meeting?

4         A.   The outcome of the meeting was Wendell

5   you've got to work with Mr. Watt, you have to work

6   with Gilbane, my answer is not any different than

7   in the past, you have to learn how to work with

8   these individuals.

9         Q.   Was anyone present at this meeting other

10  than just you and Mr. Harp?

11        A.   Just the two of us.

12        Q.   Approximately how long did that meeting

13  last?

14        A.   No idea.

15        Q.   Was it in the afternoon or in the

16  morning?

17        A.   Afternoon, I can remember that.

18        Q.   So at the conclusion of the meeting you

19  simply said to Mr. Harp you've got to work with

20  these people and he left; is that right?

21        A.   That was the resolution that I recall.

22        Q.   All right.   And I take it then that it

23  was your sense that he was going to go along with

24  the program?

25        A.   He's got to, you've got to go along, work

HARP v. DeSTEFANO                                    November 7, 2005

Page 23

1    it out with Claude, I can't help you with that

2    piece of it, I mean, you know.

3         Q.   So now it's your recollection that that

4    meeting was in either April or May; is that

5    correct?

6              MS. KONE:   Objection.

7         A.   It was in May.

8         Q.   It was in May, okay.   So at the end of

9    that meeting Mr. Harp is still on board, he's

10   still got his contract, what happened then?

11             MS. KONE:   Objection.

12        A.   It still wasn't decided that he was going

13   to get the contract, okay, we had told him that

14   verbally, but I mean in terms of do you go by the

15   guidelines, that had to be agreed upon.

16        Q.   Well, he had the contract, right?

17        A.   He's got a contract but the contract for

18   a redesign.

19        Q.   All right, that's right, there was going

20   to be a redesign?

21        A.   The building had to be redesigned based

22   on different site because there was some, there

23   was a question about too many homes being taken

24   for the project.   So this is what we were talking

25   about in terms of a new contract for redesign of

HARP v. DeSTEFANO                                    November 7, 2005

Page 24

1    the building.  And this is what I'm saying, yes,

2    there was a verbal agreement based on the fact

3    that we could come to some agreement on this

4    criteria that Mr. Watt put in his letter.  And

5    that's what the meeting with Wendell and I was on,

6    Mr. Watt says this is the criteria, these are the

7    things you've got to adhere to if you want to be,

8    you know, given this contract again.

9         Q.  All right, all right.  So then what

10   happened after that meeting between you and Mr.

11   Harp that brought about the termination of his

12   contract?

13        A.  It wasn't that Wendell and I agreed that

14   anything would change, Wendell you've got to go

15   back to Mr. Watt and work this out with Watt.  So

16   I think that was clear that he had to, his thing

17   was fine, I'll go back to Watt and work with Watt,

18   that was what happened at the end of that meeting

19   as far as the resolution was concerned.  In terms

20   of moving on for his termination, I think that was

21   came about as a result of the conversation I had

22   with the mayor.  I had a conversation several days

23   later with the major and I brought up the fact

24   that Wendell and I had had a conversation relative

25   to the criteria that we had put forth to him and

HARP v. DeSTEFANO                                    November 7, 2005

Page 25

1    that, you know, reluctantly he said that he would
2    get back to Watt and work with Watt and try to
3    work this thing out, blah-blah-blah.  And again,
4    Watt in his head knew he had problems with him and
5    that kind of thing.  The conversation went, do you
6    really think we're going to have these two guys
7    working together on this project and Wendell
8    basically prolonging this project any more.  And I
9    did say I don't think so, I just don't know, I
10   don't think Wendell's mind is really on doing the
11   project the way that it should be, I mean I think
12   he wants more creativity, more conventional
13   approach to this project than what the criteria is
14   calling for.  And he says, well, if you don't feel
15   that he's going to do that then maybe we shouldn't
16   renew his contract and what are you thinking, and
17   at that point I did say I don't think we probably
18   should, if that's going to be the way it is.
19        Q.  So the suggestion of rethinking the
20   continuation of Mr. Harp's contract came from the
21   mayor, didn't it?
22        A.  I think it came from me, I think I
23   approached that with the mayor.
24        Q.  What was it that you said to the mayor
25   that along those lines, cause the way you

Page 26

1    described it it sounded like the mayor was saying

2    it to you?

