**EXHIBIT O**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

WENDELL HARP and ARCHITECTS    :

ENVIRONMENTAL COLLABORATIVE    :

INTERNATIONAL, P.C.,           :

              Plaintiffs,      : Civil Action No.

         vs.                   :   3:03CV977

JOHN DeSTEFANO, CITY OF NEW    :      (CFD)

HAVEN and NEW HAVEN BOARD OF   :

EDUCATION,                     :

              Defendants.      :

- - - - - - - - - - - - - - - x


              Deposition of JOHN DeSTEFANO, taken

    pursuant to the Federal Rules of Civil

    Procedure at the Office of the Corporation

    Counsel, New Haven City Hall, 165 Church

    Street, New Haven, Connecticut, before

    Elizabeth A. Zawacki, LSR #00087, a Registered

    Merit Reporter and Notary Public in and for the

    State of Connecticut, on Thursday, July 21,

    2005, at 3:06 p.m.

VS. DeSTEFANO

July 21, 2005

Page 9

Q.    Let me go back and try to recreate that.

I had asked you whether there were written procedures in place that related to the selection of architects for board of education projects. You said the RFP process. Maybe I should ask you this: The RFP process simply involves a request of a formal, written publication, if you will, calling upon interested persons or entities to submit written proposals for a given project, correct?

MS. KONE:  Objection.

A.    I'm not thoroughly familiar with the RFP process.

Q.    Well, what did you mean when you said in response to my question whether there are written procedures governing the selection of architects that there is the RFP process?

A.    There is an RFP process.

Q.    Is it always the same? In other words, is there a standardized process that's gone through, or is it different for each project?

A.    I am not certain.

Q.    In any event, let me be a little more precise. With regard to the Prince-Welch project, can you take us through the process by which Wendell Harp was selected?

HARP VS. DeSTEFANO                                    July 21, 2005

Page 10

1        A.      That was 1996.  I don't specifically
2   recall at this point the process and the steps by
3   which any of the architects that year were selected.
4        Q.      Were you involved in that process?
5        A.      I would imagine yes.
6        Q.      Were you in charge of that process?
7                MS. KONE:  Objection.  Vague.
8        A.      I serve as chair of the citywide school
9   construction committee.  I would assume, although I
10  don't have direct recollection of this, that I would
11  have in that role executed my responsibilities to
12  chair a meeting at which that was a topic.
13       Q.      Is there such a thing as a labor compact
14  agreement that governs the use and selection of
15  contractors for New Haven school construction
16  projects?
17       A.      I do not know if this is what you're
18  referring to.  On construction of the schools, some
19  of them, not all of them, there is a project labor
20  agreement that the district executes with the
21  Connecticut building trades.
22       Q.      What is that?
23       A.      I'm not aware of it in every detail, but
24  as I best understand it, it generally requires that
25  the Connecticut building trades and contractors who

HARP VS. DeSTEFANO                                                July 21, 2005

Page 11

1    employ members of the Connecticut building trades

2    provide the construction work on the schools, and at

3    the same time the contractors and the construction

4    managers accept certain responsibilities as to

5    pricing, avoidance of work stoppage, minority,

6    female and disadvantaged business set asides,

7    apprenticeship training for New Haven residents, and

8    may include other rights and responsibilities for

9    respective parties.

10        Q.    Now, you were elected mayor in the

11   election of 1995, were you not?

12        A.    1993.

13        Q.    Yes, right.  How much, to the best of your

14   recollection, what was the total amount of money

15   that was raised for that campaign?

16        A.    I don't recall.

17        Q.    How about '95?

18        A.    I don't recall.

19        Q.    Can you give us an approximation?

20        A.    I truly don't recall.

21        Q.    How about '97?

22        A.    I don't recall.

23        Q.    '99?

24        A.    Don't recall.

25        Q.    2001?

HARP VS. DeSTEFANO

July 21, 2005

Page 21

1   been set, and I believe the school was under design.

2   There was a change made.  I forget the exact date.

3       Q.    The significance of that is there were

4   some buildings called The Three Sisters, as I

5   recall --

6                MS. KONE:  Objection.

7       Q.    -- that were spared as a result of your

8   reconfiguration; is that right?

9                MS. KONE:  Objection.  I think your

10  question is really confusing.

11               MR. WILLIAMS:  I don't think it

12  confuses the mayor.

13               MS. KONE:  I think the mayor is

14  confused in terms of his difficulty in coming up

15  with a date.  Maybe you want to ask him about the

16  change with respect to the retention of The Three

17  Sisters, and then he can do better.

18               MR. WILLIAMS:  I thought that's what

19  I just did.

20               MS. KONE:  No, but it was your first

21  question that was confusing.

