UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WENDELL HARP and ARCHITECTS ENVIRONMENTAL COLLABORATIVE INTERNATIONAL, P.C., | : : : : | |
| Plaintiffs, | : : | Civil Action No. 3:03 CV 977 (CFD) |
| v. | : : | |
| JOHN DESTEFANO, CITY OF NEW HAVEN, and NEW HAVEN BOARD OF EDUCATION, | : : : : : | |
| Defendants. | : | |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Wendell Harp and Architects Environmental Collaborative International, P.C. ("AECI") brought this action against John DeStefano, the Mayor of the City of New Haven ("DeStefano" or the "Mayor"), the City of New Haven (the "City") and the New Haven Board of Education ("Board of Education" or "Board"), under 18 U.S.C. § 1983.  The plaintiffs claim that the defendants violated their First Amendment rights by terminating a contract between the City and AECI to retaliate against the plaintiffs for supporting DeStefano's political opponent, Sherri Killins ("Killins"), in the City's 2003 mayoral primary election.  The defendants moved for summary judgment.  For the reasons that follow, the defendants' motion is granted.

**I.      Background**[1]

Wendell Harp ("Harp") is an architect and the sole owner of AECI, an architectural

---

[1] The facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties.  They are undisputed unless otherwise indicated.

services firm in New Haven, Connecticut. Harp's wife, Toni Harp, is a state senator representing New Haven in the Connecticut legislature. Aside from the family income AECI generates, Toni Harp is not connected to or involved with AECI's business. Harp has actively participated in New Haven politics since 1989 by supporting candidates for aldermen, state representatives and senators, the Democratic Town Committee, and Mayor of New Haven. Among other supportive efforts, Harp has raised money, made phone calls, attended meetings, and appeared at the polls for these candidates. Harp supported candidates running against DeStefano on several occasions, including his opponents for the Democratic mayoral nomination in 1989 and 1993. Destefano won the 1993 election and took office as New Haven's Mayor in January 1994. Later that year, Harp received a multimillion dollar contract from the City to redesign the Hill Career School.

On February 10, 1997, AECI and the New Haven School District ("School District") entered into a contract for the design of a second school, the new Prince Welch School. Harp and AECI worked on the project for six years until the Board of Education terminated AECI's contract on May 27, 2003. That contract's termination is the basis for this lawsuit.

From the outset, in 1997, progress on the school's design moved slowly. At first, this was partly because of a directive from Claude Watt, the Board's project manager,[2] in August of 1999 that required AECI to redesign the school to accommodate pre-kindergarten through eighth grade students, rather than pre-kindergarten through fifth grade students as was originally planned. The New Haven School District entered into a superseding contract with AECI for the school's design on March 27, 2000 that permitted the School District to terminate the contract at

---

[2]Gilbrane Building Company was hired as the program manager for the Board's School Construction Program, and Watt was its representative.

any time upon providing notice to AECI.

      By August of 2000, Watt started to express concerns to Harp that AECI was not handling the project properly, both in its choice of a modern design and its staffing decisions for the project and because of its poor relationship with the School Based Building Advisory Committee ("SBBAC"), a committee of principals, teachers, parents, and the Alderman for the ward in which the school was to be located. Throughout the fall of 2000, SBBAC, the New Haven Historic District Commission, and the City Plan Department expressed concerns that AECI's modern design for the school was not in harmony with the surrounding neighborhood. Two meetings between SBBAC and Harp to review AECI's design plans were cancelled in September of 2000 because Harp arrived late or missed the meeting. In late October 2000, Watt provided AECI with a written assessment of AECI's design plans that criticized the plans as inconsistent with the Board's wishes. After AECI made minor changes to the plans, SBBAC scheduled a third meeting on November 21, 2000 to discuss the design plans, but Harp did not attend. Watt gave AECI a supplemental critique of the plans on November 30, 2000 that included SBBAC's comments from the recent meeting. After Watt met with Harp on December 3, 2000 to discuss the November 30 critique, Watt wrote a memo to the Board's Chief Operating Officer stating that "the quality of services received to date is not commensurate with payments," "the quality of services has been more reactive than proactive," and "[t]he actual conditions reflect a foot dragging reluctance on the part of the design team, where it appears that the needs of the client have become secondary to the designer's vision."