3                    MS. KONE:   Objection.

4         Q.   I'm just asking you to tell me.

5         A.   The mayor was questioning me to really

6    find out whether I really felt that it was really

7    something that we needed to say, let's terminate

8    his contract and move on with someone else, or he

9    really wanted to know from me what my gut was on

10   the thing, whether there would be future problems.

11   The project had already been delayed a long time,

12   long time, and kind of wanted to move.  And my gut

13   at that time was Wendell wanted to be more

14   creative with this thing so.

15        Q.   The delays in this project at that point

16   had nothing to do one way or the other with Mr.

17   Harp, did they?

18                   MS. KONE:   Objection.

19        A.   Well, that all depends on who you talk

20   to, you know, there were certainly concerns on Mr.

21   Watt's part, who is the project manager, who

22   certainly knows, you know, more about these things

23   than I do in terms of design and construction

24   documents and that kind of thing.  I mean, yes, he

25   did figure some of the delay was due to Wendell.

HARP v. DeSTEFANO

November 7, 2005

Page 27

```
 1        Q.  The delay relating to the decision to
 2   redesign, the whole decision to redesign came from
 3   the mayor in response to neighborhood concerns;
 4   isn't that right?
 5                MS. KONE:  Objection.
 6        A.  I think there were concerns, staff and
 7   neighborhood concerns.  Staff, you know, staff
 8   from the standpoint, point of Wendell couldn't
 9   produce things in detail.
10        Q.  The neighborhood concerns focused
11   primarily on the size of the parcel that was going
12   to be used; isn't that right?
13                MS. KONE:  Objection.
14        A.  There were some neighborhood concerns
15   about the number of buildings that were being
16   taken.  There were neighborhood concerns about
17   streets being opened or closed.  There were
18   historical, I guess that community concern about,
19   about the design of the building being too
20   conventional, so there were a number, not just one
21   thing, a number of concerns out there.
22        Q.  Did you misspeak, was it the concern that
23   the design was too conventional or it was too
24   unconventional?
25                MS. KONE:  Objection.
```

STEFANO                                    November 7, 2005

Page 48

sue.

   MR. WILLIAMS:

      Q.  But it was a special meeting?

      A.  It was a special meeting.

      Q.  And this Harp' issue was added to it?

      A.  Added to the agenda, okay.  So I wanted

correct that.  And, you know, I guess there

med to have been some confusion about my

king with someone about whether Harp and

ator Harp were supporting the Killins'

inistration or candidacy for mayor of the city.

as I said, I probably did talk with a number

people about that and, you know, I mean things

e in the newspaper.  Wendell had talked to me

ut it, you know, the fact that there was, you

w, he was going to support her and, you know,

time, he was going to have his wife support

.  Sherri Killins was going to go into the

rship based on his wife's co-chairs, that kind

hing.  So I'm sure I talked to the mayor on

this from time to time, so with that many

le talking about it, you know, I did probably

to him, especially after Wendell told me

.

      Q.  When was it that Mr. Harp and you had

SANDERS, GALE & RUSSELL
(203) 624-4157

oswlaw.com

Page 49

conversation that you've just related?

A.  I guess in the spring sometime, March or

, we talked about that, so I wanted to make

clear.

Q.  All right.  Anything else you'd like to

o your testimony before we shut it down?

A.  No.

Q.  Thank you very much, appreciate you're

g out.

        (Deposition concluded:  11:21 a.m.)

N D. BRENNER, P.C.
N L. SALTZMAN, P.C.
ı. WALLMAN, P.C.
ℓ. SCHAEFER, P.C.
ı W. ANDERSON, P.C.
 M. HURWITZ, P.C.
A. MARTINO, P.C.
ıℓ S. JAFFE, P.C.
 MICK, P.C.
H ROSENTHAL
v W. KONE
. DANIELS
 BRENCHER IV, P.C.
ℝ DOWD DEAKIN, P.C.
 A. MOFFETT

.. GOTTFRIED
 P. HACKETT

ʌ⁄SEL:
 KOWAL FREILICH