22               MR. WILLIAMS:  The first question is

23  history.  I'm trying to zero in here.

24      A.    Give me your question again, please.

25      Q.    Yes.  There was a change in the

Page 20

Q.    You considered it, did you not, a significant thing that Senator Harp would support you, in opposition to her senatorial colleague, in that election?

A.    Not particularly.

Q.    She did, in fact, campaign for you, didn't she?

A.    I don't recall specifically what she did or didn't do.

Q.    Do you recall a political rally at the Harp senatorial campaign office on Whalley Avenue?

A.    It may have happened.  I don't recall.

Q.    Now, there was a change in the course of the Prince-Welch project in the configuration of the school; is that right?

MS. KONE:  Objection.  Vague.

Q.    The foot plan of the school.

MS. KONE:  At what point in time?

MR. WILLIAMS:  A point in time prior to the completion of the construction.

MS. KONE:  It hasn't been completed.

MR. WILLIAMS:  There you go.

MS. KONE:  Objection.

A.    In approximately December.  There was a smaller site adopted in 2001, after the site had

HARP VS. DeSTEFANO

July 21, 2005

1    configuration of the foot plan, if you will, of the

2    Prince-Welch building specifically to try to spare

3    these multifamily buildings commonly known as The

4    Three Sisters; is that right?

5         A.    The original plan did take three buildings

6    on Congress Avenue called Three Sisters.  The final

7    plan had those buildings be retained.

8         Q.    That decision to do a redesign in order to

9    make it possible to keep those buildings required

10   new architectural drawings; isn't that right?

11        A.    Yes.

12        Q.    Do you recall the date on which that

13   decision was made to have such a redesign?

14        A.    My impression is that in December of '02

15   there was a court case that allowed the city to

16   proceed with the project over the objections of some

17   people, and at that time we -- when I say "we," at

18   that time it was my view that The Three Sisters, I

19   believe some other properties, ought to be retained,

20   and it was my understanding, although not conclusive

21   at that time, that that might necessitate redesign.

22        Q.    That would have been, in fact, in the

23   spring of 2003; isn't that right?

24        A.    As I recall, upon decision in December of

25   '02, we not only committed to address the site

HARP VS. DeSTEFANO                                    July 21, 2005

Page 23

1    issues, but also the character of the design of the

2    building in response to other concerns that had been

3    articulated about the design that the district owned

4    at that point in time.  My sense is that in March of

5    '03, my sense is that in February of '03 we became

6    aware that the site would need to be redesigned.

7         Q.    You supported that, that decision, did you

8    not?

9         A.    Yes, the decision being a smaller site,

10   and design considerations to reflect the concerns

11   that had been articulated by various parties.

12        Q.    And with that thought in mind, Mr. Harp

13   was called upon to submit new drawings; isn't that

14   right?

15              MS. KONE:   Objection.

16        A.    My recollection is not in February of '03.

17   My recollection is that staff work was done at that

18   point to evaluate in February '03 whether we should

19   continue with the existing architect if we were

20   going to do a redesign, and my recollection is that

21   staff was assigned to study the implications on the

22   cost and building delivery impact for changing.

23        Q.    It's your recollection that that was in

24   February of '03?

25        A.    That that discussion occurred, yes.

HARP VS. DeSTEFANO                                    July 21, 2005

Page 24

1       Q.      Is there, to your knowledge, was there

2    anything in writing on that topic at that time?

3       A.      Oh, I can't speak to that.

4       Q.      Who did you talk to about it?  Strike

5    that.  You didn't say you talked about it.

6               Did you participate in any such

7    discussions?

8       A.      I recall at the time in both December of

9    '02 and February of '03 as we considered redesigning

10   the school, about whether we would retain AEIC as

11   the architect.

12      Q.      Did you participate in any such

13   discussions?

14      A.      We may have discussed it.  I don't

15   specifically recall.

16      Q.      Do you recall with whom you may have

17   discussed it?

18      A.      Not specifically.

19      Q.      Do you recall seeing in December of '02 or

20   January or February of '03 any written memoranda on

21   the subject of changing architects?

22      A.      My recollection, although I don't recall

23   the date, although it would have been proximate to

24   that time frame, is that staff had been directed to

25   prepare a sheet articulating the two criteria I

Page 25

1  previously mentioned, cost consideration and

2  building delivery date, the implications of staying

3  with AEIC and changing to a different architect.