      Following the December 3, 2000 meeting, the relationship between Harp and Watt became increasingly contentious, and progress on the school's design remained slow. In early

2001 Harp complained to Dr. Reginald Mayo, the Superintendent of New Haven Schools, that Watt lacked creative vision and asked that Mayo remove Watt from the project. Mayo denied the request. Throughout 2001 and 2002, the problems between Harp and Watt escalated, as did the community outcry over AECI's proposed design. Watt criticized AECI's work on numerous occasions through written comments to AECI, Paul Guidone, the Board's Chief Operating Officer, and Tom Roger, Watt's direct supervisor. Watt complained about AECI's slow progress with the work, AECI's proposed modern design, the quality of AECI's services, and that AECI was ignoring its contractual obligation to use input from the Board and the public to create the school's design.

In early 2002 AECI submitted Design Development Documents that Watt, the construction company, and the building company's estimator found inadequate. AECI submitted revised design documents in May 2002 which still proposed a modern design for the school. Following AECI's submission, on May 20, 2002, Roger wrote a memo to Guidone advising him that a redesign of the school could be necessary because, in addition to significant problems with AECI's design, there was a chance that a parcel of land the Board expected to purchase and use for the school would no longer be available. Roger further recommended that AECI's involvement in any redesign be limited because of its past poor performance on the project. Harp again asked Mayo to remove Watt from the project on May 29, 2002.

Due to a lawsuit filed by neighborhood residents to enjoin the condemnation of their properties, progress on the school stopped from June through late December 2002, when the City prevailed in the suit. In late 2002 and early 2003, however, Watt, Roger, and Susan Weisselberg, the Program Coordinator for the City's School Construction Project, advocated terminating

4

AECI's contract and hiring a new architect. Mayo, however, advocated keeping Harp and AECI on the job, and in late March he convinced DeStefano and members of the Board to give Harp and AECI a new contract for work on the school, on the condition that AECI would agree to design changes, the Board's time-line for the project, and other criteria. It was further agreed that Mayo would negotiate the new contract with Harp. Mayo sent Harp a new draft architectural contract on April 24, 2003 that was intended to supersede the 2000 contract, but it was never signed and approved by the Board. Harp was instructed on May 1, 2003 that no additional work was to be performed on the project until further notice.

Shortly thereafter, at Mayo's direction, Watt drafted supplemental conditions to the new architectural contract that included new deadlines for AECI and specifically required a traditionally designed school. Harp and Mayo met to discuss the supplemental conditions on May 13, 2003. Harp sharply criticized them and Watt, but he reluctantly agreed to try again to work out his differences with Watt. Mayo discussed this meeting with DeStefano several days later. Mayo told DeStefano that he did not think Harp and Watt could work together, that he was concerned about AECI's future compliance with the new design criteria, and that he thought AECI's contract should be terminated. On May 16, 2003, DeStefano contacted a different contractor to discuss taking over the Prince Welch design work and creating a design based upon the supplemental conditions.

On May 23, 2003, the Board's Administration and Finance Committee convened a special meeting to consider the termination of AECI's contract, the hiring of a different contractor to replace AECI, and another unrelated contract. DeStefano, Mayo, and Watt also attended the meeting. The Committee, whose members were familiar with the history of the

Prince Welch School project, discussed whether AECI would be able to complete the project within the Committee's preferred deadlines and design parameters. The Committee decided to recommend the termination of AECI's contract to the full Board of Education. At the Board's regular meeting four days later, it unanimously voted to terminate AECI's contract and to hire an alternative firm to complete the project.