4      Q.    Do you recall seeing such a document

5  before the first of March '03?

6      A.    As I said earlier, I don't remember the

7  date per se.  It was proximate to this time.

8      Q.    Did that document, in fact, do such

9  comparisons?

10     A.    My recollection is it addressed the

11  considerations of cost of a new architect versus

12  retaining AEIC and impact on the project scheduling,

13  building delivery.

14     Q.    Do you recall who was the author of that?

15     A.    Not specifically.

16     Q.    What was the conclusion drawn, if any, by

17  the author of that memorandum?

18     A.    I'm not aware that it drew a conclusion.

19     Q.    Was any action taken as a result of that

20  memorandum?

21     A.    At what point in time?

22     Q.    At any point in time.

23          MS. KONE:  By whom?  Objection,

24  vague.

25     Q.    Anybody.

HARP VS. DeSTEFANO                                                July 21, 2005

                                                                    Page 26

1        A.      I don't specifically recall.

2        Q.      Who was the chair of the board of

3   education at that time?

4        A.      I believe Carlos Torre.

5        Q.      Did you have at any time in March of 2003

6   any discussion with Mr. Torre about the potential

7   cost or time considerations that would have been

8   involved in changing architects?

9        A.      I don't specifically recall.  It's

10  possible.

11       Q.      It is the case, is it not, that a decision

12  was made before the middle of April of '03 to make

13  no such change?

14       A.      I believe in mid-March, later, late March,

15  a decision was made that if the existing architect

16  could perform to the design criteria that reflected

17  our concerns coming out of the litigation, and some

18  of the objections to the existing design, and could

19  meet performance and time deadlines, that we would

20  continue, continue AEIC's engagement.

21       Q.      Were you involved in that decision?

22       A.      Yes.

23       Q.      You endorsed that or you actually made

24  that decision?  It was your responsibility to make

25  it, correct?

HARP VS. DeSTEFANO

July 21, 2005

Page 27

1          MS. KONE: Objection. Compound

2     question.

3          A.    My sense of late March was that on balance

4     that was the correct thing to do in the context of

5     the considerations I just articulated.

6          Q.    Now, did there come a time after the end

7     of March when you changed your mind?

8          A.    I believe subsequent to the March meeting

9     a set of design criteria and performance standards

10    were prepared by staff. Sometime late April, early

11    May Dr. Mayo met with Wendell Harp. Subsequent to

12    that meeting, which I would guess occurred the first

13    half of May, I can't specify what date, Dr. Mayo

14    made clear to me his concerns that, whether AEIC

15    could comply with the expectations we had discussed

16    in March, and at that point I do remember a

17    conversation with Dr. Mayo, although I don't recall

18    whether it was in person or by phone, that it would

19    be in the best interests of the project to not

20    continue the relationship with AEIC.

21         Q.    When did you have that conversation with

22    Dr. Mayo?

23         A.    My recollection is sometime the first half

24    of May 2003.

25         Q.    Up until that conversation you still

HARP VS. DeSTEFANO                                              July 21, 2005

Page 28

1    supported the decision to keep Harp's organization

2    on the project, correct?

3         A.    I wish to be clear.  There have been,

4    going back for years, considerations to not continue

5    that contract, and it was an active subject of

6    discussion, as I previously responded, in December

7    and again in March in light of the conversation

8    Dr. Mayo had with Wendell in May, sometime in April,

9    May, I don't recall the specific date, that we were

10   not going to get this project done with this firm.

11        Q.    Right, but I'd like to get back to my

12   question.  My question was:  Up until you had that

13   discussion, whatever reservations you may have had,

14   you had already made a decision, you'd made a

15   decision in late March, as you told us, to stay with

16   the Harp organization, and you had not changed your

17   mind about that up to the point at which you had

18   that conversation with Dr. Mayo?

19        A.    Based on the information Dr. Mayo conveyed

20   to me and on his recommendation following that

21   discussion.

22        Q.    So that up until that point you stood by

23   your decision to stay with Harp?

24        A.    On balance, that was my decision up to

25   that point.

ARP v. DeSTEFANO                                    November 7, 2005

                                                        Page 31

1          Q.   Did that committee meet very often during

2     the spring of 2003?

3                    MS. KONE:   Objection.

4          A.   Yes, once every two weeks.

5          Q.   All right.   But the meeting where the

6     termination was decided was not one of the

7     regularly scheduled meetings; is that correct?