Harp alleges that DeStefano orchestrated the Board's termination of AECI's contract to retaliate against him for supporting Killins's candidacy against DeStefano. On May 14, 2003, the day after Mayo and Harp met to discuss Watt's supplemental design requirements, but before Mayo recommended to DeStefano that AECI's contract should be terminated, the New Haven Register published an article that announced Killins would run against DeStefano for the Democratic mayoral nomination, and that Toni Harp supported her candidacy. Although the article did not explicitly announce that Harp supported Killins, it described Harp as a "political lightning rod" and mentioned that he had "quietly backed candidates against DeStefano in the past." It also stated that Killins's campaign headquarters would be located in a building owned by Harp. Wendell Harp claims that the termination of AECI's contract two weeks after the publication of this article constituted retaliation by DeStefano and the Board for his support of Killins.

The Board denies any improper motive for the contract's termination, as does the City and DeStefano. Each Board member, with the exception of DeStefano, submitted a declaration explaining that he or she voted to terminate AECI's contract because of the significant project delays, dissatisfaction with AECI's performance on the project, AECI's reluctance to comply with the School Construction Program's design requirements, and because he or she found Harp

more difficult to work with than other architects.³  One Board member also emphasized that the Board wanted to reach a decision quickly to increase the likelihood that the school would be ready for use in the 2006-2007 academic year.  The Board members further stated that they either did not know that the Harps supported Killins' candidacy against DeStefano or that this knowledge in no way affected their decision to terminate AECI's contract.

## II.     Legal Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000).   The burden of showing that no genuine factual dispute exists rests upon the moving party.  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton, 202 F.3d at 134.

---

³DeStefano was deposed by the plaintiffs' attorneys; at his deposition he gave the same reasons for supporting the termination of AECI's contract identified by the Board members in their declarations.

"When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

### III.   Discussion

#### A.   Standing

The defendants argue that summary judgment should be granted because neither Harp nor AECI have standing to bring this action. Although the Court agrees that Harp lacks standing, the Court finds that AECI may bring the case under the doctrine of third party standing.

##### 1.   Harp

An individual shareholder does not have standing to litigate a corporation's rights. Domino's Pizza, Inc. v McDonald, 546 U.S. 470, 478 (2006) ("[I]t is fundamental corporation and agency law . . . that the shareholder . . . has no rights and is exposed to no liability under the corporation's contracts.");[4] Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir. 1986) (upholding grant of summary judgment to defendants on the ground that shareholders lacked standing to bring the suit because "[t]he legal injury, if any, was to the firm" rather than the shareholders); Potthoff v. Morin, 245 F.3d 710, 717 (8th Cir. 2001) ("Actions to enforce corporate rights or redress injuries to the corporation cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock.") (citation and quotation marks omitted).

---

[4]Although the Court notes that Domino's Pizza concerned a sole shareholder's allegations under 42 U.S.C. § 1981, which prohibits racially discriminatory contracts, the principles of agency and corporation law applied by the Court to assess the plaintiff-shareholder's standing to bring the suit are equally applicable here.

This rule applies even where the individual is the sole shareholder of a corporation. Domino's Pizza, 546 U.S. at 478 ("The corporate form and the rules of agency protected [the corporation's sole shareholder's] personal assets even though he "negotiated, signed, performed, and sought to enforce contracts for [the corporation]. The corporate form and the rules of agency similarly deny him rights under those contracts."); Jones v. Niagara Frontier Transp. Auth., 836 F.2d 731, 736 (2d Cir. 1987) ("A shareholder-even the sole shareholder-does not have standing to assert claims alleging wrongs to the corporation"); Potthoff, 245 F.3d at 717 ("When [the plaintiff] incorporated ComReal, he relinquished the right to seek direct legal redress . . . for injuries suffered by him as ComReal's sole shareholder and principal employee."). Unless the complaint alleges injuries to the shareholder separate from those alleged to the corporation, the individual shareholder has no standing to bring claims alleging injuries to the corporation. Rand, 794 F.2d at 849 ("'[D]imunition in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right.'" (quoting Warren v. Mfrs. Nat'l Bank of Detroit, 759 F.2d 542, 544 (6th Cir.1985))); Potthoff, 245 F.3d at 717 ("[The plaintiff's] . . . claim can survive only if he has alleged that he personally has suffered a direct, non-derivative injury."); Wantanabe Realty Corp. v. City of New York, 315 F. Supp. 2d 375, 400 (S.D.N.Y. 2003) ("[E]ven a shareholder of record cannot recover damages for diminution in the value of the shares in consequence of an injury to the corporation."); Marty's Adult World of New Britain, Inc. v. Guida, 453 F. Supp. 810, 814 (D. Conn. 1978); see Caravella v. City of New York, 79 Fed. Appx. 452, 453 (2d Cir. 2003) (holding that the "[p]laintiff has no individual standing to bring a civil rights action" because "[t]he injuries to plaintiff as alleged were indirectly caused by harm to [the corporation] and therefore are not "distinct" from those of the corporation").