8          A.   No.

9          Q.   It was a special meeting?

10         A.   Yes, it was.

11         Q.   All right.   And it was called for the

12    very purpose of considering this issue; is that

13    right?

14                   MS. KONE:    Objection.

15         A.   Yes.

16         Q.   The answer is yes?

17         A.   Yes.

18         Q.   And the mayor attended that meeting; is

19    that correct?

20         A.   Yes, he did.

21         Q.   And you attended the meeting?

22         A.   Yes, I was there.

23         Q.   And Attorney Weisselberg here attended

24    the meeting?

25         A.   I think she was there, yes.

HARP VS. DeSTEFANO                                    July 21, 2005

1    change architects on either of those projects?

2         A.    I don't have a specific recollection, but

3    I'm certain I would have had a contemporaneous

4    involvement in it.

5         Q.    Do you have any recollection of the

6    process that was gone through to make the changes of

7    architects in either of those two cases?

8         A.    I have no recollection today, no.

9         Q.    Were both of those instances prior to the

10   one involving Mr. Harp?

11        A.    I believe so.

12        Q.    Did there come a time in 2003 when you

13   concluded that either Mr. Harp or Senator Harp was

14   not a political supporter of yours?

15             MS. KONE:  Objection.  Compound.

16        Q.    Start with Mr. Harp.

17        A.    2002, actually.

18        Q.    When in 2002?

19        A.    My sense was he was supporting Sally Brown

20   for town chair against Susan Voigt, who was the

21   candidate I was supporting.

22        Q.    Would that have been in the summer of '02?

23        A.    March of '02.

24        Q.    What was it that caused you to come to

25   that conclusion?

1      A.      Because he was opposing my choice.

2      Q.      It was public; is that what you're saying?

3      A.      I have a hard time defining "public."  I

4   was aware of it.

5      Q.      Did there come a point in 02 or 03 when

6   you came to the conclusion that Senator Harp was not

7   a supporter of yours?

8      A.      She was supporting Sally Brown as well, to

9   the best of my recollection.

10      Q.      Now, that was in the spring of '02, you

11   said?

12      A.      The election was in March of '02.  It may

13   have been earlier, in February, January, as the

14   canvassing evolved.

15      Q.      After the election had taken place in '02

16   was there any kind of a reconciliation politically

17   with Senator Harp?

18      A.      I don't know that, you know,

19   reconciliation would have been in order or not.  You

20   know, Senator Harp had a political relationship, but

21   we also had a business relationship to work together

22   to serve the city in our respective positions.

23      Q.      So given the responsibilities that each of

24   you had and have, you have to find ways to work

25   together, regardless of temporary situations, I take

HARP VS. DeSTEFANO                                           July 21, 2005

Page 34

1    it; is that a fair statement?

2                    MS. KONE:  Objection.

3         A.    Well, in the instance you asked, I was

4    aware that she and Wendell opposed Susan in '03, you

5    know.  We just moved on.

6         Q.    Would that be true of Wendell Harp, as

7    well as of Senator Harp?

8                    MS. KONE:  Objection.

9         Q.    That you moved on?

10        A.    You want to be more specific?

11        Q.    I think I understand what you are saying

12   when you point out that you have a state senator,

13   you have a mayor, you have to work together.

14   Wendell Harp is in a different position, so with

15   regard to Wendell Harp, following the election in

16   the spring of '02, what happened in your

17   relationship?

18        A.    Nothing, really, to my point of view.

19        Q.    Did you have the sense that he was still

20   an opponent of yours, or not?

21        A.    When you say "opponent," politically?

22        Q.    Yes.

23        A.    It's not personal.

24        Q.    Of course, I understand.

25        A.    Well, yes, because there was a primary for

HARP VS. DeSTEFANO

July 21, 2005

Page 35

```
 1   state representative which, to the best of my

 2   recollection, was in September of '02, with Johnny

 3   Martinez, Raol Avila, where I supported John

 4   Martinez, and I believe Senator Harp and Wendell

 5   supported Avila, and then there was a charter

 6   revision question in '02, November '02, where I

 7   believe I supported a charter revision question and

 8   they opposed.  So I had awareness that on a

 9   political level they through '02 were consistently

10   opposing my perspectives on those things.

11       Q.    When the issue of terminating the Harp

12   contract came up in May of '03, as you told us, was

13   there some sense of urgency about carrying out the

14   termination?

15       A.    Not about the termination per se.  A sense

16   of urgency about delivering the project.

17       Q.    When was it that you first became aware

18   that Senator Harp and Mr. Harp were supporting

19   Ms. Killins in her opposition to you?

20       A.    My sense was in 2002.

21       Q.    That they were supporting her?

22       A.    Yes.

23       Q.    When in '02 did you come to form that

24   opinion?

25       A.    In October of '02 Shari Killins was
```