Here, the complaint alleges that the Board terminated AECI's contract to retaliate against Harp for supporting Killins's candidacy. Although Harp is one of the plaintiffs here, and the complaint alleges retaliation against him for exercising his First Amendment rights, the only *harm* alleged in the complaint is to AECI, through the termination of its contract. Harp, then, does not seek to bring this suit to redress harm to himself. As the complaint is drafted, any alleged harm to Harp—such as lost income—is purely derivative from the injury to AECI due to his status as AECI's sole shareholder. See Domino's Pizza, 546 U.S. at 478. Accordingly, Harp lacks standing to bring this action.

### 2.     AECI

"A party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)). Resting on the assumption "that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation," id., this rule prevents courts from unnecessarily interfering where "'other governmental institutions may be more competent to address the questions and . . . judicial intervention may be unnecessary to protect individual rights.'" Id. (quoting Warth, 422 U.S. at 500); Secretary of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 955 (1984) ("The reason for this rule is twofold. The limitation frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy, and it assures the court that the issues before it will be concrete and sharply presented.") (citations and quotation marks omitted). A third party may assert another's rights

only in limited circumstances, upon a showing of three factors: (1) the third party suffered an injury in fact, (2) "the party asserting the right has a 'close' relationship with the person who possesses the right," and (3) "there is a 'hindrance to the possessor's ability to protect his own interests." Kowalski, 543 U.S. at 129-130 (citing Powers v. Ohio, 499 U.S. 400, 411 (1991)); Camacho v. Brandon, 317 F.3d 153, 159 (2d Cir. 2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) some hindrance to the third party's ability to protect his or her own interests.") (quotation marks omitted). Although the Supreme Court "has been quite forgiving with these criteria in certain circumstances" including suits seeking to vindicate individuals' First Amendment rights, the Court generally "[has] not looked favorably upon third-party standing." Kowalski, 543 U.S. at 129-130.

Applying this three factor test here, the Court concludes AECI has third party standing to assert Harp's retaliation claim. First, it is undisputed that the defendants' alleged retaliation—the termination of AECI's contract—injured AECI. Second, as Harp is AECI's president and sole shareholder, and Harp derives a substantial portion of his income from his position at AECI, AECI has a sufficiently close relationship with Harp to assert his rights. Cf. Kowalski, 543 U.S. at 130 (noting third party standing is permitted "when enforcement of [a] challenged regulation against the litigant would result indirectly in the violation of the third party's rights") (emphasis omitted); compare Juvenile Matters Trial Lawyers Ass'n v. Judicial Dep't, 363 F. Supp. 2d 239, 249 (D. Conn. 2005) (denying third party standing where class of individuals for whom third party would bring the suit was hypothetical and ill-defined). Finally, shareholder standing rules,

discussed above, prevent Harp from vindicating his own rights; if AECI could not bring this suit, a violation of Harp's First Amendment rights could not be redressed.  See Kowalski, 543 U.S. at 130 (holding third party standing is permitted where, among other factors, "there is a 'hindrance to the possessor's ability to protect his own interests'").  To ensure that Harp's First Amendment rights may be vindicated, and to avoid creating an incentive for indirect retaliation against political speech, the Court concludes that AECI has third party standing to assert Harp's First Amendment rights.[5]

### B.    First Amendment Retaliation

Alternatively, the defendants argue that summary judgment is appropriate because AECI failed to raise a genuine issue of material fact as to whether Harp was retaliated against in violation of his First Amendment rights for publicly supporting Killins's candidacy.  The Court agrees, and grants summary judgment on this basis.