HARP VS. DeSTEFANO                                    July 21, 2005

Page 36

1    terminated.  I believe it was in October '02.  I may

2    be a little off in my dates.  Shari Killins was

3    terminated by Empower New Haven.  The board had a

4    meeting before the termination was effective, again

5    in about October '02.  I went to that board meeting,

6    which was held at the Dixwell branch library, and I

7    saw Senator Harp sitting next to Shari Killins, and

8    my instinct at that point was that's where the

9    primary challenge was going to be.

10       Q.    Did you ever discuss that issue with

11   Dr. Mayo?

12       A.    I don't specifically recall doing so.  I

13   may have, I may not have.

14       Q.    Do you know the number of new schools

15   constructed since you became mayor?

16       A.    Not specifically.

17       Q.    Can you give us a ballpark?

18       A.    Completed, approximately 25.

19       Q.    Then there are significant school

20   renovations in addition to that during the same

21   period?

22       A.    I would include substantial renovations in

23   that.

24       Q.    Of the architects for those schools and

25   projects, how many have been contributors to your

```
 1              C E R T I F I C A T E

 2         I hereby certify that I am a Notary Public, in

 3   and for the State of Connecticut, duly commissioned

 4   and qualified to administer oaths.

 5         I further certify that the deponent named in

 6   the foregoing deposition was by me duly sworn and

 7   thereupon testified as appears in the foregoing

 8   deposition; that said deposition was taken by me

 9   stenographically in the presence of counsel and

10   transcribed by computer-aided transcription, and the

11   foregoing is a true and accurate transcript of the

12   testimony.

13         I further certify that I am neither of counsel

14   nor attorney to either of the parties to said suit,

15   nor of either counsel in said suit, nor am I

16   interested in the outcome of said cause.

17         WITNESS my hand and seal as Notary Public this

18   28 day of   July           , 2005.

19

20                         _____

21                         Elizabeth A. Zawacki

22                              LSR #00287

23                            Notary Public

24   My commission expires:

25   February 28, 2010
```

**EXHIBIT P**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - -x

WENDELL HARP and,                          :

ARCHITECTS ENVIRONMENTAL                   :

COLLABORATIVE INTERNATIONAL, PC,:

     Plaintiff,                            :Civil Action No.

           -v-                       :3:03CV 977(CPD)

JOHN DeSTEFANO,                            :

CITY OF NEW HAVEN and                      :

NEW HAVEN BOARD OF EDUCATION,              :

     Defendants.                           :

- - - - - - - - - - - - - - - - - - - - - - - - - -x


       Deposition of CLAUDE WATT, taken

pursuant to the Federal Rules of Civil Procedure,

at the Law Offices of John R. Williams &

Associates, 51 Elm Street, New Haven,

Connecticut, before James A. Martone, LSR

and Notary Public, in and for the State of

Connecticut, on July 19, 2005 at 9:05 a.m.

HARP v. DeSTEFANO                                July 19, 2005

Page 18

1   you had asked me two questions.  One about the

2   termination and one about rescinding a directive.

3       Q.   All right.

4       A.   And trying to -- I was trying to avoid

5   kind of mixing because there were so many things

6   going on.  But specifically, the -- we were in

7   the process of developing and preparing an

8   amendment to Mr. Harp's agreement.  That's one

9   part.  We were going to modify his agreement to

10  capture those things I described earlier, with

11  regard to the changes and change in direction of

12  the design.

13           The directive to go forward was

14  limited because we had not done the amendment

15  itself at that time.  Was to address specifically

16  some studies with consideration of some of these

17  changes that had been pointed out.  And we held

18  on to that piece of it.  And there were, as I

19  mentioned, two things that occurred.  One was to

20  hold on that piece because we were still working

21  on the amendment, we hadn't gotten it finalized,

22  and the specifics of how or why that decision was

23  made, I don't recall off the top of my head.  But

24  I did I think communicate to Mr. Harp that we

25  were not to go forward on that particular piece,

the site to get the most out of it.

Q.   Okay.  And why was it that you had put a hold on that?

A.   I was informed at the time that we weren't going to -- that it had been decided not to go forward.  I think it was a decision not to go forward at that time with Mr. Harp.

Q.   Okay.  Who gave you that information?

A.   That would have come from Sue and Tom. Again, going back to the sort of meeting, where they called me and said this is what we're going to do.