#### 1.    Retaliation by the Board and the City

The claim against the Board and the City fails for lack of a causal connection between the Board's vote to terminate AECI's contract and Harp's support for Killins.  "To survive a motion

---

[5]The Court disagrees with the defendants' characterization of the rights asserted by the complaint.  The defendants argue that AECI does not seek to assert Harp's First Amendment rights because the May 14, 2003 New Haven Register article did not constitute a public announcement of Harp's support for Killins.  Although it is true that the article did not directly quote Harp as supporting Killins, the article implied this fact by reporting that Toni Harp's support for Killins could be "a reflection of political ambitions shared by [Toni] Harp and her husband . . . who has quietly backed candidates against DeStefano in the past."  The article also reported that Killins's campaign headquarters would be located in a building owned by Harp.  These portions of the article form a sufficient basis to assert a retaliation claim based upon Harp's perceived political associations.  See Cotarelo v. Village of Sleepy Hollow Police Dep't, 460 F.3d 247, 253 (2d Cir. 2006) ("Political party affiliation is protected by the First Amendment.").

for summary judgment on a First Amendment retaliation claim, the plaintiff must present evidence which shows . . . 'that there was a causal connection between the protected speech and the adverse employment action.'" Cotarelo v. Village of Sleepy Hollow Police Dep't, 460 F.3d 247, 251 (2d Cir. 2006) (quoting Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000)). Additionally, "'the causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" Id. (quoting Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir. 1994)); Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). "[T]he defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of the protected conduct." Cotarelo, 460 F.3d at 251-52 (citation and quotation marks omitted); Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004); see also Vezzetti v. Pellegrini, 22 F.3d 483, 488 (2d Cir. 1994) ("Unless there is evidence of political retribution, . . . there is no case for the jury. Even where such evidence exists, and is credited, there is no claim if the job would have been eliminated in any event to cut the budget . . . regardless of any incidental satisfaction the unemployment of an adversary may afford those in power."). To establish this causal connection where a plaintiff alleges retaliation through the act of a voting body, the plaintiff must show that a majority of its members based their decisions on impermissible grounds. Coogan v. Smyers, 134 F.3d 479, 485 (2d Cir. 1998) ("[E]ven if some [voting members] based their decision solely on impermissible grounds, a finding that a majority of [them] acted adversely to the plaintiff on legitimate grounds is sufficient for all to escape liability."); Jeffries v. Harleston, 52 F.3d 9, 14 (2d Cir. 1995).

A plaintiff may use circumstantial evidence to establish the necessary causal connection

between the plaintiff's protected speech and his employer's action, such as "by showing that the protected activity was followed by adverse treatment." Morris, 196 F.3d at 110. Temporality alone, however, may not be sufficient to show retaliation by an employer; "[t]he operative issue is not simply the length of time between the protected activity and the alleged retaliation, but the demonstrated nexus between the two." Oliphant v. Connecticut Dep't of Transp., No. 02cv700, 2006 WL 3020890, at * 10 (D. Conn. Oct. 23, 2006).

Here, the plaintiffs allege that the Board voted to terminate AECI's contract to retaliate against Harp for publicly supporting Killins against DeStefano. The plaintiffs presented no evidence that the Board would not have terminated AECI's contract absent Harp's protected conduct. Rather, their sole evidence to support their allegation is the short period of time between the May 14, 2003 New Haven Register article indicating that Harp would support Killins and the termination of AECI's contract two weeks later on May 27, 2003. In light of the other available evidence, this is insufficient to raise a material issue of fact as to whether the Board's vote was retaliatory. At the time of the termination, Harp had balked at Watt's most recent set of design specifications, and Mayo had finally concluded that Harp and Watt could not work together on the project. The Board members' declarations provide undisputed evidence[6] that more than a majority of its members voted to terminate AECI's contract for non-retaliatory reasons concerning the school's design, the timely completion of the project, and ongoing difficulties in working with Harp. The undisputed facts in the record that document a troubled relationship between Harp and nearly everyone else affiliated with or interested in the Prince

---

[6] The Court notes that the plaintiffs chose not to depose any of the Board members other than DeStefano.