Q.   Was that the same meeting you were told that his contract was going to be terminated?

A.   That would have been the same time, yes.

MS. KONE:  Can we take a break for a moment?

MR. WILLIAMS:  Sure.

(Recess taken: 9:43-9:45 a.m.)

MS. KONE:  I think Mr. Watt wants to correct a prior answer.

Q.   Have you had a chance to have a discussion with your attorney?

A.   Yes.  Just with regard to there was --

HARP v. DeSTEFANO                                    July 19, 2005

Page 19

1    and that may have been early part of May.

2    Sometime between the 6th and 8th, something like

3    that.

4              And then subsequent to that, the

5    decision was made later into the month, sometime

6    in the month to go ahead and give him notice that

7    we weren't going to proceed with this agreement.

8        Q.   So about how much time elapsed between

9    the point at which you told Mr. Harp to hold off

10   on this change or whatever it was --

11       A.   The site studies, some of the studies.

12       Q.   -- and the time his contract was

13   terminated?

14       A.   I would say probably a week or so.

15       Q.   Now the decision to tell Mr. Harp to

16   put this particular aspect on hold, who made that

17   decision?

18       A.   Specifics of who specifically made the

19   decision, I don't know.  The decision came to me

20   through Tom and Sue.

21       Q.   Okay at a meeting in one of the

22   conference rooms again?

23       A.   At our office, yes.

24       Q.   Did they indicate to you the reason for

25   that decision?

Page 20

A.    I don't recall really getting into a
lot of dialogue at that time. I don't recall.

Q.    Okay. Were you the person who was
given the task of communicating that decision to
Mr. Harp?

A.    Actually, that, because it was a
termination of a contract, would have come from
someone else. A little more formally.

Q.    Okay.

A.    Yes.

Q.    What about the decision to put a hold
on that earlier aspect?

A.    That would have been me, because that
would have been just a basic administration
activity on my part.

Q.    Was that done in writing or by
telephone?

A.    I think it was done on telephone, by
telephone, and I can't recall if it was in
writing. I would think it may have been.

Q.    Okay. Now were you aware of any
communication from superintendent Mayo to
Mr. Harp in April of '03, requesting further
submissions from Mr. Harp of any kind concerning
this project?

## CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___21st___ day of
___July___, 20 05

_____
NOTARY PUBLIC
JAMES MARTONE

My Commission Expires:

APRIL / 2008

**EXHIBIT Q**

Rule 47.5.4 of the Federal Rules of Appellate Procedure for the 5th Circuit provides that "Unpublished opinions issued on or after January 1, 1996 are not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case (or similarly to show double jeopardy, abuse of the writ, notice, sanctionable conduct, entitlement to attorney's fees, or the like). An unpublished opinion may, however, be persuasive.  An unpublished opinion may be cited, but if cited in any document being submitted to the court, a copy of the unpublished opinion must be attached to each document.  The first page of each unpublished opinion bears the following legend:

Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4."

LEXSEE 103 FED. APPX. 823

**BARBARA BURGE, Plaintiff-Appellee, versus PEARL RIVER COUNTY, Mississippi; ET AL., Defendants, DAVID EARL JOHNSON, In his Official and Individual Capacity, Defendant-Appellant.**

**No. 03-60924 Summary Calendar**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*103 Fed. Appx. 823; 2004 U.S. App. LEXIS 14602*

**July 15, 2004, Filed**

**NOTICE:** [**1] RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of Mississippi. USDC No. 1:02-CV-668.

**DISPOSITION:** Reversed and rendered.

**JUDGES:** Before HIGGINBOTHAM, DAVIS and PRADO, Circuit Judges.

**OPINION:** [*824] PER CURIAM: *

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Defendant-appellee David Earl Johnson, Chancery Clerk for Pearl River, Mississippi, appeals from the district court's order rejecting his claim of qualified immunity as to *First Amendment* claims made by plaintiff-appellee Barbara Burge, a former deputy clerk under Johnson. Burge does not appeal from the district court's denial of her other claims.