Welch School project—including Watt, the Board's project manager, SBBAC, and the surrounding community, among others—further support these Board members' explanations for voting to terminate AECI's contract. Absent any evidence that indicates a majority of Board members voted to terminate the contract to retaliate against Harp, the plaintiffs' claim against the Board and the City[7] cannot survive summary judgment.

### 2.     Retaliation by DeStefano[8]

The plaintiffs' claim against DeStefano fails because the Board's vote broke the causal chain between any illegitimate motive DeStefano may have had against the plaintiffs and the decision to terminate AECI's contract. See Jeffries, 52 F.3d at 14. As discussed above, the plaintiffs bear the burden of showing a causal connection between the defendants' actions and the termination of AECI's contract. See Cotarelo, 460 F.3d at 252. The plaintiffs presented no evidence of any such nexus with regard to DeStefano. Even assuming, *arguendo*, that DeStefano sought the termination of AECI's contract to retaliate against Harp, the Board's vote to terminate the contract for non-retaliatory reasons constitutes a superseding cause for the contract's termination that precludes holding DeStefano liable. Jeffries, 52 F.3d at 14. Although the Board's vote would not cut off DeStefano's liability if there were evidence suggesting his illegitimate motives tainted the Board's vote, the plaintiffs presented no such evidence; to the

---

[7]Under Connecticut law, the Board acts as the City's agent with respect to its delegated functions, including the construction of schools. Bd. of Educ. of the City of New Haven v. City of New Haven, 237 Conn. 169, 181 (1996). Accordingly, since the Board did not retaliate against the plaintiffs, the City is also absolved of liability.

[8]Since the Court concludes that Harp failed to establish causation between DeStefano's actions and the Board's vote to terminate AECI's contract, the Court does not address his qualified immunity defense.

contrary, the Board members' declarations provide ample evidence that the Board was long familiar with the on-going problems plaguing the Prince Welch School project. Cf. Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 126 (2d Cir. 2004) (holding that the Board of Education's vote to terminate the plaintiff did not absolve the plaintiff's supervisors of liability as an intervening cause because the Board's vote was based upon the plaintiff's supervisors' negative recommendations and the Board failed to conduct its own independent investigation of the plaintiff's case).

      Finally, the Court notes that the plaintiffs presented no evidence that DeStefano sought to terminate AECI's contract because of Harp's support for Killins. It is undisputed that DeStefano knew of Harp's political opposition to him long before the May 14, 2003 New Haven Register article. Harp had publicly supported DeStefano's political opponents on several prior occasions. At the same time, AECI had been awarded two multi-million school design contracts during DeStefano's tenure as mayor—the Hill Career School and the Prince Welch School. Also, DeStefano knew Harp supported Killins in April 2003, at which time DeStefano maintained his support for renegotiating AECI's contract. Where a defendant knows of a plaintiff's affiliation with a group long before the defendant's alleged retaliatory action, such affiliation does not provide significant evidence of retaliation. Cobb, 363 F.3d at 109 (holding that the defendants' longstanding knowledge of plaintiffs' membership in benevolent association rendered later retaliation on that basis "highly implausible"); Melzer v. Bd. of Educ., 336 F.3d 185, 199 (2d Cir. 2003) (noting that the defendant's longstanding knowledge of plaintiff's membership in North American Man/Boy Love Association made dismissal years later on that basis "highly implausible"). In light of Harp's prior public support for several of DeStefano's political

16

opponents, the inference of such a retaliatory motive by DeStefano is especially weak. As the plaintiffs have raised no genuine material issue of fact as to the nexus between DeStefano and the termination of AECI's contract, summary judgment is granted to DeStefano.

### IV.     Conclusion

For the reasons given above, the defendants' motion for summary judgment [docket # 49] is granted. The clerk is directed to close this case.

SO ORDERED this  27th  day of September 2007 at Hartford, Connecticut.


                                           /s/ Christopher F. Droney
                                          **CHRISTOPHER F. DRONEY**
                                          **UNITED STATES DISTRICT JUDGE**