Burge alleged in her *42 U.S.C. § 1983* complaint, inter alia, that Johnson had unconstitutionally [**2] terminated her from her job, which she worked for 11 years without disciplinary action, based on negative comments made by her husband in public about Johnson, in violation of her *First Amendments* rights of free speech and free association. Johnson and other defendants had filed a "Motion to Dismiss" that was supported by an affidavit from Johnson. Although the district court rejected Burge's request that this motion be treated as a motion for summary judgment, and the court did not encourage Burge to file her own summary-judgment evidence, the district court, in addressing the "Motion to Dismiss," considered Johnson's affidavit and a deposition of Johnson. When a court considers matters outside the pleadings, it should treat a motion to dismiss as a motion for summary judgment. [*825]  See *Burns v. Harris County Bail Bond Bd., 139 F.3d 513, 517 (5th Cir. 1998); FED. R. CIV. P. 12(b)*. In reviewing the denial of qualified immunity, this court must treat the motion to dismiss as a motion for summary judgment under *FED. R. CIV. P.*

*56.* See *Bolen v. Dengel, 340 F.3d 300, 312 (5th Cir. 2003),* [**3] cert. denied, *158 L. Ed. 2d 399, 124 S. Ct. 1714 (2004).* Burge has not explicitly challenged the district court's consideration of materials outside the pleadings, and she agrees in large part with the factual assertions Johnson has made in those pleadings.

Although an appellate court ordinarily does not have jurisdiction to review a denial of summary judgment, see *Palmer v. Johnson, 193 F.3d 346, 350-51 (5th Cir. 1999),* the court retains jurisdiction to determine as a matter of law whether a defendant is entitled to qualified immunity, after accepting all of the plaintiff's factual allegations as true, by determining whether these facts show that the defendant's conduct was objectively reasonable under clearly established law. *Behrens v. Pelletier, 516 U.S. 299, 313, 133 L. Ed. 2d 773, 116 S. Ct. 834 (1996); Colston v. Barnhart, 130 F.3d 96, 98-99 (5th Cir. 1997),* reh'g denied, *146 F.3d 282 (5th Cir. 1998).* Although the district court concluded that "specific factual issues" remained and denied Johnson's qualified-immunity assertion on this basis, a review of the pleadings and the record reflects that the district court based its qualified-immunity [**4] ruling on a set of factual allegations with which Burge essentially agrees. In such circumstances, this court has jurisdiction to review the denial of qualified immunity. See *Behrens, 516 U.S. at 312; Colston, 146 F.3d at 284.*

This court reviews de novo the grant of a motion for summary judgment predicated on qualified immunity. *Cousin v. Small, 325 F.3d 627, 637 (5th Cir.),* cert. denied, *540 U.S 826, 157 L. Ed. 2d 48, 124 S. Ct. 181 (2003).* Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *FED. R. CIV. P. 56(c).* Government officials performing discretionary functions are protected from civil liability under the doctrine of qualified immunity if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).* [**5]

Federal courts review claims of qualified immunity under a two-step analysis. See *Saucier v. Katz, 533 U.S. 194, 201, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001).* First, a court asks whether, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?" *Id.* "If the allegations do not establish the violation of a constitutional right, the officer is entitled to qualified immunity. . . . If the allegations make out a constitutional violation, we must ask whether the right

was clearly established --that is, whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" n1 *Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001)* (quoting *Saucier, 533 U.S. at* [*826] *201); Wilson v. Layne, 526 U.S. 603, 614, 143 L. Ed. 2d 818, 119 S. Ct. 1692 (1999)* ("whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it [**6] was taken" (internal quotation marks and citations omitted)).

> n1 Officials "can still be on notice that their conduct violates clearly established law even in novel circumstances." *Hope v. Pelzer, 536 U.S. 730, 741, 153 L. Ed. 2d 666, 122 S. Ct. 2508 (2002).* "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.*

Johnson argues that the district court erred in denying his qualified-immunity defense with respect to Burge's claim that Johnson's termination of her violated her *First Amendment* right to free speech. The parties essentially agree that Burge complained about her job to her husband in the privacy of their home and that the husband then made negative comments, while in a local coffee shop, about Johnson's prospects of being re-elected; a friend of Johnson's reported the husband's comments back to Johnson, who then confronted Burge. A public employer "may [**7] not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson, 483 U.S. 378, 383, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987).* Determining whether the employer has properly terminated the employee for engaging in protected speech requires "'a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id. at 384* (quoting *Pickering v. Board of Educ. of Tp. High Sch. Dist., 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968)).* Under *Pickering,* such a claim requires the employee to establish four elements: (1) an adverse employment decision; (2) speech by the plaintiff that involves a matter of "public concern"; (3) that the plaintiff's interest in commenting on such matters outweigh the defendants' interests in promoting efficiency; and (4) that the plaintiff's speech motivated the adverse action.

103 Fed. Appx. 823, *; 2004 U.S. App. LEXIS 14602, **

*Teague v. City of Flower Mound, Tex., 179 F.3d 377, 379 (5th Cir. 1999).*

"Matters [**8] of public concern are those which can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Branton v. City of Dallas, 272 F.3d 730, 739 (5th Cir. 2001)* (quoting *Connick v. Myers, 461 U.S. 138, 146, 75 L. Ed. 2d 708, 103 S. Ct. 1684*). "Speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern." Id. Such matters do not involve public concern simply "by virtue of a manager's status as an arm of government." *Id. at 740*. Burge has not explicitly asserted that her own speech involved anything more than complaints about her job and working conditions, which are not matters of "public concern." Burge cannot establish a viable *First Amendment* claim with respect to her own speech.

Burge has emphasized that her *husband's* speech involved matters of "public concern" because it involved political speech regarding a public election. See *Wiggins v. Lowndes County, Miss., 363 F.3d 387, 390 (5th Cir. 2004)*. Burge, however, has not addressed whether she has standing to bring such a claim on behalf of her husband. See *Powers v. Ohio, 499 U.S. 400, 410, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1998)* [**9] (litigant ordinarily must assert her own legal rights rather than those of a third party). Although "third party standing" exists in certain circumstances, see *Campbell v. Louisiana, 523 U.S. 392, 397, 140 L. Ed. 2d 551, 118 S. Ct. 1419 (1998)*, the district court cited no decisional authority, and we are aware of none, to suggest that [*827] a right to raise a *First Amendment* claim based on a third party's "public concern" speech was "clearly established" for qualified-immunity purposes. See *Price, 256 F.3d at 369*. Accordingly, the district court erred in denying Johnson's "Motion to Dismiss" Burge's *First Amendment* free-speech claim on qualified-immunity grounds.

The other qualified-immunity contention rejected by the district court concerned Burge's claim that Johnson's termination of her violated her *First Amendment* to freely associate in her marriage. The *First Amendment* protection of freedom of association applies to the States through the *Fourteenth Amendment*. n2 *Elfbrandt v. Russell, 384 U.S. 11, 18, 16 L. Ed. 2d 321, 86 S. Ct. 1238 (1966)*. When, as here, "a plaintiff's claims arise under both freedom of speech and freedom of association, . . . the freedom of association [**10] claims are analyzed under the same Pickering balancing test used to determine the success of the freedom of speech claims." *Anderson v. Pasadena Indep. Sch. Dist., 184 F.3d 439, 444 (5th Cir. 1999)* (citing *O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 135 L. Ed. 2d 874, 116 S. Ct. 2353 (1996)*). A claim predicated on the right to free association, however, "'is not subject to the threshold

public concern requirement.'" *Breaux v. City of Garland, 205 F.3d 150, 157 n.12 (5th Cir. 2000)* (quoting *Boddie v. Columbus, 989 F.2d 745, 747 (5th Cir. 1993)*).

n2 In *Roberts v. United States Jaycees, 468 U.S. 609, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984)*, the Supreme Court observed that the "freedom of association" takes on two forms. First, the Court identified "a right to associate for the purpose of engaging in those activities protected by the *First Amendment*--speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id. at 618*. Second, there is a certain right of "intimate association," based on the reasoning that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id. at 617-18*. Marriage falls into the second group.

The Supreme Court has also observed "that the right to marry is part of the fundamental 'right of privacy' implicit in the *Fourteenth Amendment's Due Process Clause*." See *Zablocki v. Redhail, 434 U.S. 374, 384, 54 L. Ed. 2d 618, 98 S. Ct. 673 (1977)*. Burge has not specifically asserted such a claim.

[**11]

The factual allegations underlying Burge's freedom-of-association claim are essentially no different from those underlying her free-speech claim. The claim is based in no way on who Burge's husband is or on his status, but, as with her free-speech claim, is based on what he said. Cf. *Sowards v. Loudon County, Tenn., 203 F.3d 426, 430, 434 (6th Cir. 2000)* (plaintiff was jailer whose husband ran for the office of sheriff against the incumbent sheriff who had been plaintiff's employer and who fired plaintiff). Even if it is arguable whether Burge stated a viable freedom-of-association claim under the *First Amendment*, the district court cited no decisional authority, and we are aware of none, which suggested that Johnson violated a "clearly established" right of Burge to freely associate with her husband. The district court thus erred in denying Johnson's qualified-immunity defense with respect to this claim as well.

For reasons discussed above, we REVERSE the district court's determinations in regard to defendant-appellant Johnson, and RENDER judgment in Johnson's favor on plaintiff-appellee Burge's claims against him.